**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | | |
|---|---|---|
| FUZHOU HENGLI PAPER CO., LTD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | Proprietary Information Removed |
| UNITED STATES, | ) | from Pages 37 and 41 |
| | ) | |
| Defendant, | ) | Court No. 25-00064 |
| | ) | |
| AMERICAN PAPER PLATE COALITION, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**PLAINTIFF FUZHOU HENGLI PAPER CO., LTD.'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Fuzhou Hengli Paper Co., Ltd.

("Fuzhou Hengli" or "Plaintiff") hereby moves for judgment upon the agency record in this

action.  Plaintiff challenges the final determination issued by the U.S. Department of Commerce

("Commerce") in *Certain Paper Plates From the People's Republic of China: Final Affirmative*

*Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical*

*Circumstances, in Part*, 90 Fed. Reg. 8,271 (Dep't Commerce Jan. 28, 2025) ("*Final*

*Determination*") in the following respects: (i) Commerce's determination not to accept Fuzhou

Hengli's reporting of FOPs; (ii) Commerce's application of adverse facts available with respect

to Fuzhou Hengli's reporting of FOPs; (iii) Commerce's determination to reject, and find moot,

Fuzhou Hengli's proposed surrogate value for its paperboard input; and (iv) Commerce's finding

that critical circumstances exist with respect to Fuzhou Hengli.  The legal and factual grounds for

Plaintiff's motion are set forth in the brief accompanying this motion.  A proposed order is attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion, and (i) hold that Commerce's determination not to accept Fuzhou Hengli's FOP reporting is not supported by substantial evidence and not in accordance with law; (ii) hold that Commerce's adverse facts available application based on Fuzhou Hengli's FOP reporting is not supported by substantial evidence and not in accordance with law; (iii) hold that Commerce's determination to reject, and find moot, Fuzhou Hengli's surrogate value arguments for paperboard input is not supported by substantial evidence and not in accordance with law; (iv) hold that Commerce's finding that critical circumstances exist for Fuzhou Hengli is not supported by substantial evidence and not in accordance with law; (v) remand the case to Commerce with instructions to correct the errors identified by the Court; and (vi) grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Gene Degnan
Gene Degnan
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Jordan L. Fleischer
Edward J. Thomas III
Nicholas C. Duffey
Jenny (Shiyu) Liang

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Ave, N.W.
Suite 800
Washington, D.C. 20036
(202) 216-4107

*Counsel to Plaintiff Fuzhou Hengli Paper Co., Ltd.*

August 1, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | | |
|---|---|---|
| FUZHOU HENGLI PAPER CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 25-00064 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| AMERICAN PAPER PLATE COALITION, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## ORDER

Upon consideration of Plaintiff Fuzhou Hengli Paper Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record, and all other pertinent papers, it is hereby:

**ORDERED** that Plaintiff's Motion is granted; and it is further

**ORDERED** that the decision of the U.S. Department of Commerce ("Commerce") in *Certain Paper Plates From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 8,271 (Dep't Commerce Jan. 28, 2025) ("*Final Determination*") is not supported by substantial evidence and is otherwise not in accordance with law; and it is further;

**ORDERED** that the *Final Determination* is hereby remanded to Commerce for reconsideration in accordance with the Court's opinion on this matter.

**SO ORDERED.**

_____
Honorable Jennifer Choe-Groves, Judge

Dated: _____, 2025
     New York, NY

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| FUZHOU HENGLI PAPER CO., LTD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **NON-CONFIDENTIAL** |
| ) | Proprietary Information Removed |
| UNITED STATES, ) | from Pages 37 and 41 |
| ) | |
| Defendant, ) | Court No. 25-00064 |
| ) | |
| AMERICAN PAPER PLATE COALITION, ) | |
| ) | |
| Defendant-Intervenors. ) | |

**PLAINTIFF FUZHOU HENGLI'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Edward J. Thomas III
Nicholas C. Duffey
Jenny (Shiyu) Liang

**MORRIS, MANNING & MARTIN, LLP**
1333 NEW HAMPSHIRE AVE, N.W.
SUITE 800
WASHINGTON, D.C. 20036
(202) 216-4107

August 1, 2025

*Counsel to Plaintiff Fuzhou Hengli Paper Co., Ltd*

# **TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO RULE 56.2 ................................................................ 1

II.   ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
ADMINISTRATIVE DETERMINATION ............................................................ 2

    A.   Whether Commerce's determination not to accept Fuzhou Hengli's reporting
methodology for its material FOPs is supported by substantial evidence or
otherwise not in accordance with the law. ............................................................ 2

    B.   Whether Commerce's determination to apply adverse facts available to Fuzhou
Hengli is supported by substantial evidence or otherwise in accordance with the
law. ....................................................................................................................... 2

    C.   Whether Commerce's determination to reject, and find moot, Fuzhou Hengli's
arguments regarding the surrogate value for its paperboard inputs is supported by
substantial evidence or otherwise in accordance with the law. ............................ 2

    D.   Whether Commerce's determination to find that critical circumstances exist with
respect to Fuzhou Hengli is supported by substantial evidence or otherwise in
accordance with law ............................................................................................. 3

III.  STATEMENT OF FACTS REGARDING THE PROCEDURAL HISTORY OF THE
INVESTIGATION .............................................................................................. 3

IV.  SUMMARY OF ARGUMENT ............................................................................ 12

        1.   Fuzhou Hengli's Reporting Complied with Commerce's Request for
Information and Provides All the Necessary Information on the Record 12

        2.   Commerce's Application of AFA is Unsupported by Substantial Evidence
and Contrary to Law. .......................................................................... 12

        3.   Commerce Should Make a Determination Regarding the Appropriate
Surrogate Value for Fuzhou Hengli's FBB Input in Accordance with the
Law and Based on Substantial Evidence................................................. 13

        4.   Commerce Should Find That Critical Circumstances Do Not Exist with
Respect to Fuzhou Hengli ...................................................................... 14

V.   STANDARD OF REVIEW ................................................................................. 14

VI.  ARGUMENT ..................................................................................................... 14

    A.   Fuzhou Hengli's Reporting Complied with Commerce's Request for Information
and Provides All the Necessary Information on the Record ................................. 14

        1.   Fuzhou Hengli's FOP Reporting Fully Complied with Commerce's
Request for Information ........................................................................ 17

        2.   Fuzhou Hengli's FOP Reporting is Accurate ........................................... 18

    B.   Commerce's Application of AFA is Unsupported by Substantial Evidence and
Contrary to Law ................................................................................................. 20

        1.   Legal Criteria for the Application of Adverse Facts Available ................ 21

i

2. Fuzhou Hengli Cooperated to the Best of its Ability and its Reporting Methodology Was Transparent from the Start of the Investigation ........ 23

3. Commerce Did Not Comply with the Statutory Criteria Because it Provided No Notice to Fuzhou Hengli in Compliance with 19 U.S.C. § 1677m(d) ................................................................................................ 24

4. Commerce's Excuses for Not Noting the Alleged Misreporting Until Verification Are Spurious. .................................................................... 26

C. Commerce Should Make a Determination Regarding the Appropriate Surrogate Value for Fuzhou Hengli's FBB Input in Accordance with the Law and Based on Substantial Evidence ................................................................................................ 29

1. The Legal Framework for Surrogate Value Selection ............................. 30

2. The Record is Unequivocally Clear That Fuzhou Hengli's Paperboard Input is FBB. ....................................................................................... 31

3. The Record is Clear that Only HTS 481092 is Specific to FBB and That HTS 481092 Cannot Include FBB ......................................................... 32

4. Fuzhou Hengli's FBB Is Not "Kraft Paper And Paperboard" Covered Under HTS 481032 ............................................................................. 33

5. Fuzhou Hengli's FBB Is Not "Bleached Uniformly Throughout" As Is Required Under HTS 481032 ................................................................ 37

6. Fuzhou Hengli's FBB Is Not "More Than 95 Percent by Weight of The Total Fiber Content Consists of Wood Fibers Obtained by A Chemical Process" As Required by HTS 481032 .................................................. 39

7. Fuzhou Hengli's FBB Is Multi-Ply as Provided for by HTS 481092 ....... 41

8. Commerce Cannot Value an Input with a Surrogate Value for an Entirely Different Material Simply Based on Weight When There is an Appropriate Surrogate Value on the Record. ........................................ 42

9. There Is No Basis in Law or Commerce's Practice to Use a Simple Average of the Two HTS Categories ..................................................... 44

D. As There is No Basis to Apply AFA to Fuzhou Hengli, Commerce Must Reverse its Finding that Critical Circumstances Exist for Fuzhou Hengli. ........................ 45

1. Legal Standard for an Affirmative Finding of Critical Circumstances ..... 45

2. Commerce Should Find That Critical Circumstances Do Not Exist with Respect to Fuzhou Hengli ................................................................... 46

VII. CONCLUSION AND RELIEF REQUESTED ............................................................ 47

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
618 F. 3d 1316 (Fed. Cir. 2010).................................................................30

*Alloy Piping Prods. v. United States*,
33 CIT. 1589 (Oct, 20, 2009).....................................................................26

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
925 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) ..........................................42

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
766 F. Supp. 3d 1296 (Ct. Int'l Trade 2025) ..........................................22

*Ceramark Tech. Inc. v. United States*,
11 F. Supp. 3d 1317 (Sep. 24, 2014) ......................................................26

*Eregli Demir v. Celik Fabrikalari T.A.S*,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ....................................22, 25

*Guizhou Tyre Co. v. United States*,
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ..........................................21

*Husteel Co. v. United States*,
98 F. Supp. 3d 1315 (Ct. Intl Trade 2015)..............................................21

*Hyundai Steel Co. v. United States*,
518 F. Supp. 3d 1309, SLIP OP. 2021-47 (2021)...................................22

*Mukand, Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014)................................................................22

*Nation Ford Chem. Co. v. United States*,
166 F.3d 1373 (Fed.Cir.1999)..................................................................16

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)................................................................21

*NSK Ltd. v. United States*,
481 F.3d 1355 (Fed. Cir. 2007)................................................................22

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016)................................................................21

*Qingdao Sea-Line Trading Co. v. United States*,
766 F .3d 1378, 1386 (Fed. Circ. 2014)........................................................................30

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
298 F.3d 1330 (Fed. Cir. 2002)....................................................................................21

*Taian Ziyang v. United States*,
783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ...............................................................30

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................14

19 U.S.C. § 1673b(e)(1)....................................................................................................45

19 U.S.C. § 1673d(b)(4)(A)(i) ..........................................................................................46

19 U.S.C. § 1677b(c) .....................................................................................................4, 5

19 U.S.C. § 1677b(c)(1)....................................................................................13, 15, 16, 30

19 U.S.C. § 1677b(c)(3)....................................................................................................16

19 U.S.C. § 1677e(a)(1)-(2) .............................................................................................15

19 U.S.C. § 1677e(b)........................................................................................................21

19 U.S.C. § 1677e(b)(1)...............................................................................................12, 21

19 U.S.C. § 1677m(d) ............................................................................................. *passim*

**Regulations**

19 C.F.R 351.206(h)(1)....................................................................................................45

19 CFR 351.206(h)(2).......................................................................................................46

19 CFR 351.206(i) ............................................................................................................46

**Other Authorities**

*Certain Frozen Warmwater Shrimp From the People's Republic of China: Final
Results and Partial Rescission of Antidumping Duty Administrative Review*,
75 Fed. Reg. 49,460 (Dep't Commerce Aug. 13, 2010).........................................31

*Certain Paper Plates from the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value and Final Affirmative
Determination of Critical Circumstances, in Part* 90 Fed. Reg. 8,271 (Dep't
Commerce Jan. 28, 2025) ............................................................................... *passim*

*Certain Paper Plates from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 72,367 (Dep't Commerce Sept. 5, 2024) ....................................................................... *passim*

*Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 13,139 (Int'l Trade Comm'n Mar. 20, 2025) ..................................................................... 11

*Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 14,046 (Dep't Commerce Feb. 26, 2024) .................................... 3

*Certain Paper Plates From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 72,375 (Dep't Commerce Sept. 5, 2024) ................................................................... 28

*Certain Paper Plates From Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Postponement of Final Determination and Extension of Provisional Measures*, 89 Fed. Reg. 72,370 (Dep't Commerce Sept. 5, 2024) ................................................................. 28, 29

*Certain Steel Threaded Rod from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (Dep't of Commerce Nov. 22, 2016) ............................................................ 30

*Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19,546 (Dep't Commerce Apr. 22, 2002) ......................................................... 31

*Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 55,039 (Dep't Commerce Sept. 24, 2008) ............................................... 31

*Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of the First Antidumping Duty Administrative Review*, 76 Fed. Reg. 9,753 (Dep't Commerce Feb. 22, 2011) ........................................ 44

v

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES , JUDGE**

| | | |
|---|---|---|
| FUZHOU HENGLI PAPER CO., LTD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | Proprietary Information Removed |
| UNITED STATES, | ) | from Pages 37 and 41 |
| | ) | |
| Defendant, | ) | Court No. 25-00064 |
| | ) | |
| AMERICAN PAPER PLATE COALITION, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**PLAINTIFF FUZHOU HENGLI PAPER CO., LTD.'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with Rule 56.2 of the Rules of this Court, and the Scheduling Order, ECF

No. 34, Plaintiff Fuzhou Hengli Paper Co., Ltd. ("Fuzhou Hengli" or "Plaintiff") files this brief

in support of its Rule 56.2 Motion for Judgment Upon the Agency Record.  As discussed below,

the U.S. Department of Commerce's ("Commerce") *Final Determination* is unsupported by

substantial evidence and otherwise not in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

The administrative determination under review is Commerce's *Final Determination* in

the antidumping duty ("AD") investigation of paper plates ("subject merchandise") from China.

*Certain Paper Plates from the People's Republic of China: Final Affirmative Determination of*

*Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in*

*Part* 90 Fed. Reg. 8,271 (Dep't Commerce Jan. 28, 2025), PR Doc. 360 ("*Final Determination*")

and accompanying Issues and Decision Memorandum, PR Doc. 354 ("IDM").

## II.    ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

**A.    Whether Commerce's determination not to accept Fuzhou Hengli's reporting methodology for its material FOPs is supported by substantial evidence or otherwise not in accordance with the law.**

No.  Fuzhou Hengli's input reporting methodology was reasonable, accurate and conformed to Commerce's request for information in the Initial Questionnaire and Supplemental Questionnaire issued to Fuzhou Hengli.

**B.    Whether Commerce's determination to apply adverse facts available to Fuzhou Hengli is supported by substantial evidence or otherwise in accordance with the law.**

No.  Commerce's application of adverse facts available ("AFA") to Fuzhou Hengli in the *Final Determination* is unsupported by substantial evidence and not in accordance with law. Fuzhou Hengli responded to Commerce's requests for information to the best of its ability, and it was Commerce that failed its statutory obligation to notify Fuzhou Hengli of any alleged deficiencies in its FOP reporting before considering the application of AFA.

**C.    Whether Commerce's determination to reject, and find moot, Fuzhou Hengli's arguments regarding the surrogate value for its paperboard inputs is supported by substantial evidence or otherwise in accordance with the law.**

No.  Commerce's analysis of the correct surrogate value for the paperboard input should consider all record information regarding the specificity of both FBB and kraft paper to the input used in production in order to be in accordance with the law and supported by substantial evidence.  An evaluation of the complete record information demonstrates that the surrogate value for FBB is the appropriate surrogate value, and not the surrogate value for kraft paper.

**D.    Whether Commerce's determination to find that critical circumstances exist with respect to Fuzhou Hengli is supported by substantial evidence or otherwise in accordance with law.**

No.  As Commerce erred in its application of AFA to Fuzhou Hengli, its determination that critical circumstances exist with respect to Fuzhou Hengli is also contrary to the law and unsupported by substantial evidence.

## III.    STATEMENT OF FACTS REGARDING THE PROCEDURAL HISTORY OF THE INVESTIGATION

On January 25, 2024, AJM Packaging Corporation ("AJM"), Aspen Products, Inc. ("Aspen"), Dart Container Corporation ("Dart"), Hoffmaster Group, Inc. ("Hoffmaster"), Huhtamaki Americas, Inc. ("Huhtamaki"), and Unique Industries, Inc. ("Unique") (collectively known as the American Paper Plate Coalition or "Petitioner") filed a petition (the "Petition") with Commerce alleging that imports of paper plates from the People's Republic of China (as well as Thailand and Vietnam) were being, or were likely to be, sold in the United States at less than fair value.  *See* Letter to Sec'y Commerce from The Bristol Group PLLC, "Petitions for the Imposition of Antidumping and Countervailing Duties: Certain Paper Plates from the People's Republic of China, the Kingdom of Thailand, and the Socialist Republic of Vietnam" (Jan. 25, 2024), PR Doc. 1-8, CR Doc. 1-8.  On February 26, 2024, Commerce issued a notice of the initiation of a less-than-fair-value investigation with a period of investigation ("POI") for China, a non-market economy ("NME") country, of July 1, 2023 through December 31, 2023. *See Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 14,046 (Dep't Commerce Feb. 26, 2024) PR Doc. 47.

On April 22, 2024, Commerce selected Fuzhou Hengli and Jinhua P&P Product Co., Ltd. ("Jinhua") as the mandatory respondents in this investigation and issued initial questionnaires to

3

Fuzhou Hengli on April 24, 2024.  *See* Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII, to Donald B. Cameron, Morris, Manning & Martin, LLP, "Less-Than-Fair-Value Investigation of Certain Paper Plates from China: Request for Information" (Dep't Commerce Apr. 24, 2024), PR Doc. 146 ("IQR").  Fuzhou Hengli subsequently filed its responses to Commerce's initial questionnaire.  *See* Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates from the People's Republic of China, Case No. A-570-164: Fuzhou Hengli's Section A Initial Questionnaire Response" (May 29, 2024), PR Doc. 185, CR Doc. 88 ("Hengli Sec. A Resp."); Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates from the People's Republic of China, Case No. A-570-164: Fuzhou Hengli's Sections C and D Initial Questionnaire Responses" (Jun. 18, 2024), PR Doc. 210, CR Doc. 114-117 ("Hengli Sec. C-D Resp.").

In proceedings involving NME countries, Section 773(c) of the Act requires Commerce to use surrogate values of factors of production and other selling costs from a comparable market economy country.  *See* 19 U.S.C. § 1677b(c).  Accordingly, Commerce also requested surrogate country and surrogate value comments and information from all interested parties and Fuzhou Hengli submitted surrogate country comments on May 14, 2024.  *See* Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates from the People's Republic of China, Case No. A-570-164: Fuzhou Hengli Surrogate Country Comments" (May 14, 2024), PR Doc. 160. ("SC Comments").  Petitioners also submitted surrogate country comments.  *See* Letter to Sec'y Commerce from The Bristol Group PLLC, "Certain Paper Plates from the People's Republic of China: Comments on Surrogate Country" (May 14, 2024), PR Doc. 161. Fuzhou Hengli, Jinhua, and Petitioners submitted surrogate value comments on June 28, 2024. *See* Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates

from the People's Republic of China, Case No. A-570-164: Fuzhou Hengli's Surrogate Value Comments" (Jun. 28, 2024), PR Doc. 219-226. ("SV Comments"); Letter to Sec'y Commerce from deKieffer & Horgan, PLLC, "Certain Paper Plates from the People's Republic of China: Preliminary Surrogate Value Submission" (Jun. 28, 2024), PR Doc. 215-227; Letter to Sec'y Commerce from The Bristol Group PLLC, "Certain Paper Plates from the People's Republic of China: Petitioner's Initial Surrogate Value Submission" (Jun. 28, 2024), PR Doc. 227-234. Fuzhou Hengli and Jinhua made supplemental surrogate value submissions on July 23, 2024. *See* Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates from the People's Republic of China, Case No. A-570-164: Fuzhou Hengli's Final Surrogate Value Submission" (Jul. 23, 2024), PR Doc. 252-264 ("Hengli's Final SV Submission"); Letter to Sec'y Commerce from deKieffer & Horgan, PLLC, "Certain Paper Plates from the People's Republic of China: Final Surrogate Value Submission" (Jul. 23, 2024), PR Doc. 249-251.

In its surrogate value comments, Fuzhou Hengli explained that it used FBB as its paperboard input, and provided extensive documentation, including academic articles, comparing the different types of paper inputs and the product standards to which the different inputs were designed. *See id.* at Ex. 18, 29 & 20. Based on this documentation, Fuzhou Hengli demonstrated that its paper input was FBB rather than the kraft paperboard advocated by Petitioners.

In the case of exports from an NME country, Commerce calculates normal value based on the respondent's reported factors of production ("FOPs") in accordance with Section 773(c) of the Act. 19 U.S.C. § 1677b(c). Therefore, in Section D of its questionnaire, Commerce requested that Fuzhou Hengli report each of it inputs in "fields {that} should contain information regarding the specific factors used to produce the merchandise under consideration. Before

5

calculating, choose a unit of measure for which you will calculate the factors (e.g., calculate

factors based on the production of one metric ton of the merchandise under consideration or

based on the production of one item of the merchandise under consideration." *See* Hengli Sec.

C-D Resp. at Exhibit D-10-11.

In its questionnaire responses, Fuzhou Hengli explained that it is a trading company and

that the merchandise under consideration was produced by unaffiliated producers Guangdong

Ecosource Environmental Technology Co., Ltd. ("Ecosource") and Ningbo Hongtai Package

New Material Technology Co., Ltd. ("Ningbo Hongtai").  *See* Hengli Sec. A Resp. at 23; Hengli

Sec. C-D Resp. at Exhibit D-1–D-2.  Therefore, the FOPs reported by Fuzhou Hengli were the

FOPs of these two companies.

In its response to Section D of Commerce's questionnaire, Fuzhou Hengli explained that

Ecosource reported its FOPs on a consistent basis, by kilogram for all material factors, kilowatts

for electricity, and hours for labor.  *See* Hengli Sec. C-D Resp. at Exhibit D-9.  For the

calculation of the unit consumption of FOPs for the final product, Ecosource used "packages" as

the unit of measurement for the subject merchandise.  *Id.*  Importantly, Fuzhou Hengli

demonstrated that its allocation of FOPs accounted for the consumption of paper inputs of

different weights to the production of paper plates with different weights by allocating the

quantity of paper input (in kilograms) over the production quantity of all products (in kilograms).

*See id.* at Exhibit D-6 & Exhibit D-9.  In comments on Fuzhou Hengli's Section A, C, and D

questionnaire responses, Petitioner alleged that Fuzhou Hengli's FOP reporting was deficient and

urged Commerce to request that Fuzhou Hengli submit a version of its FOP database that

reported all FOP usage rates on a per-kilogram basis.  *See* Letter to Sec'y Commerce from The

Bristol Group PLLC, "Certain Paper Plates from the People's Republic of China: Comments on

Fuzhou Hengli's Section A, C, and D Questionnaire Responses" (Jul. 15, 2024), PR Doc. 244,

CR Doc. 141 ("Petitioners' Comments on Fuzhou Hengli's Questionnaire Responses").

Commerce subsequently issued a supplemental questionnaire in which it requested that

Fuzhou Hengli report all its FOP consumption usage rates on a per-kilogram basis and revise its

submitted databases accordingly.  Commerce requested no other changes or alterations to

Fuzhou Hengli's FOP reporting methodology.  Specifically, Commerce did not include any

notification that Fuzhou Hengli's allocation methodology was otherwise deficient.  *See* Letter to

Fuzhou Hengli Paper Co., Ltd, c/o Eugene Degnan, Morris Manning & Martin, LLP, "Less-

Than-Fair-Value Investigation of Certain Paper Plates from the People's Republic of China:

Supplemental Questionnaire for Fuzhou Hengli Paper Co., Ltd." (Dep't Commerce Jul. 26,

2024), PR Doc. 265, CR Doc. 143 ("SQR").  Fuzhou Hengli timely submitted its response to

Commerce's supplemental questionnaire, in which it reported its FOPs and revised its databases

as requested.  Commerce did not issue any additional supplemental questionnaire or

communicate to Fuzhou Hengli that it found Fuzhou Hengli's revised reporting of its FOP

consumption rates deficient.  *See* Letter to Sec'y Commerce from Morris, Manning & Martin,

LLP, "Certain Paper Plates from the People's Republic of China, Case No. A-570-164: Fuzhou

Hengli's Supplemental Questionnaire Response" (Aug. 9, 2024), PR Doc. 278, CR Doc. 158-172

("Hengli's SQR Resp.") at 7 & Exhibit SQR-12.1, SQR-12.2.

On September 5, 2024, Commerce published its *Preliminary Determination.  See Certain*

*Paper Plates from the People's Republic of China: Preliminary Affirmative Determination of*

*Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical*

*Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional*

*Measures,* 89 Fed. Reg. 72,367 (Dep't Commerce Sept. 5, 2024), PR Doc. 313 *("Preliminary*

*Determination"*).  In the *Preliminary Determination*, Commerce found that Fuzhou Hengli was

not selling subject merchandise at less than fair value and calculated an estimated weighted-

average dumping margin for Fuzhou Hengli of 0 percent.  Commerce selected Turkey as the

surrogate country.  *See* Memorandum to Ryan Majerus, Deputy Assistant Sec'y for Policy and

Negotiations, from Scot Fullerton, Acting Deputy Assistant Sec'y for Antidumping and

Countervailing Duty Operations, "Decision Memorandum for the Preliminary Affirmative

Determination in the Less-Than-Fair-Value Investigation of Certain Paper Plates from the

People's Republic of China" (Aug. 29, 2024), PR Doc. 299 ("PDM") at 7; *see also*

Memorandum to The File, from Lingjun Wang, Analyst, AD/CVD Operations, Office VII,

Enforcement and Compliance, "Less-Than-Fair-Value Investigation of Certain Paper Plates from

the People's Republic of China: Surrogate Values for the Preliminary Determination" (Aug. 29,

2024), PR Doc. 302-304 ("Prelim SV Memo").

 In its *Preliminary Determination*, Commerce found that, because Fuzhou Hengli's

preliminary dumping margin was zero percent, its dumping did not exceed the threshold of 25

percent necessary to impute knowledge of sales below fair value.  Therefore, Commerce found

that critical circumstances did not exist for Fuzhou Hengli.  *See* PDM at 29-30.

 Commerce officials then conducted verifications of the mandatory respondents, including

an on-site production verification at Ecosource's factory and a review of Fuzhou Hengli's books

and records at its corporate office.  In its verification report, Commerce suggested that Fuzhou

Hengli's reporting of its material FOP consumption usage rates for the types of paper input used

in finished paper plates was "inconsistent with the production process" of paper plates because

the rates were not specific to the different weights of FBB used for production of differing

products.  *See* Memorandum to The File from Jose Rivera and Lingjun Wang, Int'l Trade

Compliance Analysts, AD/CVD Operations, Office VII, "Verification of the Questionnaire

Responses of Hengli Paper Co., Ltd. (Hengli) and its producer Guangdong Ecosource

Environmental Technology Co., Ltd. (Ecosource)" (Dec. 17, 2024), PR Doc. 335, CR Doc. 313

("Verification Report") at 16.

Commerce officials also verified, based on factory inspection reports from the suppliers

of 98.79 percent of Fuzhou Hengli's paper inputs, that the input used in the products sold by

Fuzhou Hengli was FBB multi-ply paper board.  *See* Verification Report at 9, 11.  Commerce

officials further noted that factory inspection reports of the FBB used in Fuzhou Hengli's exports

demonstrated that the fiber content of the FBB consisted of a mix of mechanical pulp and

chemical pulp and in no inspection report verified by Commerce did the chemical pulp content

exceed 60 percent.  *See id.*

In its case brief before the agency, the Petitioners argued that Commerce should apply

adverse facts available to Fuzhou Hengli because of how it reported its FOPs and that Commerce

should reconsider its selection of the Harmonized Tariff Schedule ("HTS") category used to

value the paperboard input.  *See* Letter to Sec'y Commerce from The Bristol Group PLLC,

"Certain Paper Plates from the People's Republic of China: Case Brief for the American Paper

Plate Coalition" (Dec. 26, 2024), PR Doc. 340, CR Doc. 315-316 ("Petitioners' Case Br.") at 6-

24.

In its rebuttal brief, Fuzhou Hengli averred that none of the statutory criteria for applying

adverse facts available ("AFA") to Fuzhou Hengli were present in this case.  *See* Letter to Sec'y

Commerce from Morris, Manning & Martin, LLP, "Certain Paper Plates from the People's

Republic of China, Case No. A-570-164: Fuzhou Hengli's Rebuttal Brief" (Jan. 8, 2025), PR

Doc. 346, CR Doc. 318 ("Hengli's Rebuttal Br.") at 30-32.  Further, these sections are subject to

Commerce's statutory obligation, pursuant to Section 782(d) of the Act, to inform the respondent if Commerce finds its submission deficient and allow the respondent an opportunity to remedy the alleged deficiency, which Commerce did not do.  *See* 19 U.S.C. § 1677m(d).

In its rebuttal brief, Fuzhou Hengli also argued that its reporting methodology for its material FOPs was reasonable based on Commerce's practice in previous cases in which respondents had allocated total consumption of a FOP across total production output to calculate per-unit consumption.  *See* Hengli's Rebuttal Br. at 32-34.  Fuzhou Hengli also showed that its own reporting methodology would lead to no distortion to its costs.  Recalculating with Commerce's preferred methodology only resulted in a negligible change in input quantity and in fact led to more favorable dumping margins for Fuzhou Hengli.  *See id.* at 34-36.

Fuzhou Hengli further argued that Commerce was aware of Fuzhou Hengli's FOP reporting methodology during the preliminary stage of the investigation, and yet provided no notice, pursuant to its obligation to notify the respondent of deficiencies under Section 782(d) of the Act, that its submission was deficient. *See* 19 U.S.C. § 1677m(d).  Fuzhou Hengli also argued that Commerce did not provide it an opportunity to cure the deficiency, even though the issue was clearly apparent to Commerce before it issued its only supplemental questionnaire to Fuzhou Hengli.

Fuzhou Hengli also rebutted Petitioner's argument that Commerce should reconsider its selection of the HTS category used to value Fuzhou Hengli's paperboard input.  *See* Hengli's Rebuttal Br. at 10-29.  Relying on extensive evidence on the record, Fuzhou Hengli argued, among other things, that its FBB input is not "kraft paper and paperboard;" that its FBB is not "bleached uniformly throughout;" and that its FBB is not "more than 95 percent by weight" wood fibers "obtained by a chemical process," all of which are required under the HTS category

proffered by Petitioner. *Id.* Fuzhou Hengli further demonstrated that its FBB is multi-ply, as is required by the HTS category that it placed on the record, and as was verified during Commerce's verification. *Id.* at 21-22; Verification Report at 9, 11.

In the *Final Determination*, Commerce applied AFA to Fuzhou Hengli on the basis that it "withheld information that was requested" because it did not report consumption of its paper input FOP on a per-CONNUM basis. *See* IDM at 7-8. Commerce determined that, because of the allocation methodology employed by Fuzhou Hengli from the very beginning of this investigation, Fuzhou Hengli had withheld its FOP information and applied an adverse inference in selecting the AFA rate, ultimately applying to Fuzhou Hengli a dumping margin of 515.40 percent after initially finding that Fuzhou Hengli had not sold at less than fair value at all.

In the *Final Determination*, because Commerce applied AFA to Fuzhou Hengli, it made a determination as to the surrogate value of paperboard used by Jinhua but made no determination with respect to the surrogate value used by Fuzhou Hengli to value its paperboard input. *See* IDM at 18.

Finally, although Commerce had made a preliminary negative determination of critical circumstances with respect to Fuzhou Hengli, after applying AFA to Fuzhou Hengli in the *Final Determination* based on its reporting of its FOP consumption rate, and assigning Fuzhou Hengli a dumping margin of 515.40 percent, Commerce reversed its critical circumstances determination with respect to Fuzhou Hengli

The International Trade Commission's ("ITC") own Final Determination was published in the *Federal Register* on March 19, 2025. *See Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 13,139 (Int'l Trade Comm'n Mar. 20, 2025), PR Doc. 371. The ITC found that

critical circumstances existed for imports of subject merchandise from China and that such imports were likely to undermine the remedial effect of the Order. Commissioner David S. Johanson filed a separate view which determined that critical circumstances did not exist. *See Paper Plates from China, Thailand, and Vietnam*, Inv. Nos. 701-TA-704-705, 731-TA-1664-1666, USITC Pub. 5595 (Mar. 2025) (Final).

## IV.    SUMMARY OF ARGUMENT

### 1.    Fuzhou Hengli's Reporting Complied with Commerce's Request for Information and Provides All the Necessary Information on the Record

Commerce's application of facts available was not appropriate because Fuzhou Hengli's FOP reporting was consistent with the instructions in the questionnaire and no necessary information was missing from the record. Fuzhou Hengli's interpretation of Commerce's instructions for reporting the FOPs was reasonable by an objective standard, was demonstrably accurate, and ultimately the record even includes the information to report the all inputs in the way preferred by Commerce (though never specified to Fuzhou Hengli). Accordingly, the methodology employed by Fuzhou Hengli was in full compliance with Commerce's instructions, and there is no "hole" in the record that needs to be addressed with facts available.

### 2.    Commerce's Application of AFA is Unsupported by Substantial Evidence and Contrary to Law.

Commerce's determination to reject Fuzhou Hengli's FOP reporting and apply AFA is contrary to law and not based on substantial evidence. Commerce "may" apply AFA when there are necessary facts missing from the record and an "interested party has failed to cooperate by not acting to the best of its ability." *Id.*;19 U.S.C. § 1677e(b)(1). However, the Act requires that Commerce meet the requirements of 19 U.S.C. § 1677m(d), to provide notice of deficiencies and an opportunity to remedy them. In this case under litigation Fuzhou Hengli acted to the best of its ability and responded to the Department's requests for information completely but, despite

12

Fuzhou Hengli's reporting methodology being evident from the very first questionnaire response, Commerce gave absolutely no notice it found the methodology deficient and provided no opportunity to Fuzhou Hengli to amend it. This renders Commerce's AFA determination contrary to the law, as well as not based on substantial evidence.

> 3.     **Commerce Should Make a Determination Regarding the Appropriate Surrogate Value for Fuzhou Hengli's FBB Input in Accordance with the Law and Based on Substantial Evidence.**

Commerce's attempt to inflate the NV by valuing the main input of paperboard with an SV for kraft paper, a completely different and much more expensive material, must be rejected. The record evidence is clear that this material was not used at all by Fuzhou Hengli. Commerce cannot artificially and arbitrarily inflate the NV by valuing an input with a much higher SV from a very different product, contrary to its established practice and statutory requirements.

Commerce's practice when selecting the best available information for valuing factors of production ("FOPs"), in accordance with section 773(c)(1) of the Act, is to select, to the extent practicable, surrogate values which are product-specific, representative of a broad market average, publicly available and contemporaneous with the POI, and tax/duty exclusive. Specificity is particularly the most important factor in the selection of SVs.

Fuzhou Hengli's submitted category for valuing paperboard inputs, HTS 481092, is the only category on the record that satisfies all of these criteria as it is the only category that is specific to the input used by Fuzhou Hengli's producers to make the merchandise under investigation.

Commerce's determination to partially value FBB with a SV for an entirely different material, based solely on weight, without regards to the specificity criteria, must be rejected as unlawful. Commerce's assertion that HTS 4810.32 is more specific to the paperboard inputs than HTS 4810.92 in terms of its weight is pure speculation. Further, Commerce's assertion that

"basis weight is a critical component in the manufacture and sale of paper plates as supported by the fact that basis weight is the fourth digit in the 13-digit CONNUM" is wildly disingenuous as basis weight has no effect on normal value under Commerce's NME methodology in this case.

### 4. Commerce Should Find That Critical Circumstances Do Not Exist with Respect to Fuzhou Hengli

As there is no basis to apply AFA with respect to Fuzhou Hengli's FOP reporting, Commerce must reverse its final affirmative finding of critical circumstances for Fuzhou Hengli and that Hengli had dumped "massive imports" over a "relatively short period" based only on the AFA finding.

## V.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD investigation, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.    ARGUMENT

### A.    Fuzhou Hengli's Reporting Complied with Commerce's Request for Information and Provides All the Necessary Information on the Record

Commerce's application of AFA was not appropriate because Fuzhou Hengli's FOP reporting was consistent with the instructions in the questionnaire and no necessary information was missing from the record.  Fuzhou Hengli's interpretation of Commerce's instructions for reporting the FOPs was reasonable by an objective standard, was demonstrably accurate, and ultimately the record even includes the information to report all inputs in the way preferred by Commerce (though never specified to Fuzhou Hengli).  Therefore, no necessary information is missing from the record justifying a facts available determination.

Fuzhou Hengli's reporting methodology fully complied with Commerce's request for information and was reasonable and accurate. Commerce's asserted basis for rejecting Fuzhou Hengli's FOPs as deficient are specious. Furthermore, no necessary information is missing from the record such that an AFA application could be justified.

Section 776 of the Tariff Act of 1930, as amended ("the Act") outlines the legal standard for applying facts otherwise available. 19 U.S.C. § 1677e(a)(1)-(2). Pursuant to it, the Department will rely on record facts otherwise available when:

> (1) necessary information is not available on the record, or
> (2) an interested party or any other person
> > (A) withholds information that has been requested by {Commerce},
> > (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . ,
> > (C) significantly impedes a proceeding . . . , or
> > (D) provides such information but the information cannot be verified.

Commerce's basis for finding that necessary information is not on the record of the investigation under litigation here is that

> Fuzhou Hengli withheld information that was requested. Specifically, Fuzhou Hengli failed to timely report CONNUM-specific FOPs despite its ability to do so and, thus, significantly impeded this investigation. Fuzhou Hengli's production process and records permit it to match the paperboard inputs with produced paper plates based on basis weight, but it failed to do so.

IDM at 8.

As discussed below, the record shows that Fuzhou Hengli did not withhold requested information, did report CONNUM-specific FOPs, and thus did not impede the investigation.

By way of background, in NME AD proceedings, Commerce calculates normal value by isolating each FOP in the production process in the NME country and assigning to it a value from a surrogate market economy country using the "best available information." *See* 19 U.S.C. § 1677b(c)(1). This "surrogate value" or "SV" multiplied by the quantity of the input reported,

creates a "hypothetical" market value to approximate the production experience in the NME

country.  *See Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1377–78

(Fed.Cir.1999).  The statutory factors of production include, but are not limited to, labor, raw

materials, energy and other utilities, and representative capital cost.  *See* 19 U.S.C.

§ 1677b(c)(3).  Commerce adds to the total factors of production an estimated amount for

general expenses and profit, plus the cost of containers, coverings, and other expenses.  *See* 19

U.S.C. § 1677b(c)(1).

      To determine what factors of production are required for the subject merchandise, an

antidumping duty questionnaire is issued to all mandatory respondents – the Initial

Questionnaire.  Section D of the Initial Questionnaire directs the respondent to provide a

description of each factor, and the quantity of that factor, used in producing the merchandise

under investigation.  *See* IQR at Sec D.  Fuzhou Hengli reported each of the factors used in its

production: paperboard, varnish, ink, flexo stabilizer, and various packing materials.  *See*

Hengli's Sec C-D Resp. at Exhibit D-1; D-6.

      In the investigation under litigation, Commerce determined that information was missing

from the record solely because Fuzhou Hengli reported its input of paperboard as one material

input, rather than break it up into separate fields according to the varying basis-weights and

report the paperboard as several separate inputs.  *See* IDM at Comment 1.  That is, Commerce is

not contesting that the total paperboard inputs for each product were reported.  Rather, at the

*Final Determination*, Commerce asserted for the very first time that it wanted them reported in a

slightly different way.  As discussed below, this determination is contrary to law and not based

on record evidence.

16

### 1.    Fuzhou Hengli's FOP Reporting Fully Complied with Commerce's Request for Information

Fuzhou Hengli's data was correctly reported in the manner requested.  Commerce implies that it has requested one specific "manner" of reporting, with which Fuzhou Hengli did not comply.  *Id.*  However, this is a misstatement of Commerce's own practice and instructions.  There are many ways to report and allocate FOPs, depending on the materials and/or the production process.  The language in Commerce's Initial Questionnaire, which directs the respondents to report the inputs that go into the various fields of the FOP database, recognizes this and provides no single "correct manner":

> These {i.e., FOP} fields should contain information regarding the specific factors used to produce the merchandise under consideration. Before calculating, choose a unit of measure for which you will calculate the factors (e.g., calculate factors based on the production of one metric ton of the merchandise under consideration or based on the production of one item of the merchandise under consideration).

IQR at D-10.

Fuzhou Hengli complied with this request for information.  It reported the specific factors used to produce the merchandise under consideration, *i.e.,* paperboard, varnish, ink, flexo stabilizer, and various packing materials.  *See* Hengli's Sec C-D Resp. at Exhibit D-1.  Fuzhou Hengli reported that its producers

> reported the FOPs on a consistent basis, kilograms, for each and all material factors, and kilowatts for electricity, and hours for labor. For the calculation of the unit consumption of production factors for the final product, Guangdong Ecosource and Ningbo Hongtai use "packages" as the unit of measurement for the subject merchandise.

*Id.* at D-9.

Thus, Fuzhou Hengli reported each of the "specific factors" (*i.e.*, paperboard, varnish, ink, flexo stabilizer, and various packing materials), calculated based upon a "unit of measure" of "one item of the merchandise under consideration" (*i.e.*, a package, which is the unit by which the merchandise is priced and sold).  Fuzhou Hengli also provided worksheets and its FOP

database, both of which show that paperboard is allocated as one factor, varnish is allocated as one factor (to the plates that used it), ink is allocated as one factor (to the plates that used it) and flexo stabilizer is allocated as one factor (to the plates that used it). *Id.* at Exhibits D-1 and D-6. Accordingly, Fuzhou Hengli's FOP reporting was precisely "in the manner requested."

It is worth noting that Commerce takes no exception to all the different varnishes being reported in a single field, nor with the inks or flexo stabilizer. These, like paperboard, come in differing forms. *Id.* at Exhibit D-6. However, because they are similar and valued with the same HTS, there is no reasonable basis to demand that each individual type be reported separately. The same applies to paperboards and there is absolutely no reason to treat this particular input as an exception. Same as varnishes, inks and flexo stabilizer, all paperboards inputs are similar and there is only one paperboard SV being used to value the one type of paperboard used by Fuzhou Hengli. That is, no matter what the basis-weight of the paperboard, it will be the same quantity multiplied by the same SV to obtain the same overall value. Therefore, it is completely reasonable that Fuzhou Hengli would report its paperboard in the same way as the other inputs.

### 2.    Fuzhou Hengli's FOP Reporting is Accurate

When reporting paperboard inputs on a kilogram basis, the weight-basis of the input is not relevant. All the paper plate products are produced in exactly the same manner whether using thicker (higher weight-basis) or thinner (lower weight-basis) paperboard: (1) printing the design/appearance of the plate on the paperboard, (2) cutting off the scrap edges outside of the design, and then (3) molding the paperboard into plates. *See id.* at Exhibit D-2 (Production Flowchart); s*ee also* Verification Report at 9. Accordingly, there will not be a variance in the quantity of inputs for the different products on a per-kg basis. On a per-kg basis, there is no meaningful difference if the particular paperboard input used is lighter or heavier. A kilogram of thicker paperboard weighs the same as a kilogram of thinner paperboard. If the product requires

1.1 kg of paperboard to make 1 kg of plate, regardless of the basis weight of the paperboard, it is still going to amount to 1.1 kg reported in the FOP database.

The situation would be different if there were multiple SVs for paperboards, with a different one for each basis weight. In such a case, since the paperboards with different basis weights would be valued differently, failing to report on a per-kilogram basis might lead to distortive results. As this is not the case here, there is no meaningful difference between reporting the paperboard inputs as one or several FOPs. Fuzhou Hengli's reporting methodology is therefore accurate and Commerce's distinction between the two reporting methods is a false one.

Commerce's argument that Fuzhou Hengli's reporting is deficient because it is non-CONNUM-specific is disingenuous. IDM at Comment 1. Commerce asserts that non-CONNUM specific reporting has been permitted where the inputs were all the same, but is not reasonable in this case because these products are not manufactured using the same inputs. *Id.* In fact, however, all the paperboard inputs are in fact the same – FBB. There are merely different thicknesses of FBB, but it is the exact same material, used in the exact same way in production. *See* Hengli's Sections C-D Resp. at Exhibit D-2; *see also* Prelim SV Memo at Attachment 1. There is no meaningful difference between the paperboard inputs used. This fact is reflected in the fact that the SV itself is a value for either all weight-bases (HTS category 481092) or a range of values (HTS category 481032). It is completely contradictory for Commerce to claim that the factor reporting is not sufficiently specific when the SVs themselves are the same level of specificity.

Fuzhou Hengli has proven the accuracy of its reporting methodology by re-calculating the inputs using the methodology that Commerce asserts was necessary. *See* Hengli's Rebuttal

Br. at Attachment I.  This re-calculation showed an overall difference of 0.063 percent between Commerce's methodology and Fuzhou Hengli's (with Fuzhou Hengli's methodology resulting in very slightly higher quantities, which is against its interest).  *Id.*  It is nonsensical to conclude that a difference of six hundredths of one percent is evidence that Fuzhou Hengli's methodology was inaccurate.  *See* IDM at Comment 1.  Commerce has no serious basis for disagreement, either, as its own required methodology would in fact lead to lower margins for Fuzhou Hengli.

In sum, the methodology employed by Fuzhou Hengli was in full compliance with Commerce's instructions, was reasonable, and was demonstrably accurate.  Accordingly, there is no basis to apply facts available as no necessary information is missing from the record, and Commerce could readily use the verified information on the record to calculate margins, even using its preferred reporting methodology.

### B.  Commerce's Application of AFA is Unsupported by Substantial Evidence and Contrary to Law

In the *Final Determination*, Commerce rejected Fuzhou Hengli's FOP reporting and determined that the application of AFA was appropriate because "Fuzhou Hengli's data was {sic} not reported in the manner requested and the company failed to notify Commerce that it used another reporting methodology in its initial questionnaire response."  *See* IDM at Comment 1.  Commerce crafted the AFA language to make it appear that this reporting issue was "discovered" only at verification, apparently in an attempt to avoid its legal obligation to notify respondents of any deficiencies in the responses and allow them the opportunity to rectify them.  *See* IDM at 7-8.  The record evidence, however, shows that Hengli acted to the best of its ability to cooperate with Commerce throughout the investigation, and it was Commerce that failed to fulfill its legal obligation to examine the records fully and notify Fuzhou Hengli of any deficiencies.

20

However, rather than maintaining Fuzhou Hengli's zero margin calculated in the *Preliminary Determination*, which is now further corroborated by the actual and verified evidence in this investigation, Commerce regrettably decided to play "gotcha" by drumming up an excuse to accuse Fuzhou Hengli of non-cooperation and apply AFA to Fuzhou Hengli. Such gamesmanship is contrary to the law and must be reversed.

### 1.    Legal Criteria for the Application of Adverse Facts Available

The Department "may" apply AFA when there are necessary facts missing from the record and an "interested party has failed to cooperate by not acting to the best of its ability." *See* 19 U.S.C. § 1677e(b)(1). A respondent's failure to cooperate to the "best of its ability" is determined by assessing whether it has put forth its "maximum effort to provide full and complete answers to all inquiries." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003). There is nothing in the statute, however, that requires the Department to apply AFA, even upon such a finding. *See Husteel Co. v. United States,* 98 F. Supp. 3d 1315 (Ct. Intl Trade 2015); *see also* 19 U.S.C. § 1677e(b). Though courts usually grant the Department discretion as to the application of AFA, this discretion, though wide, is "not unbounded." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002). The Department's decisions must be in accordance with law and supported by substantial evidence. *See*., *e.g, Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1333 (Ct. Int'l Trade 2021). The statute does not allow the Department to wantonly apply AFA to respondents whenever an omission or mistake is made, regardless of the materiality of the issue and graveness of the situation. The CIT has determined that the "best of ability" standard does not require perfection and "recognizes that mistakes sometimes occur." *See Husteel Co. v. United States*, quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

21

The Act further requires that Commerce meet the requirements of 19 U.S.C. § 1677m(d), to provide notice of deficiencies and an opportunity to remedy them.  The courts have firmly established that the application of AFA without giving the respondent another opportunity to remedy any deficiency is unduly punitive and unlawful.  The Federal Circuit has previously held that the failure to notify a party of a deficiency and provide an opportunity to cure renders a facts available decision unlawful.  See, *e.g., Mukand, Ltd. v. United States,* 767 F.3d 1300, 1304 (Fed. Cir. 2014) ("Before resorting to facts otherwise available, Commerce must notify the respondent of the nature of the deficiency and, to the extent practicable, provide an opportunity for the respondent to remedy or explain the deficiency.").

For instance, in *Baroque Timber Indus. (Zhongshan) Co. v. United States*, the CIT held that the Department must satisfy "its obligation under Section 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire '*specifically point{s} out* and request{s} clarification of {the} deficient responses,' and *identifies the information needed* to make the required showing."  *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 766 F. Supp. 3d 1296, 1313 (Ct. Int'l Trade 2025); 19 U.S.C. § 1677m(d); *see also Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1322-23, SLIP OP. 2021-47 (2021) (alterations in original) (emphasis supplied) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).

Finally, this court has emphasized that the requirements of 19 U.S.C. § 1677m(d) are mandatory, regardless of the respondents' burden of proof.  It has explicitly stated that "{t}he Government's suggestion that Commerce's statutory obligation is mitigated by the respondent's burden to provide accurate information runs counter to the mandatory nature of § 1677m(d)." *Eregli Demir v. Celik Fabrikalari T.A.S,* 308 F. Supp. 3d 1297, 1318 (Ct. Int'l Trade 2018).

### 2.    Fuzhou Hengli Cooperated to the Best of its Ability and its Reporting Methodology Was Transparent from the Start of the Investigation

Fuzhou Hengli cooperated with the Department's requests in a forthcoming and cooperative manner throughout the investigation.  From the beginning of the proceeding, its reporting methodology has been consistently transparent as reflected in all of its questionnaire responses.

This paperboard input information at issue was submitted in Fuzhou Hengli's Initial Questionnaire response, in Section D.  The fundamental element of the Section D response is the FOP Database, which essentially distills all the key information required in the Section D response.  It is almost always presented as Exhibit D-1, as it was in Fuzhou Hengli's response, reflecting its position as the most important element of the Section D response.  *See* Hengli Sec. C-D Resp. at Exhibits D-1, D-9, D-12, and D-13.  This database lists each FOP reported by the respondent in separate columns/fields, and provides the relevant information for each input that is needed to calculate normal value.  Fuzhou Hengli's FOP database had one single column/field for reporting paperboard.  This shows that Fuzhou Hengli is reporting all the paperboard used as one single FOP.  That is, if Fuzhou Hengli was subdividing the paperboard inputs into different basis weights, it would need to report multiple entries - one for each different paperboard weight.  *See id.* at Exhibit D-1.  Therefore, it could not be more evident that Fuzhou Hengli reported all paperboard as one input.

Fuzhou Hengli's Section D additionally provided worksheets demonstrating its allocation of the paperboard inputs, all of which show all paperboard basis-weights being allocated over all products.  For example, Exhibit D-6, "Materials Allocation, Ecosource," shows every basis-weight of paperboard being allocated to every product, at tabs "FOP Materials Allocation" and "FOP Screening of products invol."  *See id.* at Exhibit D-6.  Similarly, Exhibit D-12.1 (Revised

Exhibit D-6) provides the exact same data at its "FOP Materials Allocation" and "FOP Screening of products invol" tabs, the only difference being that in Exhibit D-6 the inputs were allocated by package, while in Exhibit D-12.1 they were allocated by kilogram.  *See* Hengli's SQR Resp. at Exhibit D-12.1.

Fuzhou Hengli also clearly reported in its Sections C response that its products under investigation consisted of paper plates of multiple different paper base weights.  Field number 3.4: Basis Weight, specifically request this information.  *See* IQR at Field Number 3.4.  Fuzhou Hengli reported several different basis weights for its products.  The information is incorporated into the "control number," or CONNUM, which, like the FOP database, is a very fundamental aspect of the response.  Simply comparing these very fundamental reporting characteristics, Fuzhou Hengli's Section C response with its FOP database reporting, any reasonable person would conclude that different weight products were sold while one paperboard input was reported.  Accordingly, Fuzhou Hengli's reporting methodology was transparent and easily understood.

### 3.   Commerce Did Not Comply with the Statutory Criteria Because it Provided No Notice to Fuzhou Hengli in Compliance with 19 U.S.C. § 1677m(d)

Commerce did not meet the statutory criteria to apply AFA.[1]  As Fuzhou Hengli's reporting methodology has been transparent since the beginning, Commerce had more than ample time and opportunity to review, identify, and inform Fuzhou Hengli of any alleged reporting deficiency.  Glaringly, Commerce gave absolutely no indication that it was dissatisfied with Fuzhou Hengli's FOP reporting methodology with regards to the specificity of its paperboard until the *Final Determination*.  *See*, e.g., IDM at Comment 1.

---

[1] Fuzhou Hengli also disagrees that factual information is missing from the record, and addresses these arguments *infra*.

As noted, this notice is statutorily mandated.  In *Eregli Demir v. Celik Fabrikalari T.A.S*, the court explained that "If { … } Commerce determines that a response to a request for information under this subtitle does not comply with the request, {Commerce} *shall* promptly inform the person submitting the response of the nature of the deficiency and *shall,* to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews."  *Eregli Demir v. Celik Fabrikalari T.A.S,* 308 F. Supp. 3d 1297, 1318 (Ct. Int'l Trade 2018) (emphasis added in the original) (internal citations omitted); 19 U.S.C. § 1677m(d).  Despite being aware of Fuzhou Hengli's reporting methodology from the beginning of the investigation and having more than sufficient time and opportunity to review and identify any deficiencies, Commerce waited until the *Final Determination* to fault the methodology and did not give any prior notice as to any deficiency in Fuzhou Hengli's reporting.  This is an arbitrary practice that brazenly violates the statutory requirements.

The requirement to inform respondents, pursuant to 19 U.S.C. § 1677m(d), is only applicable, of course, if Commerce can identify the alleged deficiency in time to allow the respondent to address it within the deadlines of the proceeding.  In this investigation, there is no question that Fuzhou Hengli's FOP reporting methodology was fully apparent during the entire preliminary stage of this investigation and thus there was no reason for Commerce to not follow the statutory criteria.  There is simply no basis for Commerce to claim that it did not have knowledge, or constructive knowledge, of the alleged deficiency in time to adhere to the requirements of 19 U.S.C. § 1677m(d).  The substantial evidence standard requires Commerce to thoroughly examine the record, and even the most cursory examination of the record from the very first submission of FOP information shows that Fuzhou Hengli allocated all paperboard

inputs over all products. *See Alloy Piping Prods. v. United States*, 33 CIT. 1589 (Oct, 20, 2009);

*see also Ceramark Tech. Inc. v. United States*, 11 F. Supp. 3d 1317, 38 CIT. 1395 (Sep. 24,

2014).

### 4. Commerce's Excuses for Not Noting the Alleged Misreporting Until Verification Are Spurious.

Commerce's assertion that it complied with its statutory obligation pursuant to Section

782(d) of the Act to inform the respondent of a deficiency is baseless. Commerce's statement

that "we provided such an opportunity to the per-wrapped package reporting and granted the

requested extension in full" is a bold mischaracterization. *See* IDM at Comment 1. The question

referenced by Commerce simply stated "Fuzhou Hongli reported certain factors of production on

a per pack basis (see Exhibits D-6 and D-7). Please report all factor consumption usage rates on

a per KG basis and revise the individual and combined FOP databases accordingly." *See* SQR at

Question 12. Commerce's direction to report inputs on a per-kg instead of a per-package basis

has nothing to do with the paperboard weight specificity issue.

The question does not notify Fuzhou Hengli that it should report its paperboard input

separately for each basis-weight of the paperboard. Specificity of the paperboard input weight

does not change in any way based upon whether the materials are allocated by "package" or

kilogram. Naturally, the overall paperboard input quantity for producing different packages will

vary because the size of the packages vary, while the paperboard input quantity per-kilogram

will remain virtually identical because regardless of their size the plates are produced virtually

identically and use virtually the identical weight on a per-kilogram basis, but this has no bearing

on the weight-basis of the paperboard. Further, the fact that Fuzhou Hengli fully complied with

the request and yet Commerce still applied AFA further demonstrates that this statement by

Commerce is erroneous and spurious.

The reference to Fuzhou Hengli's initial reporting of factors based on "packages" is a red herring put forward to excuse Commerce's negligence.[2]  Commerce implies that it was only after Fuzhou Hengli reported its FOPs on a per-kg basis that it was possible to determine that Fuzhou Hengli was not reporting multiple different paperboards inputs.  This is nonsensical and only serves to obfuscate the obvious record evidence.  The fact that there is one paperboard field in the FOP database shows clearly that the paperboard is not being reported as multiple different inputs.  Likewise, as discussed above, the material allocation exhibits submitted in the Section D Response and Supplemental Questionnaire Response confirm this matter.  Whether or not the allocation basis is per-kg or per-package has no bearing on this fact.  Therefore, there is no reason for Commerce not to know from the outset that Fuzhou Hengli was not reporting paperboard inputs on a CONNUM-specific basis.

Commerce's assertion that "{a}t verification, Commerce noted that Fuzhou Hengli reported that all CONNUMs have the same paperboard input usage rate, which was derived from multiple paperboard inputs with different basis weights" is misleading.  As described above in Section I.A., this information was on the record from the submission of the very first Section D response.

Commerce's claim that "we discovered at verification that Fuzhou Hengli was able to match the paperboard inputs with paper plates based on basis weight but failed to do so" is also a mischaracterization.  *See* IDM at Comment 1.  Commerce never found Fuzhou Hengli's input reporting deficient, nor directed Fuzhou Hengli to report paperboard inputs based on basis-

---

[2] We note that Commerce's statement that "The initial questionnaire states that the consumption amount must be reported on a per unit basis (*e.g.,* per kilogram, pound, *etc.*) is misleading, as the initial questionnaire also says at page D-10 that the per-unit basis can also be "the production of one item of the merchandise under consideration" *i.e.*, a package in this instance. *See* IQR at D-4.

weight of the finished product. So, there was no "discovery" of anything that Fuzhou Hengli "failed to do." Accordingly, this does not alleviate Commerce from the obligation to notify Fuzhou Hengli of alleged deficiencies.

Commerce's assertion that "{t}hirteen business days before the *Preliminary Determination,[3]* Fuzhou Hengli revised its reported material consumption reporting to be based on a per-kilogram basis" in its supplemental response equally fails as a justification for not alerting Fuzhou Hengli in a timely manner that its reporting was deficient. *See* IDM at Comment 1. This, in fact, highlights the likely cause of Commerce's failure to provide Fuzhou Hengli the opportunity to cure any alleged deficiencies. The reason Fuzhou Hengli's supplemental questionnaire response was submitted close to the *Preliminary Determination* is that Commerce did not issue a supplemental questionnaire to Fuzhou Hengli until 163 days after the initiation of the investigation. *See* SQR. By contrast, the first supplemental questionnaire in the companion *Paper Plates from Vietnam* investigation was issued 131 days after initiation, and in *Paper Plates from Thailand*, 92 days (Section A) and 125 days (Sections C and D), both over a month sooner than the supplemental questionnaire to Fuzhou Hengli. *See Certain Paper Plates From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures,* 89 Fed. Reg. 72,375 (Dept' Commerce Sept. 5, 2024) and accompanying preliminary decision memorandum; *see Certain Paper Plates From Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part,*

---

[3] We note that Fuzhou Hengli submitted its response 20 days before the signature date of the Preliminary Determination. *See* Hengli's SQR Resp. submitted on August 9; Preliminary Determination signed on August 29.

*and Postponement of Final Determination and Extension of Provisional Measures,* 89 Fed. Reg. 72,370 (Dept' Commerce Sept. 5, 2024) and accompanying preliminary decision memorandum. Further, in both of those investigations, Commerce issued four supplemental questionnaires to the respondents, while only one was issued to Fuzhou Hengli here. *Id.* Furthermore, the supplemental questionnaire issued to Fuzhou Hengli was largely just a verbatim duplication of Petitioner's comments.

In short, it is clear that Commerce failed to scrutinize Fuzhou Hengli's responses in a timely manner, if at all. Taking the totality of facts and circumstances in this case, this is the most reasonable explanation for Commerce's failure to notify Fuzhou Hengli of the alleged deficiency. Commerce's stated reasons for "only discovering" Fuzhou Hengli's alleged deficiencies at verification were mere excuses proposed to obfuscate its own negligence and unlawful actions.

### C. Commerce Should Make a Determination Regarding the Appropriate Surrogate Value for Fuzhou Hengli's FBB Input in Accordance with the Law and Based on Substantial Evidence

Commerce's attempt to inflate the NV by valuing the main input of paperboard with an SV for kraft paper, a completely different and much more expensive material, must be rejected. The record evidence is clear that this material was not used at all by Fuzhou Hengli. Further, as clearly shown below, it is a very different material from FBB, with entirely different specifications and properties. The fact that its value is four times that of the FBB also demonstrates that it is essentially a different product. Commerce cannot artificially and arbitrarily inflate the NV by valuing an input with a much higher SV from a very different product, contrary to its established practice and statutory requirements.

### 1.    The Legal Framework for Surrogate Value Selection

Commerce's practice when selecting the best available information for valuing factors of production ("FOPs"), in accordance with section 773(c)(1) of the Act, is to select, to the extent practicable, surrogate values which are product-specific, representative of a broad market average, publicly available and contemporaneous with the POI, and tax/duty exclusive. Commerce undertakes its analysis of valuing the FOPs on a case-by-case basis, after carefully considering the available evidence in light of the particular facts of each industry. While there is no hierarchy for applying the surrogate value selection criteria, specificity is particularly the most important factor in the selection of SVs. *See Taian Ziyang v. United States,* 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011) ("*Taian Ziyang")* (holding that "in sum, 'product specificity' logically must be the primary consideration in determining 'best available information.' If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1"); *see also Qingdao Sea-Line Trading Co. v. United States,* 766 F .3d 1378, 1386 (Fed. Circ. 2014) ("*Qingdao Sea-Line*") (holding SV selection justified where Commerce treated product-specificity as "more important factor" than other criteria); *see also Ad Hoc Shrimp Trade Action Comm. v. United States,* 618 F. 3d 1316, 1322 (Fed. Cir. 2010) ("*Ad Hoc Shrimp*") (affirming the selection of "product-specific data" as "best available information"); *see also Certain Steel Threaded Rod from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015,* 81 Fed. Reg. 83,800 (Dep't of Commerce Nov. 22, 2016) ("*Threaded Rod from China*")*,* and accompanying IDM at 8 (relying on Bulgaria as the primary surrogate country because it has greater specificity for diameter of the steel inputs).

Additionally, the Department must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' surrogate

value is for each input." *Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 49,460 (Dep't Commerce Aug. 13, 2010) and accompanying Issues and Decision Memorandum at Comment 3; *see also Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 55,039 (Dep't Commerce Sept. 24, 2008) ("PET Film") and accompanying Issues and Decision Memorandum at Comment 2; *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19,546 (Dep't Commerce Apr. 22, 2002) ("Crawfish 2002") and accompanying Issues and Decision Memorandum at Comment 2.

> ### 2.    The Record is Unequivocally Clear That Fuzhou Hengli's Paperboard Input is FBB.

Fuzhou Hengli's submitted category for valuing paperboard inputs, HTS 481092, is the only category on the record that satisfies all of these criteria as it is the only category that is specific to the input used by Fuzhou Hengli's producers to make the merchandise under investigation.

There can be no question that Fuzhou Hengli's suppliers used the input folding box board ("FBB") to produce the subject merchandise. Fuzhou Hengli placed extensive evidence on the record demonstrating this fact. Based on this evidence, the Department determined in the *Preliminary Determination* that Fuzhou Hengli's paperboard input was FBB and the correct surrogate value ("SV") for valuing it is HTS category 481092. Every aspect of the record evidence regarding the FBB input was subsequently thoroughly verified by the Department and found to be accurate. Accordingly, there is no basis to change the *Preliminary Determination*.

Commerce, though declining to address Fuzhou Hengli's paperboard input in the IDM, appears to at least partially concede that HS subheading 4810.32 (Kraft Paper) and HS subheading 4810.92 (FBB) are two entirely different materials with entirely different properties and specifications.  *See* IDM at Comment 2.

### 3. The Record is Clear that Only HTS 481092 is Specific to FBB and That HTS 481092 Cannot Include FBB

HTS category 481092 is defined as:

"Paper and paperboard, coated on one or both sides with kaolin (China clay) or other inorganic substances, with or without a binder, and with no other coating, whether or not surface-colored, surface-decorated or printed, in rolls or rectangular (including square) sheets, of any size:  **Paper And Paperboard (Other Than Kraft Or Graphic), Multi-Ply, Clay Coated, In Rolls Or Sheets**."

*See* Letter to Sec'y of Commerce from The Bristol Group PLLC, "Certain Paper Plates from the People's Republic of China: Petitioner's Supplemental Surrogate Value Submission" PR Doc. 248 (July 23, 2024) ("Petitioners' Additional SV Submission") at Exhibit 1.

As detailed below, this category specifically addresses the FBB used by Fuzhou Hengli's suppliers.

The other HTS category used by Commerce, HTS 481032, is not supported as being specific to Fuzhou Hengli's products' inputs.  HTS 481032 is defined as:

"Paper and paperboard, coated on one or both sides with kaolin (China clay) or other inorganic substances, with or without a binder, and with no other coating, whether or not surface-colored, surface-decorated or printed, in rolls or rectangular (including square) sheets, of any size:

**Kraft paper and paperboard,** other than that of a kind used for writing, printing or other graphic purposes:

**Bleached uniformly throughout the mass** and **of which more than 95 percent by weight of the total fiber content consists of wood fibers obtained by a chemical process** and weighing more than 150 g/m²."

*Id.*

Fuzhou Hengli's FBB is distinct from the solid bleach board ("SBB") kraft paper and paperboard covered by this HTS category used by Commerce. As discussed below, the record evidence is clear that the inputs used in Fuzhou Hengli's products fall under HTS 481092 and not HTS 481032.

### 4. Fuzhou Hengli's FBB Is Not "Kraft Paper And Paperboard" Covered Under HTS 481032

HTS 481032 is for a distinctly different input than that used by Fuzhou Hengli. HTS 481032 explicitly applies to "Kraft paper and paperboard":

| Heading/ Subheading | Stat. Suf- fix | Article Description |
|---|---|---|
| 4810 (con.) | | Paper and paperboard, coated on one or both sides with kaolin (China clay) or other inorganic substances, with or without a binder, and with no other coating, whether or not surface-colored, surface-decorated or printed, in rolls or rectangular (including square) sheets, of any size: (con.) |
| | | Kraft paper and paperboard, other than that of a kind used for writing, printing or other graphic purposes: |
| 4810.31 | | Bleached uniformly throughout the mass and of which more than 95 percent by weight of the total fiber content consists of wood fibers obtained by a chemical process and weighing 150 g/m² or less: |
| 4810.31.10 | | In strips or rolls of a width exceeding 15 cm or in rectangular (including square) sheets with one side exceeding 36 cm and the other side exceeding 15 cm in the unfolded state.................... |
| | 20 | Folding carton stock.......................... |
| | 40 | Base stock for trays, dishes, plates, cups and the like........................ |
| | | Other: |
| | 50 | Gift wrap................................ |
| | 80 | Other............................... |
| | | Other: |
| 4810.31.30 | 00 | Cards, not punched, for punchcard machines, whether or not in strips...................... |
| 4810.31.65 | 00 | Other............................... |
| 4810.32 | | Bleached uniformly throughout the mass and of which more than 95 percent by weight of the total fiber content consists of wood fibers obtained by a chemical process and weighing more than 150 g/m²: |

The HTSUS explains that "in this chapter 'kraft paper and paperboard' means paper and paperboard of which not less than 80 percent by weight of the total fiber content consists of

fibers obtained by the chemical sulfate or soda processes." *See id.* at Exhibit 1, HTSUS Chapter

48 at note 6.

> "6. In this chapter 'kraft paper and paperboard' means paper and paperboard of which not less than 80 percent by weight of the total fiber content consists of fibers obtained by the chemical sulfate or soda processes."

Kraft paper and paperboard is made of chemical pulp:

> "**Two major chemical pulping processes are sulfite pulping and kraft pulping**.  Sulfite pulping can be carried out at different pH levels with different bases – calcium at low pH (1-2), magnesium (3-5), and ammonium and sodium over the entire range of pH.  The pH levels used in sulfite pulping cover the entire range of 1-13 (1-2, acid sulfite; 3-5, bisulfite; 5-7 neutral sulfite (semichemical) – NSSC; 9-13, alkaline sulfite).  On the other hand, kraft pulping is a distinctly alkaline process and works in the range of pH 11-14, using the cooking chemicals of sodium hydroxide and sodium sulfide (the reactive species being the hydroxide and hydrosulfide ions)."

*See* Hengli's Final SV Submission at Exhibit 19, "Referenced by DOE of Malaysia

reprint" for the "Chemical Pulping" at page 904 ("Two major chemical pulping

processes are sulfite pulping and kraft pulping.").

   Kraft pulping is one of the two major chemical pulping processes.  Accordingly, to

qualify as kraft paper or paperboard, at least 80 percent of the total fiber content by weight must

be chemical pulp.  None of Fuzhou Hengli's FBB meets this criterion, as demonstrated by the

factory reports verified by the Department for 98.79% of the paperboard inputs supplied to

Ecosource during the POI.  *See* Verification Report at 11.

   For instance, an inspection report from Ecosource's largest supplier, provided in Fuzhou

Hengli's Final SV Submission, demonstrates:

34

[Translation]

# Jiangxi Chenming Paper Company Limited.

## Product Factory Inspection Report

Product Type: 250g paperboard for plates    Paperboard Type: FBB multi-layer paperboard
Production Date: September 24, 2023    Inspection Date: September 24, 2023

| No. | Inspection Item | Unit | Inspection Method | Standard Range | Inspection Result | Single Item Determination |
|---|---|---|---|---|---|---|
| 1 | Grammage | g/m² | GB/T451.2 | 245-250 | 250 | Passed |
| 2 | Thickness | um | GB/T451.3 | 330-340 | 335 | Passed |
| 3 | Folding Endurance | times | GB/T457 | ≥100 | 109 | Passed |
| 4 | MD/CD Stiffness | mN | GB/T22364 | ≥10.5/4.5 | 11.3/4.7 | Passed |
| 5 | Smoothness (Front) | s | GB/T456 | ≥100 | 268 | Passed |
| 6 | Front/Back Whiteness (R457) | % | GB/T7974 | 81±2 | 80.9/81.2 | Passed |
| 7 | Surface Absorption（Front/Back） | g/ m² | GB/T1540 | ≤25/35 | 19.5/29.4 | Passed |
| 8 | Dust （0.2-1.0) mm2≤20 | | GB/T1541 | 8/15 | 7/15 | Passed |
| | ≥1.0mm2 (Not Allowed) | | | 0 | 0 | Passed |
| 9 | Moisture Content | % | GB/T462 | 7.5-8.0 | 7.6 | Passed |
| 10 | Pulp Composition（Chemical Needle Pulp） | % | | | 20 | Passed |
| 11 | Pulp Composition（Chemical Leaf Pulp） | % | | | 38 | Passed |
| 12 | Pulp Composition（Mechanical Pulp） | % | | | 42 | Passed |
| 13 | Coating（Calcium Carbonate） | % | | | 10 | Passed |
| 14 | Ash Content | % | | | 11.3 | Passed |
| 15 | Surface Strength | m/s | GB/T22365 | ≥2.0 | 2.25 | Passed |
| 16 | Interlayer Bond Strength | J/ m² | GB/T26203 | ≥120 | 130 | Passed |
| 17 | Bursting Strength  (Front) | psi | | 90±5 | 108 | Passed |
| 18 | Edge Soaking | mm | GB/T10739 | ≤4 | 3 | Passed |

Inspector: Xiong Lu        Reviewer: Tu Siyan        Approver: Li Shaoxiong
Technical Department

[Seal]
Jiangxi Chenming Paper
Company Limited.
**Technical Department**

*See* Fuzhou Hengli's Final SV Submission at Exhibit 14 for three "Product Factory Inspection Reports" for the "Pulp Composition (Chemical Needle Pulp): 20%" and "Pulp Composition (Chemical Leaf Pulp): 38-42%".

Ecosource's second largest supplier likewise had chemical pulp well below the levels needed for kraft paper:



[Translation]

**Shandong Bohui Paper Industry Co., Ltd.**
SHANDONG BOHUI PAPER INDUSTRY CO., LTD.

North of Industrial Road, Maqiao Town, Huantai County, Zibo City, Shandong Province, China
MAQIAO, HUANTAI, ZIBO, SHANDONG, CHINA
Postal Code: 256405    Phone Number: 0533-8533397    Company Website: www.bohui.com

**Paper Quality Inspection Report**

Testing Condition:
Temperature: (23±1)°C/Relative Humidity: (50±2)%RH

| Customer Name | | | Guangdong Ecosource Environmental Technology Co., Ltd. | | | |
|---|---|---|---|---|---|---|
| Product Name: | High-grade food-grade paper for dishes LPT | | Grammage: | 300g/m² | Date of Production: | October 21, 2023 |
| Paperboard Type | | | FBB multi-layer paperboard | | | |
| Pulp Components | | | Chemi-mechanical pulp: 30~40%, Chemical pulp: 50~60%. | | | |
| | | | Reintroduced non-compliant paper: 10~20% | | | |
| Coated Components | | | Calcium carbonate | | | |
| Items to be Tested | | Unit | Testing Methods | Standard Value | Test Value | Single Item Determination |
| Grammage | | g/m² | GB/T451.2 ISO536 | 300±3% | 298 | Passed |
| Thickness | | μm | GB/T451.3 ISO534 | 380±3% | 372 | Passed |
| Moisture Content | | % | GB/T462 ISO287 | / | 9.7 | Passed |
| Cobb (60s) | Top | g/m² | GB/T1540 ISO535 | ≤ 60 | 26 | Passed |
| | Back | | | ≤ 60 | 26 | Passed |
| Brightness (D65) | Top | % | GB/T7974 ISO2470-2 | 82±3.0 | 82.52 | Passed |
| Taber Stiffness | CD | mN.m | GB/T22364 ISO2493 | ≥5.9 | 7.58 | Passed |
| | MD | | | ≥12.0 | 14.76 | Passed |
| PPS Surface Roughness | | μm | GB/T22363 ISO8791 | ≤ 3.5 | 2.62 | Passed |
| Folding Endurance | CD | times | GB/T457 ISO5626 | ≥100 | 542 | Passed |
| *Bursting Strength | | kPa | GB/T454 ISO2758 | / | 841 | Passed |
| *Edge Soaking (95°C hot water for 10 min) | Distance Method | mm | GB/T31905 | / | 3.00 | Passed |
| | Gravimetric Method | kg/m² | | / | 1.05 | Passed |
| Interlayer Bond Strength | | J/m² | GB/T26203 | ≥130 | 221 | Passed |
| Conclusion | | | Passed | | | |

Prepared by: Zhou Yanyan          Reviewed by: Cui Junyan          Approved by: Jin Yongchao

Quality Inspection Approved Seal

SHANDONG BOHUI PAPER INDUSTRY CO., LTD.
Q.A.D.

*See* Hengli's Final SV Submission at Exhibit 15 for the "Paper Quality Inspection Report" for the "Pulp Components: Chemical pulp: 50~60%".

As the Department noted in the Verification Report,

> We reviewed [          ] product specification and a factory inspection report from a paper input supplier, [                                   ], who supplied 70 percent of total quantity of paper inputs. The inspection report lists the paper type as folding box board (FBB) multi-ply paper board. We reviewed explanations from suppliers of paper inputs which stated that the fiber content consists of wood fibers. Finally, we noted the factory inspection report lists that chemical pulp (needle leaf) is 20 percent, chemical pulp (broad leaf) is 38 percent, and mechanical pulp is 42 percent.

Verification Report at 9.

The Department further verified the accuracy of Fuzhou Hengli's reporting of these inputs:

> We reviewed sample source documentation for material consumption. Further, we reviewed procedures, invoices, freight, accounting record, VAT invoice, and payment for raw materials, ink, and flexo gloss that were purchased from NME suppliers. Ecosource made no purchases from market economic suppliers. We noted no discrepancies. See VE-13.

*Id.* at 16.

Accordingly, it is indisputable that Fuzhou Hengli's FBB input is not kraft paper or SBB and is not covered by Petitioner's suggested HTS category of 4810.32.

## 5.    Fuzhou Hengli's FBB Is Not "Bleached Uniformly Throughout" As Is Required Under HTS 481032

The FBB used to produce Fuzhou Hengli's products is not "bleached uniformly throughout" as specified in HTS 481032.

| 4810.32 | | | Bleached uniformly throughout the mass and of which more than 95 percent by weight of the total fiber content consists of wood fibers obtained by a chemical process and weighing more than 150 g/m²: |

As discussed, FBB consists of at least three layers, including a mechanical or chemi-mechanical layer sandwiched between bleached chemical layers. *See* Hengli's Final SV Submission at Exhibit 19; *Food Packaging Technology* at 252. Fuzhou Hengli provided "Product Factory Inspection Reports" for the "Paperboard Type:  FBB Multi-layer paperboard"

at three different weights used by Ecosource's largest supplier of paperboard, the "Paper Quality Inspection Report" for "Paperboard Type – FBB multi-layer paperboard" used by Ecosource's second largest supplier of paperboard, and the "Enterprise Standard" of the inputs, each of which demonstrates that the products used by Fuzhou Hengli's suppliers are not bleached uniformly throughout.  *See* Hengli's Final SV Submission at Exhibit 14-15; Exhibit 20.

Due to the differing composition of these layers, they are not "bleached uniformly."  As shown in the chart below, chemical and mechanical derived pulp do not react similarly to bleaching.  The "Optical" quality presented in the chart shows that chemical process pulp is easily bleached, but that the mechanical processed pulp used by Fuzhou Hengli (FBB) is not.  Accordingly, the bleaching of the FBB is not uniform.  *See id.* at Exhibit 19 - Quality Parameters - Optical, (pdf page 525).



| Quality Parameters | | |
| --- | --- | --- |
| | Chemical | Mechanical |
| Strength | - High - fibres intact | - Low - fibres damaged |
| Bulk | - Low - more and flexible fibres | - High - few and less flexible fibres |
| Optical | - Dark but bleachable - Poor light scattering | - Bright but hard to bleach high - Good light scattering |
| Drainability | - Good - long fibres, few fines | - Poor - short fibres, many fines |
| Permanence | - Good | - Poor (optical) |

**6.      Fuzhou Hengli's FBB Is Not "More Than 95 Percent by Weight of The Total Fiber Content Consists of Wood Fibers Obtained by A Chemical Process" As Required by HTS 481032**

Fuzhou Hengli's FBB is not "more than 95 percent by weight of the total fiber content consists of wood fibers obtained by a chemical process." Fuzhou Hengli presented, and the Department verified, numerous inspection reports and quality control reports showing that the fibers in the FBB inputs used by Ecosource were well below 95% chemical processed. *See id.* at Exhibit 14 for three "Product Factory Inspection Reports" for the "Pulp Composition (Chemical Needle Pulp): 20%" and "Pulp Composition (Chemical Leaf Pulp): 42%"; Exhibit 15 for the "Paper Quality Inspection Report" for the "Pulp Components: Chemical pulp: 50~60%".

Chemi-mechanical pulp and mechanical pulp both consist of wood fibers obtained by a mechanical process. "The main difference between mechanical pulping and chemical pulping is that, in mechanical pulping, the fibers are separated without removing the lignin, whereas in chemical pulping, the lignin is dissolved from the wood using chemicals." In chemi-mechanical pulping, "the woodchips may be pretreated with chemicals either to reduce refiner energy usage or to help separate the fibers. Compared to chemical processes, the chemi-mechanical pulping processes remove only a small amount of the lignin in the wood": *See id.* at Exhibit 19 "Mechanical Pulping" at 899.

> ments that separate fibers from the wood matrix. The main difference between mechanical pulping and chemical pulping is that, in mechanical pulping, the fibers are separated without removing the lignin, whereas in chemical pulping, the lignin is dissolved from the wood using chemicals. Mechanical pulps are characterized by high yield, high lignin content, and relatively stiff fibers that can be bleached to high brightness levels but that will photoyellow (darken) on exposure to light. The yield from the mechanical pulping processes ranges from as high as 98% for some groundwood pulps to about 85% for some of the chemimechanical pulps. In refiner mechanical pulping, the woodchips may be pretreated with chemicals either to reduce refiner energy usage or to help separate the fibers. Compared to chemical processes, the chemimechanical pulping processes remove only a small amount of the lignin in the wood. Since mechanical fibers are

Despite the pre-treatment with chemicals, chemi-mechanical pulp still consists of wood fibers obtained through a mechanical process and is therefore categorized as mechanical pulp:  *See id.* at Exhibit 19 "Mechanical Pulping" at 900, "Mechanical Pulping Processes"; Wikipedia "Mechanical pulping."

## Mechanical pulping processes [edit]

A number of different mechanical processes exist:[5]

- **Stone groundwood pulp** (SGW) is produced by pressing the wood onto a rotating grinding stone. The grinding grits in the surface will penetrate into the surface of the wood and separate the fibers by a combination of compression, heating and shear.
- **Pressurised groundwood pulp** (PGW) is produced in the same manner as SGW, but the grinding is performed in a pressurized chamber with steam. This makes the process more efficient and reduce the energy consumption.
- **Refiner mechanical pulp** (RMP) is produced by feeding wood chip into the center of a disk refiner, consisting of two grooved discs. Either one disc rotates and the other is stationary, or both are rotating in opposite directions. The wood chips are forced toward the periphery by the centrifugal force and is crushed into pulp between the discs.
- **Thermomechanical pulp** (TMP) is produced in the same manner as RMP, but in an atmosphere with elevated pressure. TMP pulp can be produced in several steps, of which the first refiner is pressurized.
- **Chemimechanical pulp** (CMP) is produced with refiners, but the chips are impregnated of soaked in chemicals before refining. This softens the wood by dissolving some of the lignin. The yield also drops below 90% as a consequence.
- **Chemi-thermomechanical pulp** (CTMP) is similar to CMP, but the refining is made under elevated pressures and less chemicals are used.
- **Bleached chemi-thermomechanical pulp** (BCTMP) also includes a bleaching step.

Fuzhou Hengli's FBB consists of more than 30% "wood fibers obtained by a" *mechanical* process.  *See id.* at Exhibit 14 for three "Product Factory Inspection Reports" for the "Pulp Composition(Mechanical Pulp): 42%"; Exhibit 15 for the "Paper Quality Inspection Report" for

the "Pulp Components: Chemi-mechanical pulp: 30~40%." The Department specifically verified the pulp composition of Ecosource's inputs and found that:

- Two factory inspection reports issued by [                    ] show that chemical pulp (needly leaf) is 20 percent, chemical pulp (broad leaf) is 38 percent, and mechanical pulp is 42 percent, by weight of the total fiber content.

- Two factory inspection reports issued by [                ] to Ecosource show that chemi-mechanical pulp is 30-40 percent, chemical pulp is 50-60 percent, and reintroduced non-compliant paper is 10-20 percent, by weight of the total fiber content.

- The factory inspection report issued by [                ] shows that chemical pulp (needly leaf) is 10-15 percent, chemical pulp (broad leaf) is 20-30 percent, and chemi-mechanical pulp is 40-60 percent, by weight of the total fiber content.

Verification Report at 11.

Accordingly, Fuzhou Hengli's FBB cannot meet the criterion of "More Than 95 Percent By Weight Of The Total Fiber Content Consists Of Wood Fibers Obtained By A Chemical Process" as required by HTS 481032.

### 7. Fuzhou Hengli's FBB Is Multi-Ply as Provided for by HTS 481092

HTS 481092 covers the category for "Other paper and paperboard" (*i.e.,* other than "Kraft paper and paperboard") that is specific to multi-ply products. FBB is by definition multi-ply, as it consists of a layered combination of chemical pulp and some form of mechanical pulp or thermo-mechanical pulp sandwiched between the chemical pulp layers. FBB is defined as "compris{ed of} middle layers of mechanical pulp sandwiched between layers of bleached

chemical pulp." *See, e.g.,* Hengli's Final SV Submission at Exhibit 19, *Food Packaging Technology* at 252 ("Folding boxboard comprises middle layers of mechanical pulp sandwiched between layers of bleached chemical pulp").  This combination of the inner mechanical pulp and the outer chemical pulp layer is what creates FBB's characteristic of a low-density, expanded board with excellent folding and printing properties.

Record evidence clearly shows that Fuzhou Hengli's suppliers' FBB input is multi-ply.  The inspection reports, quality control reports and "Enterprise Standard" submitted by Fuzhou Hengli and verified by the Department show that the FBB paperboard input "consists of 3 layers:  surface, core and bottom."  *See* Hengli's Final SV Submission at Exhibit 14, Exhibit 15 and Exhibit 20 for the "Enterprise Standard" from another of Ecosource's suppliers, specifying that "The paperboard consists of 3 layers:  surface, core and bottom."  The pulp used respectively is bleached chemical pulp, bleached chemi-mechanical pulp and bleached chemical pulp.  *Id.*

### 8. Commerce Cannot Value an Input with a Surrogate Value for an Entirely Different Material Simply Based on Weight When There is an Appropriate Surrogate Value on the Record.

Commerce's determination to partially value FBB with a SV for an entirely different material that is four times higher in value than FFB, based solely on weight, without regards to the specificity criteria, must be rejected. *See* IDM at Comment 2.  As explained above, selecting an SV for a material that is entirely a different input than the one used in the production of the subject merchandise is contrary to the law and the Department's practice.  *See, e.g*., *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 925 F. Supp. 2d 1332, 1344-45 (Ct. Int'l Trade 2013) (remanding the Department's determination to value an input with a surrogate value that does not represent the specific input).  The Department's practice is to value material inputs with surrogate values that are the most specific to the input used.  As demonstrated above, only Fuzhou Hengli's proposed HTS category (HTS 481092) is specific to its folding box board

("FBB"), while HTS category 481032 is for an entirely different product. Therefore, Commerce must reverse its *Final Determination* and continue to use HTS 4810.92 to value Fuzhou Hengli's FBB input.

As an initial matter, Commerce's assertion that HTS 4810.32 is more specific to the paperboard inputs than HTS 4810.92 in terms of its weight is pure speculation. *See* IDM at Comment 2. HTS 4810.92 does not exclude weights used by the respondents. It almost certainly includes all the weights used by the respondents. There is simply no evidence that HTS 4810.32 more closely matches the paperboard weights used by the respondents.

Commerce's observation that "basis weight is a critical component in the manufacture and sale of paper plates as supported by the fact that basis weight is the fourth digit in the 13-digit CONNUM" is wildly disingenuous. *Id.* As Commerce is well aware, the basis weight has, in fact, no bearing on the NV. Under Commerce's NME methodology where all paperboard inputs are being valued with the same SV, the difference in basis weight would have no effect at all on the NV. As discussed in the prior section, Fuzhou Hengli used only one type of paperboard input, which is all valued by one SV, regardless of whether it is separately reported by different basis-weights or reported as one input for all weights.

Commerce's reliance on CONNUM construction as a basis for selecting the surrogate value based on weight is misplaced and disingenuous. It is Commerce's long-established practice to select surrogate values based on specificity – which material is most like the material input being used in production. While it would be acceptable under Commerce's practice to choose between two similar materials, *ceteris paribus*, the SV that matches the input's weight more closely, it is contrary to law to select as the SV a completely different material based only on the consideration of weight. Commerce cannot simply ignore the specificity criterion, which

is the most important consideration when selecting SVs, and base its choice for SV on one CONNUM characteristic, particularly when the SV is for a completely different material than the input being used.

### 9.    There Is No Basis in Law or Commerce's Practice to Use a Simple Average of the Two HTS Categories

There is no basis in law or practice to use an average of two HTS categories when only one of the categories is specific to the input.  As discussed, Commerce's practice is to value inputs with the SV that is most specific to the input.  Commerce cites no legal or practical precedent that justifies choosing an SV that is not specific to the input, based solely on the consideration for weight.  In fact, no such precedent exists, and Commerce's decision is contrary to law.

In *PET Film from China,* the sole case cited by Commerce (though only for the proposition that the two SVs should be combined in a simple average), Commerce found that "{t}he information on the record supports a finding that HTS subheadings may be equally applicable to Respondents' inputs" and therefore averaged the two input values.  *See* IDM at Comment 1; *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of the First Antidumping Duty Administrative Review,* 76 Fed. Reg. 9,753 (Dep't Commerce Feb. 22, 2011) ("*PET Film from China*") and accompanying IDM at Issue 3. This is decidedly not the case in this investigation, where Commerce acknowledges that HTS category 481032 is for kraft paper, a very different material than Fuzhou Hengli's FBB.  There is absolutely no evidence on this record to support the use of a SV for kraft paper being applied to value FBB.  Commerce must therefore value Fuzhou Hengli's FBB input with the only specific SV on the record—HTS 4810.92.

**D.    As There is No Basis to Apply AFA to Fuzhou Hengli, Commerce Must Reverse its Finding that Critical Circumstances Exist for Fuzhou Hengli.**

As elaborated above, there is no legal basis for Commerce to apply AFA to Fuzhou Hengli with respect to its FOP reporting.  Therefore, Commerce must reconsider its critical circumstances finding with regards to Fuzhou Hengli in the *Final Determination*.  After reversing its AFA application and recalculating an accurate dumping margin for Fuzhou Hengli, Commerce must continue to find, as in the *Preliminary Determination*, that no critical circumstances exist for Fuzhou Hengli, if the revised margin falls below the 25% threshold required by statutes to impute importer knowledge of sales below fair value.

### 1.    Legal Standard for an Affirmative Finding of Critical Circumstances

Section 733(e)(1) of the Act provides that Commerce, upon receipt of a timely allegation of critical circumstances, will determine whether there is a reasonable basis to believe or suspect that: (A)(i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise; or (ii) the person by whom, or for whose account, the merchandise was imported knew or should know that the exporter was selling the subject merchandise at less than its fair value and that there was likely to be material injury by reason of such sales; and (B) there were massive imports of the subject merchandise over a relatively short period.  *See* 19 U.S.C. § 1673b(e)(1).  Pursuant to its practice, Commerce considers a dumping margin of 25 percent or more for export price sales and 15 percent or more for constructed export price sales sufficient to impute importer knowledge of sales at less than fair value under criterion (A).  *See* PDM at 29.

Furthermore, 19 C.F.R 351.206(h)(1) provides that, in determining whether imports of the subject merchandise have been "massive," Commerce normally will examine: (i) the volume and value of imports; (ii) seasonal trends; and (iii) the share of domestic consumption accounted

for by the imports.  19 CFR 351.206(h)(2) further provides that, "{i}n general, unless the imports during the 'relatively short period'...have increased by at least 15 percent over imports during an immediately preceding period of comparable duration, {Commerce} will not consider the imports massive."  Section 351.206(i) of Commerce's regulations defines "relatively short period" generally as the period starting on the date the proceeding begins (i.e., the date the petition is filed) and ending at least three months later.  This section of the regulations further provides that, if Commerce "finds that importers, or exporters or producers, had reason to believe, at some time prior to the beginning of the proceeding, that a proceeding was likely," then Commerce may consider a period of not less than three months from that earlier time.  In an investigation, critical circumstances may only be imposed if both Commerce and the International Trade Commission make affirmative findings.  If Commerce finds that critical circumstances exist, the Commission must also determine that the imports in question "are likely to undermine seriously the remedial effect" of the order.  19 U.S.C. § 1673d(b)(4)(A)(i).

### 2.    Commerce Should Find That Critical Circumstances Do Not Exist with Respect to Fuzhou Hengli

As there is no basis to apply AFA, Commerce must reconsider its automatic imputation of importer knowledge of dumping and the final critical circumstances determination with respect to Fuzhou Hengli.  After revising the weighted-average dumping margins for Fuzhou Hengli without the application of AFA, Commerce should determine that there is no reasonable basis to believe or suspect that importers knew or should have known that Fuzhou Hengli was selling the subject merchandise at LTFV dumping, if the revised margin does not exceed the threshold of 25 percent, and thus, insufficient to impute knowledge of sales below fair value. *See* PDM at 29-30.  In such case, as in the *Preliminary Determination*, Commerce should

exclude Fuzhou Hengli from the massive imports analysis as its margin does not exceed the 25 percent threshold.  *See id.* at 30.

## VII.    <u>CONCLUSION AND RELIEF REQUESTED</u>

Based on the foregoing, Fuzhou Hengli respectfully requests that this Court (i) hold that Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Edward J. Thomas III
Nicholas C. Duffey
Jenny (Shiyu) Liang

MORRIS, MANNING & MARTIN, LLP
1333 New Hampshire Ave, N.W.,
Suite 800
Washington, D.C. 20036
(202) 216-4107

*Counsel to Plaintiff Fuzhou Hengli Paper Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 12,751 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Gene Degnan
Gene Degnan

Dated: August 1, 2025