## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

**FUZHOU HENGLI PAPER CO., LTD.,**

      **Plaintiff,**

  v.

**UNITED STATES,**

      **Defendant,**

  **and**

**AMERICAN PAPER PLATE COALITION,**

      **Defendant-Intervenor.**

Court No. 25-00064

**PUBLIC
VERSION**

**BPI Removed from Brackets on
Pages 21, 22, 23, 26, 27, and 29**

### DEFENDANT-INTERVENOR'S RESPONSE BRIEF

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Date: September 30, 2025

*Counsel to Defendant-Intervenor
American Paper Plate Coalition*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

RULE 56.2 STATEMENT ............................................................................................. 1

    1.    The Administrative Determination Under Review ....................................... 1

    2.    The Issues Presented and Reasons Supporting Commerce's Determination.................. 2

        A.    Whether Commerce's determination that Hengli did not act to the best of its ability in reporting its factors of production ("FOPs"), and therefore that the application of adverse facts available ("AFA") was warranted, was supported by substantial evidence on the record and otherwise in accordance with law. ....................................................... 2

        B.    Whether Hengli's surrogate value arguments are precluded under the ripeness doctrine. ...................................................................................................... 3

        C.    Whether Commerce's conclusion in the *Final Determination*, as AFA, that critical circumstances existed for Hengli was supported by substantial evidence on the record and otherwise in accordance with law. .................................................................. 3

JURISDICTION ......................................................................................................... 3

STANDARD OF REVIEW ........................................................................................... 3

STATEMENT OF FACTS ............................................................................................ 5

SUMMARY OF THE ARGUMENTS ........................................................................... 15

ARGUMENT .............................................................................................................. 16

I.    COMMERCE'S DETERMINATION THAT HENGLI'S REPORTED ALLOCATION METHODOLOGY WAS NOT CONNUM-SPECIFIC AND THAT HENGLI DID NOT ACT TO THE BEST OF ITS ABILITY IN REPORTING FOPs, THEREBY WARRANTING THE APPLICATION OF AFA, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW .............................................................................................. 16

        A.    Legal Framework ............................................................................... 16

        B.    Hengli Did Not Act to the Best of Its Ability in Reporting its FOPs and Instead Reported Inaccurate Information that Warranted the Application of AFA ................. 21

            1.    Commerce did not approve of Hengli's averaging allocation methodology as applied to other FOPs.............................................................................. 25

2.    Commerce satisfied its obligations under 19 U.S.C. § 1677m(d) to provide notice to Hengli about deficiencies in its allocation method once Commerce determined deficiencies existed ................................................................ 27

3.    Hengli's FOP reporting was not accurate ........................................................ 33

II.    COMMERCE'S DETERMINATION TO NOT ADDRESS HENGLI'S SURROGATE VALUE ARGUMENTS WAS IN ACCORDANCE WITH LAW AND THIS COURT SHOULD DISMISS THOSE ARGUMENTS AS NOT RIPE FOR JUDICIAL REVIEW ............................................................................................................... 37

III.    COMMERCE'S DETERMINATION, AS AFA, THAT CRITICAL CIRCUMSTANCES EXISTED FOR HENGLI IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW ......................... 39

CONCLUSION ....................................................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Aluminum Extrusions Fair Trade Committee v. United States*,
    968 F.Supp.2d 1,244 (Ct. Int'l Trade 2014) ........................................................... 38, 39

*Atl. Sugar Ltd. v. United States*,
    744 F.2d 1,556 (Fed. Cir. 1984) .................................................................................... 4

*Cleo In. v. United States*,
    501 F.3d 1,291 (Fed. Cir. 2007) .................................................................................... 4

*Consolidated Edison v. NLRB*,
    305 U.S. 197 (1938) ...................................................................................................... 4

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ...................................................................................................... 4

*Fujitsu Gen'l Ltd. v. United States*,
    88 F.3d 1,034 (Fed. Cir. 1996) ..................................................................................... 3

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1,323 (Ct. Int'l Trade 2006) ............................................................... 4

*Goodluck India Ltd. v. United* States,
    11 F. 4th 1,335 (Fed. Cir. 2021) ................................................................................. 32

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984); .................................................................................... 4

*Mukand Ltd. v. United States*,
    767 F. 3d 1,300 (Fed. Cir. 2014) .......................................................................... 18, 19

*Nippon Steel Corp. v. United States*,
    458 F.3d 1,345 (Fed. Cir. 2006) ............................................................................. 5, 18

*NSK Ltd. v. United States*,
    825 F. Supp. 315 (Ct. Int'l Trade 1993) ............................................................... 18, 33

*PAM, S.p.A v. United States*,
    582 F.3d 1,336 (Fed. Cir. 2009) ................................................................................... 4

*Qingdao Sea-Line International Trade Co. v. United States*,
    503 F. Supp. 3d 1,355 (Ct. Int'l Trade 2021) ....................................................... 38, 39

*Reiner Brach GmbH & Co.KG v. United States*,
    206 F. Supp. 2d 1,323 (Ct. Int'l Trade 2002) .......................................... 19, 20, 28, 32, 33

iv

*RHP Bearings v. United States*,
   875 F. Supp. 854 (Ct. Int'l Trade 1995) ............................................................... 33

*Nan Ya Plastics. Corp. v. United States*,
   810 F.3d 1,333 (Fed. Cir. 2016) ........................................................................... 25

*Timken Co. v. United States*,
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ............................................................... 4

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................................. 4

*Xi'an Metals & Minerals Import Export Co., Ltd. v. United States*,
   520 F. Supp. 3d 1,314 (Ct. Int'l Trade 2021), *aff'd*, 50 F. 4th 98
   (Fed. Cir. 2022) .................................................................................... 17, 18, 19

## STATUTES

19 U.S.C. §§ 1516a .................................................................................................. 3

28 U.S.C. § 1581(c) ................................................................................................. 3

19 U.S.C. § 1673b ......................................................................................... 3, 7, 11

19 U.S.C. § 1673d(a)(3) ..................................................................................... 14, 39

19 U.S.C. § 1677(18)(A) ......................................................................................... 16

19 U.S.C. §§ 1677b(c)(1), (2), (3) and (4) ......................................................... 6, 16

19 U.S.C. § 1677e(a) ......................................................... 9, 14, 17, 24, 40, 41

19 U.S.C. § 1677e(b) ......................................................... 9, 14, 17, 25, 40, 41

19 U.S.C. § 1677m(d) ......................................................... 19, 27, 29, 31, 32

## REGULATIONS

19 C.F.R. § 351.206 ....................................................................................... 3, 7, 40

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Certain Paper Plates from China*,
   89 Fed. Reg. 14,406 (Dep't of Commerce Feb. 26, 2024) (initiation) ...................... 5

*Certain Paper Plates from China*,
   89 Fed. Reg. 72,367 (Dep't of Commerce Sept. 5, 2024), and accompanying
   preliminary decision memorandum (Aug. 29, 2024) ............................... 10, 11, 25, 40

*Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam*,
 90 Fed. Reg. 8,271 (Dep't of Commerce Jan. 28, 2025), and accompanying Issues and
 Decision Memorandum (Jan. 21, 2025)............................................................ passim

*Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy; 2019-2020*,
 87 Fed. Reg. 71 (Dept. of Commerce Jan 3, 2022) ............................................... 36

### RULE 56.2 STATEMENT

Defendant-Intervenor American Paper Plate Coalition ("APPC" or "Petitioner"),[1]

petitioner in the underlying investigation, respectfully submits this response to the Rule 56.2

motion for judgment on the agency record filed in this case by plaintiff Fuzhou Hengli Paper

Co., Ltd. ("Hengli"), ECF Nos. 38, 39 and 40 ("Hengli Br.").

### 1. The Administrative Determination Under Review

The administrative determination under review is the final determination of the U.S.

Department of Commerce's ("Commerce") less-than-fair value ("LTFV") investigation of

certain paper plates from the People's Republic of China ("China"), covering the period of

investigation ("POI") of July 1, 2023, through December 31, 2023. *Certain Paper Plates from

the People's Republic of China, Thailand, and the Socialist Republic of Vietnam*, 90 Fed. Reg.

8,271 (Dep't of Commerce Jan. 28, 2025) (final determ.), P.R. 360 ("*Final Determination*"), and

accompanying Issues and Decision Memorandum (Jan. 21, 2025), P.R. 354 ("IDM").[2]

---

[1] APPC is composed of American paper plate manufacturers AJM Packaging Corporation, Aspen Products, Inc., Dart Container Corporation, Hoffmaster Group, Inc., Huhtamaki Americas, Inc., and Unique Industries, Inc.

[2] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R." Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of this brief, in accordance with Rule 5(g) of the Court's Rules.

**2. The Issues Presented and Reasons Supporting Commerce's Determination**

**A. Whether Commerce's determination that Hengli did not act to the best of its ability in reporting its factors of production ("FOPs"), and therefore that the application of adverse facts available ("AFA") was warranted, was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** Commerce correctly determined that Hengli failed to report its FOPs on a control-number ("CONNUM")-specific basis, despite the company's express claims to the contrary. Hengli initially reported FOPs that appeared to report the kilograms of paperboard necessary to make one package of subject merchandise ("kilograms-per-pack") on a CONNUM-specific basis. Then, upon Commerce's request, Hengli revised its FOPs to report the kilograms of paperboard necessary to make one kilogram of subject merchandise ("kilograms-per-kilogram"). However, whether it reported its FOPs on a kilograms-per-pack basis or on a kilograms-per-kilogram basis, Hengli used an allocation methodology that was seriously flawed and resulted in data that were not reported on a CONNUM-specific basis.

Specifically, Hengli's allocation of FOPs resulted in the *same* usage rate being reported for each and every CONNUM for many important inputs, such as paperboard, ink, varnish, labor, energy, and packing materials (such as packing cartons, packing film bags, and packing label paper). Moreover, those usage rates were based on inputs used in the production of both subject *and non-subject* merchandise. Hengli's flawed and inaccurate methodology also resulted in its by-products not being reported in a CONNUM-specific manner. Commerce later confirmed the problems with Hengli's paperboard FOP allocation methodology while conducting verification of Hengli's primary producer of subject merchandise. Accordingly, Commerce's determination that the application of AFA was warranted was supported by substantial evidence and otherwise in accordance with law.

**B. Whether Hengli's surrogate value arguments are precluded under the ripeness doctrine.**

**Yes.** As Commerce determined in the *Final Determination*, Hengli's arguments that Commerce's paperboard surrogate values did not reflect the production experience of Hengli's suppliers were moot because Commerce applied a total AFA rate to Hengli based on its FOP reporting failure. Accordingly, under the ripeness doctrine, this Court should dismiss Hengli's surrogate value arguments as seeking a hypothetical or advisory opinion from the Court, unripe for judicial adjudication.

**C. Whether Commerce's conclusion in the *Final Determination*, as AFA, that critical circumstances existed for Hengli was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** As part of its AFA determination, Commerce determined that Hengli dumped massive imports over a relatively short period of time, in accordance with 19 U.S.C. § 1673b and 19 C.F.R. § 351.206, and therefore critical circumstances existed for Hengli. Commerce's critical circumstances determination was supported by substantial evidence and otherwise in accordance with law.

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under 19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i).

## STANDARD OF REVIEW

In reviewing Commerce's antidumping ("AD") determinations, the Court of International Trade ("CIT") must sustain "any determination, finding or conclusion found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1,034, 1,038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). The specific factual findings on which Commerce relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1,291, 1,296 (Fed. Cir. 2007). As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of Commerce in choosing between two fairly conflicting interpretations of the facts on the record. *See Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1,323, 1,326 (Ct. Int'l Trade 2006). Further, the Federal Circuit has held that "substantial evidence on the record means 'more than a mere scintilla' and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if some evidence on the record detracts from the agency's ultimate determination. *Atl. Sugar Ltd. v. United States*, 744 F.2d 1,556, 1,562-63 (Fed. Cir. 1984) (citing *Universal Camera Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A. v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). As the Federal Circuit has held, the substantial evidence standard is a "high

barrier" for a challenging party to overcome. *Nippon Steel Corp. v. United States*, 458 F.3d 1,345, 1,352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1,056, 1,060 (Fed. Cir. 2001).

## STATEMENT OF FACTS

Following the filing of a petition by APPC alleging that imports of paper plates from China, Vietnam, and Thailand were being, or likely to be, sold in the United States for less-than-fair value and/or unfairly subsidized, Commerce initiated, *inter alia*, an AD investigation of certain Chinese paper plates on February 26, 2024. *Certain Paper Plates from China*, 89 Fed. Reg. 14,406 (Dep't of Commerce Feb. 26, 2024) (initiation), P.R. Doc. 47.

Commerce requested comments from interested parties on the product characteristics used to define individual types of paper plate products in Commerce's AD comparisons between products sold in the United States with products sold in China. On April 23, 2024, Commerce issued its product characteristics memorandum for this investigation. Memorandum from Bryan Hansen to the File, *AD Investigations of Certain Paper Plates from China, Thailand, and the Socialist Republic of Vietnam: Product Characteristics* (Apr. 23, 2024), P.R. 140 ("Product Characteristics Memorandum").

Commerce identified and listed 17 product characteristics in order of importance, with the first five identified as: 1) the number of paper plates in each wrapped package; 2) the surface area of the paper plates; 3) the thickness of the paperboard used to produce the plate (*e.g.*, the caliper); 4) the basis weight in grams/meter$^2$ of paperboard of which the paper plate is made; and 5) the type of paper fiber used to produce the plate. *Id.*, Attachment, at 1-2. "Basis weight" was described as the measurement of the "density" of the "paper/paperboard input of which the paper plate is made." *Id.* at 2.

Commerce selected Hengli and a second exporter, Jinhua P&P Product Co., Ltd. ("Jinhua"), to examine as mandatory respondents in the investigation and issued them questionnaires. On June 18, 2024, Hengli submitted its "Section C" and "Section D" questionnaire responses – which covered Hengli's U.S. sales data (Section C) and FOP data (Section D) for the POI. Fuzhou Hengli Sections C and D Questionnaire Responses (Jun 18, 2024), P.R. 210; C.R. 94-118 ("Hengli DQR"). Because China is considered a non-market economy country, Hengli was required to report its FOPs, in accordance with Commerce's non-market economy country analysis, rather than prices in China for sales of paper plates. *See* 19 U.S.C. §§ 1677b(c)(1) & (3). Hengli was directed by the Section D questionnaire to report "each raw material used to produce a unit of the merchandise under consideration," with the "consumption amount" "reported on a per unit basis (*e.g.*, per kilogram, pound, etc.)." Hengli DQR at D-11, P.R. 210; C.R. 115.

Furthermore, on a CONNUM, model-by-model basis, Hengli was directed to "{d}escribe the method used to calculate the reported amounts and provide supporting worksheets that show your calculation for each material input." *Id.* at D-12. Hengli stated that for the two producers of the merchandise it exported, Guangdong Ecosource Environmental Technology Co., Ltd. ("Ecosource") and Ningbo Hongtai Package New Material Technology Co., Ltd. ("Ningbo Hongtai"), it "reported the FOPs on a consistent basis, kilograms, for each and all material factors …." *Id.* at D-12.

Hengli further stated that for "the calculation of the unit consumption of production factors for the final product," the producers used "'packages'" as the unit of measurement for the subject merchandise." *Id.* It stated that the producers "reported each material input in the FOP database as provided in Exhibit D-6 and Exhibit D-7." *Id.* at D-13. In addition, Hengli stated

6

that "Guangdong Ecosource and Ningbo Hongtai reported FOPs using actual quantities consumed to produce the merchandise under investigation *on a CONNUM specific basis*." *Id*. at D-4 (emphasis added).

In describing its per-unit consumption of each raw material input, Hengli explained that for Ecosource, it "allocates based on the quantity of white cardboard and varnish withdrawn from warehouse (in kilograms) divided by the production quantity of all products (also in kilograms)." *Id.* at D-13. "For ink," it explained, Ecosource "allocates based on the quantity of ink withdrawn from the warehouse (in kilograms) divided by the production quantity of colored paper plates and bowls (in kilograms)." *Id.* Furthermore, for packaging materials, Hengli explained that Ecosource "allocates based on the quantity of packaging materials withdrawn from the warehouse (in kilograms) divided by the production quantity of all products (also in kilograms)." *Id.* at D-14. Hengli then reported that for each of those FOPs, Ecosource extracted "the consumption of the subject merchandise sold to the United States and convert{ed} the production quantity of the finished products from pieces to packages." *Id.* at D-15. It then explained that "Exhibit D-6 fully lists the above allocation steps in the works sheet 'FOP Material Allocation.'" *Id.* at D-15.

Exhibit D-6 to Hengli's questionnaire response appeared to report CONNUM-specific FOPs on a kilogram-per-package basis for each of those inputs, with the reported consumption amounts differing on a CONNUM-by-CONNUM basis, as one would expect. *See* Exhibit D-6, C.R. 115.

On June 11, 2024, in accordance with 19 U.S.C. § 1673b(e)(1) and 19 C.F.R. § 351.206, APPC filed an allegation of critical circumstances, *i.e.*, the existence of a massive surge in imports from China after the petition was filed, in order to enter large volumes of goods before

the preliminary imposition of duties during the investigation.  Petitioner Critical Circumstances

Allegation (June 11, 2024), P.R. 198.  APPC provided official import statistics that demonstrated

that the quantity of imports of subject merchandise increased massively in the three-month post-

petition period, thereby supporting a determination of critical circumstances.  *Id.* at 5-6.

On August 1, 2024, APPC filed comments and analysis for Commerce's consideration in

advance of the preliminary determination.  APPC argued that Commerce should apply total AFA

to Hengli because Ecosource did not provide factors of production information on a CONNUM-

specific basis.  Petitioner Pre-Prelim Comments (Aug. 1, 2024) at 3, P.R. 273; CR 150-152 ("Pet.

Pre-Prelim").

APPC explained that Hengli had not reported its "paper/paperboard input, varnish, and all

its packing materials" usage rates on a CONNUM-specific basis, but had simply taken "the total

amount of each input in kilograms and divided by total output of all products in kilograms,

including not only plates of all sizes, but also non-subject merchandise."  *Id.* at 4.  APPC

explained that Hengli had done much the same thing with ink as well, reporting "overall

consumption by its total production of colored plates and bowls, again including non-subject

merchandise."  *Id.*

APPC explained that by reporting its FOPs "on a per-package basis," Hengli obfuscated

"the fact that its FOP reporting for" Ecosource was not CONNUM-specific.  APPC explained

that "when you divide the per-package usage rates by the package weight for each unique

product, the usage rates that are across all CONNUMs <u>are exactly the same</u>.  They only appear

unique when multiplied by the package weight of each product."  *Id.* (emphasis added).

APPC claimed that Hengli's reported data concealed "the fact that its FOP reporting is

inaccurate and deficient, even when its own narrative states that it calculated everything on a

kilogram basis." *Id.* at 4-5.  APPC then pointed to proprietary information derived from Hengli's

Exhibit D-6 that showed that although Ecosource reported that it produced certain CONNUMS

of subject merchandise with particular basis weight codes, the basis weights for the paperboard

inputs that it reported into those CONNUMS simply could not have been used to produce those

CONNUMS.  *Id.* at 5-6.  In other words, the type of paperboard reported by Hengli as consumed

to make subject paper plates did not align with the type of paper plates actually manufactured

and sold by Ecosource.  *Id.*

APPC then explained that similar problems existed not only for paperboard and ink

inputs, but "for *all* CONNUMS produced by Guangdong Ecosource." *Id.* at 6.  This included

Ecosource's reported labor and energy FOPs, as well as amounts reported for ink and scrap by-

products.  *Id.* at 4 & 6.  APPC argued that because Hengli's reported FOPs "reported the same

per kilogram usage rates across all CONNUMs" and "also mixed in consumption and production

data for non-subject bowls as well," Hengli's data could not be relied upon to calculate normal

values that would be matched "to U.S. sales that are apparently reported on a CONNUM-specific

basis." *Id.* at 6-7.  APPC therefore argued that Commerce should determine that Hengli did not

act to the best of its ability and apply total AFA to Hengli's margin calculations, pursuant to 19

U.S.C. §§ 1677e(a) & (b).  *Id.* at 6-8.

On August 12, 2024, Hengli filed comments rebutting APPC's comments, arguing that it

had been fully cooperative in the investigation and had accurately reported its FOPs.  Hengli Pre-

Prelim Rebuttal Comments (Aug. 12, 2024), P.R. 279 ("Hengli Pre-Prelim Rebuttal").  Hengli

claimed that its FOP allocations were not only "reasonable" but that it was also "reasonable" to

presume that "products such as paper plates would consume similar quantities of inputs on a per

kg basis.  This is not a varied product like furniture or custom power generators, it is paper plates that are more or less the same except for size." *Id.* at 2-3.

On July 23, 2024, Commerce issued a supplemental questionnaire to Hengli.  Question 12 in Commerce's supplemental questionnaire observed that Hengli had reported certain FOPs "on a per pack basis," and directed Hengli to "report all factor consumption usage rates on a per KG basis and revise the individual and combined FOP databases accordingly."  Hengli Supplemental Questionnaire (July 26, 2024) at 7, P.R. 265; C.R. 143 ("Hengli SQ").

On August 9, 2024, after receiving an extension of the deadline, Hengli filed its response. Hengli Supplemental Questionnaire Response (Aug. 9, 2024), P.R. 278; C.R. 158-172 ("Hengli SQR").  With respect to the Ecosource allocations, Hengli revised its consumption usage rates in an exhibit to that questionnaire response.  *Id.* at Exhibit SQR-12.1, C.R. 161.  Once those rates were reported on a kilograms-per-kilogram basis, the exhibit showed the exact same usage amount for certain inputs, no matter which model of paper plate was involved.  *Id.*

On September 5, 2024, Commerce issued its preliminary determination in the investigation.  *Certain Paper Plates from China*, 89 Fed. Reg. 72,367 (Dep't of Commerce Sept. 5, 2024) (prelim. determ.), P.R. 313 ("*Preliminary Determination*"), and accompanying preliminary decision memorandum, P.R. 299 (Aug. 29, 2024) ("PDM").

Commerce applied total AFA to the China-wide entity and determined that the "highest petition rate of 178.80 percent" was insufficient to induce cooperation, so it instead selected the "highest transaction-specific margin calculated for the mandatory respondent, Jinhua, for the preliminary determination."  PDM at 18.  Commerce determined that using that rate struck "an appropriate balance between the goal of inducing future cooperation, and the rate not being punitive."  *Id.*  Further, Commerce determined that Jinhua's transaction-specific rate was "not

aberrational" and was "within the mainstream of Jinhua's other calculated rates." *Id.* That preliminary total AFA rate was 1,039.05 percent. *Id.*

For purposes of the *Preliminary Determination*, Commerce did not address APPC's comments and used the FOP data as "reported by the respondents," including Hengli's updated FOP database. PDM at 23. As a result, the preliminary dumping margin calculated for Hengli was zero percent. *Preliminary Determination*, 89 Fed. Reg. at 72,368.

As required by the statute, 19 U.S.C. § 1673b(e)(1), Commerce did address APPC's critical circumstances allegation, finding critical circumstances for Jinhua and the China-wide entity - imputing knowledge of the likelihood of material injury to importers to Jinhua and the China-wide entity and finding that imports of subject merchandise from those exporters after the petition was filed were "massive" because they increased by more than 15 percent during the comparison period. PDM at 29-30. Because Hengli's preliminary dumping margin was zero, Commerce explained that it did not preliminarily determine critical circumstances existed with respect to Hengli. *Id.*

On November 23 and 24, 2024, Commerce verified Hengli's questionnaire responses, including information pertaining to Ecosource. *Hengli Verification Report* (Dec. 17, 2024), P.R. 335; C.R. 313; *See also* Hengli Minor Corrections (Nov. 25, 2024), P.R. 331; C.R. 226-228. In verifying Ecosource's reported per-unit consumption amounts (*e.g.*, FOPs), Commerce observed that Ecosource had numerous "types of paper input by combination of width and basis weight, and each of them has a unique material code." *Hengli Verification Report* at 16.

Commerce verified that Ecosource's FOP allocation methodology combined multiple paper inputs, having varying basis weights and used to produce both subject and non-subject merchandise, and used the resulting overinclusive values to report FOPs for all paper plates

regardless of the *actual* basis weight of the paperboard used to produce the CONNUM at issue.
*Id.*

Commerce explained that this approach was "inconsistent with the production process
which is that a paper plate with basis weight of $270g/m^2$ is made only from paper input with
basis weight of $270g/m^2$." *Id.* Commerce explained that the "completeness test shows that all
paper plates sold during the POI have two basis weights of $250g/m^2$ and $270g/m^2$" but that
"paper inputs with basis weights other than $250g/m^2$ and $270g/m^2$ are also included in the
allocation." *Id.* (citing Attachment 2 to Hengli's Minor Corrections – a revised raw material
allocation spreadsheet, P.R. 331; C.R. 226).

Nine days after Commerce issued its verification report, APPC filed its case brief with
Commerce. Pet. Br. (Dec. 26, 2024), P.R. 340; C.R. 315-316. APPC emphasized that
"Commerce's verification proved that the FOP reporting methodology for Ecosource was
fundamentally flawed and inaccurate." *Id.* at 2. APPC argued that Hengli had "submitted a FOP
database for Ecosource that was not CONNUM-specific and that was obviously not reported in
as accurate manner as the company's records would permit." *Id.* at 1.

Referring to Commerce's products characteristics memorandum, APPC pointed out that
from the very beginning of the investigation Commerce had "found that paper basis weight is the
most important product characteristic that relates to the paperboard input in Commerce's
CONNUM Hierarchy," while paper type was the least important product matching characteristic
that related to the paper input. *Id.* at 4. The obvious reason for this, as APPC explained, was
that if the paperboard used to produce a paper plate "is not of a sufficiently heavy basis weight, it
will not be sufficiently sturdy and rigid for its intended purpose, holding and conveying food
items." *Id.*

Thus, because Commerce had verified that Hengli had misreported the basis weights of all of Ecosource's paperboard inputs and calculated them not on a CONNUM-by-CONNUM basis, nor even on a subject-merchandise specific basis, but instead using an average that crossed all weights of paperboard, including paperboard used to produce non-subject merchandise, APPC argued that "Hengli's FOP database for Ecosource <u>cannot</u> be used to calculate an accurate margin." *Id.* at 10 (emphasis in original).

APPC noted that "Ecosource accounted for the vast majority of the paper plates that Hengli sold to the U.S. market during the POI, meaning that its failure to report FOPs on a CONNUM-specific basis had a significant effect." *Id.* at 12. Accordingly, APPC argued that Commerce should apply total AFA to Hengli. *Id.*

In its rebuttal brief, Hengli argued that its "allocation methodology" was "accurate and reasonable." Hengli Rebuttal (Jan. 8, 2025) at 34, P.R. 346; C.R. 318. It claimed that "products such as paper plates would consume similar quantities of inputs on a per-kg basis," unlike "varied products like furniture or custom power generators" because it claimed paper plates "are more or less the same except for size." *Id.* It alleged that the difference between the methodology it reported to Commerce and a weight-specific method would be "negligible," so therefore there was no justification in Commerce applying AFA. *Id.* at 36. Furthermore, it claimed that Commerce "was aware" of Hengli's "FOP reporting methodology during the preliminary stage" of the investigation and alleged that APPC's arguments pertaining to the uniform amounts across multiple CONNUMs, both in comments filed before the preliminary determination and then in its brief, were "spurious." *Id.* at 31.

On January 28, 2025, Commerce issued the *Final Determination*. Commerce explained that it determined at verification that Hengli's methodology allocated "multiple paperboard

inputs with different basis weights to a CONNUM that has one basis weight."  IDM at 8.
Commerce determined that such a "reported FOP is not CONNUM-specific."  *Id.*

Commerce explained that the "initial questionnaire states that the consumption amount
must be reported on a per unit basis (*e.g.*, per kilogram, pound, etc.)," and that Hengli's "data
was not reported in the manner requested," nor did Hengli "notify Commerce that it used another
reporting methodology in its initial questionnaire response."  *Id.* at 12-13.  When Commerce
requested that Hengli "revise its FOP reporting to be based on kilograms rather than pack," and
Hengli subsequently "revised its material consumption reporting to be on a per-kilogram basis,"
it appeared that "the reported consumption for paperboard was identical for every product
produced by" Ecosource and "did not reflect product-specific consumption rates."  *Id.* at 13.
Then, at verification, Commerce determined that Hengli "was able to match the paperboard
inputs with paper plates based on basis weight but failed to do so."  *Id.* at 12.

Accordingly, Commerce determined that Hengli had not acted to the best of its ability,
and the application of total AFA was warranted, pursuant to 19 U.S.C. §§ 1677e(a) & (b).  *Id.* at
8.  As AFA, Commerce applied to Hengli the highest calculated transaction-specific margin for
Jinhua, which after making certain changes from the *Preliminary Determination*, was 515.40
percent.  *Final Determination*, 90 Fed. Reg. at 8,272.  In addition, Commerce determined that
because now Hengli's AFA rate was above the threshold "sufficient to impute knowledge of
dumping," it was "making an adverse inference that Fuzhou Hengli dumped 'massive imports'
over a 'relatively short period,'" and therefore critical circumstances existed for Hengli, pursuant
to 19 U.S.C. § 1673d(a)(3).  IDM at 4-5.

Plaintiffs timely appealed.

## SUMMARY OF THE ARGUMENTS

Substantial evidence supports Commerce's application of total AFA to Hengli. Despite Commerce's direction to Hengli to report its supplier's input consumption FOPs for subject merchandise on a CONNUM-specific basis, Hengli instead reported FOP amounts that were identical for all CONNUMs, no matter how varied, and that were based on averages of inputs consumed to produce both subject and non-subject merchandise. At verification Commerce observed that Hengli's input supplier had the ability to report CONNUM-specific FOPs, and did not do so. Because the methodology applied by Hengli in its questionnaire responses to allocate its FOPs could not be used by Commerce to calculate an accurate AD margin for Hengli, Commerce's application of AFA to Hengli was supported by substantial evidence on the record and was otherwise in accordance with law.

Furthermore, Commerce correctly determined to not address Hengli's arguments regarding its preferred surrogate values in the *Final Determination*. Any arguments concerning the production experience of Hengli's input suppliers were of no relevance to the surrogate values used in the calculation of AD margins for the other mandatory respondent in the investigation. Because Commerce applied total AFA to Hengli, any challenge to the surrogate values selected by Commerce is not ripe for adjudication by this Court.

Finally, Commerce's determination that critical circumstances existed for Hengli is supported by the record evidence. Hengli argues that because Commerce's rejection of its flawed data and application of total AFA was not lawful, Commerce's critical circumstances determination was unlawful as well. However, because Commerce's application of total AFA to Hengli was supported by substantial evidence and otherwise in accordance with law, so too was its determination that critical circumstances existed with respect to Hengli.

15

**ARGUMENT**

I.  **COMMERCE'S DETERMINATION THAT HENGLI'S REPORTED ALLOCATION METHODOLOGY WAS NOT CONNUM-SPECIFIC AND THAT HENGLI DID NOT ACT TO THE BEST OF ITS ABILITY IN REPORTING FOPs, THEREBY WARRANTING THE APPLICATION OF AFA, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW**

Hengli was directed by Commerce to report Ecosource's subject merchandise FOPs on a CONNUM-specific basis.  Although at first it appeared that Hengli had done so, the record shows that Hengli in fact reported FOPs that were based on averages of consumption amounts of paperboard of multiple basis weights, and used to produce both subject and non-subject merchandise.  They were in no way CONNUM-specific.  Furthermore, Commerce verified that Hengli was able to report Ecosource's FOPs on a CONNUM-specific basis and did not do so.  Accordingly, Commerce correctly and lawfully determined that Hengli had failed to act to the best of its ability and that the application of AFA was warranted.

**A.  Legal Framework**

Commerce considers China to be a nonmarket economy country, pursuant to 19 U.S.C. § 1677(18)(A), *i.e.*, a country with an economy that does "not operate on market principles of cost or pricing structures, so that sales of merchandise in such country to not reflect the fair value of the merchandise."  Thus, in accordance with 19 U.S.C. § 1677b(c), Commerce does not use prices of sales of paper plates in China to establish "normal value" (the price in the home market that is compared to U.S. prices), and instead calculates a proxy normal value for the AD calculation using the FOPs reported by the examined respondents, which are then valued using surrogate values obtained from a comparable market economy country. *See* 19 U.S.C. §§ 1677b(c)(1) – (4).

16

It is Commerce's longstanding practice to have examined respondents report their FOPs on a CONNUM-specific basis, using the product characteristics identified by Commerce early in the proceeding.  *Xi'an Metals & Minerals Import Export Co., Ltd. v. United States*, 520 F. Supp. 3d 1,314, 1,321, 1,327 (Ct. Int'l Trade 2021) ("*Xi'an Metals I*"), *aff'd*, 50 F. 4th 98 (Fed. Cir. 2022) ("*Xi'an Metals II*").  The term "CONNUM" is "a contraction of the term 'control number,'" and is "a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding)," with all "products whose product hierarchy characteristics are identical" "deemed to be part of the same CONNUM and are regarded as 'identical' merchandise for purposes of the price comparison." *Id.* at 1,321, n. 4.

Commerce requests CONNUM-specific data in nonmarket economy questionnaires because such data "accurately" reflect "the costs associated with the production and sale of the subject merchandise." *Id*. at 1,324.  It is therefore extremely important that examined respondents accurately report their FOPs as directed by Commerce.

When examined respondents fail to report their FOPs on a CONNUM-specific basis, Commerce has determined it appropriate to apply facts available, with an adverse inference.  The statute, 19 U.S.C. § 1677e(a)(1), states that the application of facts available is required if "necessary information is not available on the record."  19 U.S.C. § 1677e(a)(2) provides that Commerce shall apply facts available if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide information by deadlines in the form and manner requested; (C) significantly impedes an AD proceeding; or (D) provides information that cannot be verified.

In addition, 19 U.S.C. § 1677e(b) provides that Commerce is permitted to apply an adverse inference in selecting from among the facts otherwise available, if it "finds that an

interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  The Court of Appeals for the Federal Circuit ("Federal Circuit") has clarified that "acting to the best of one's ability 'requires the respondent to do the maximum it is able to do.'"  *NSK Ltd. v. United States*, 481 F. 3d 1,355, 1,361 (Fed. Cir. 2007) (quoting *Nippon Steel Corp. v. United States*, 337 F. 3d 1,373, 1,382 (Fed. Cir. 2003) ("*Nippon Steel*"). Commerce assesses whether a respondent has fulfilled this requirement by determining "whether {the} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel*, 337 F.3d at 1,382.

Both the Court of International Trade ("CIT") and the Federal Circuit have affirmed Commerce's application of AFA when a respondent fails to report CONNUM-specific data.  For example, in *Xi'an Metals I*, the CIT affirmed Commerce's determination that a respondent "failed to cooperate and act to the best of its ability," and therefore the application of AFA was warranted, when the respondent did not report its FOP data on a CONNUM-specific basis.  *Xi'an Metals*, 520 F. Supp. 3d at 1,327.

On appeal, the Federal Circuit affirmed Commerce's conclusion that "non-product-specific FOP data did not 'reasonably reflect the costs of production and should not, therefore, be used.'"  *Xi'an Metals II*, 50 F. 4th at 108.  The Federal Circuit held that because "of the importance of the information requested, Commerce was entirely reasonable to expect" that the FOPs would be reported on a CONNUM-specific basis, and it also affirmed the application of AFA as supported by substantial evidence on the record.  *Id.* at 110.

In affirming Commerce's AFA determination, the Federal Circuit relied, in part, on *Mukand Ltd. v. United States*, 767 F. 3d 1,300, 1,307 (Fed. Cir. 2014) ("*Mukand*"), in which the Federal Circuit held that "{p}roduct-specific information is a fundamental element in the

dumping analysis, and it is standard procedure for Commerce to request product-specific data in antidumping investigations."  *Xi'an Metals*, 50 F. 4th at 109 (citing *Mukand*, 767 F. 3d at 1,307).

In *Mukand*, Commerce requested that the examined respondent, Mukand, provide CONNUM-specific product sizes "to ensure that it compared similar products" in its AD comparisons.  *Mukand*, 767 F. 3d at 1,303.  Mukand responded by assigning "the same production cost across all product sizes."  *Id.*  Commerce found that because Mukand's costs were not reported by product size, it could not make adequate comparisons between normal value and U.S. price for Mukand "without undue difficulty."  The Federal Circuit agreed that application of total AFA, rather than partial AFA, was justified.  *Id.* at 1,308.  The Federal Circuit held that without the CONNUM-specific data "broken down by product size, Commerce was unable to differentiate between different types of steel bar products and could not calculate an accurate" normal value "for any of Mukand's products."  *Id.*

Hengli argues that even if its reported CONNUMs were inaccurate, Commerce's *Final Determination* was unlawful because Commerce did not notify Hengli earlier in the proceeding as to the inadequacies, pursuant to 19 U.S.C. § 1677m(d), which states that if Commerce "determines that a response to a request for information under this subtitle does not comply with the request," Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle."  Hengli Br. at 22-26.

Hengli's claim is meritless.  In *Reiner Brach GmbH & Co.KG v. United States*, 206 F. Supp. 2d 1,323, 1,332 (Ct. Int'l Trade 2002) ("*Reiner*"), the CIT held that section 1677m(d) applies only when Commerce had "notice or reason to believe that a deficiency existed."  As the

Court held in *Reiner*, if the information at issue was specifically requested by Commerce, and "Commerce did not have notice or reason to believe a deficiency existed," then no obligation to alert a respondent as to a deficiency under section 1677m(d) existed in the first place. *Id.* at 1,333. It is axiomatic that if, during an AD proceeding, "Commerce could not have known that there was a deficiency," then the obligation to identify that deficiency lay not with Commerce but with the respondent who was lawfully obligated "to create an accurate record and provide Commerce with the information requested to ensure an accurate dumping margin." *Reiner*, 206 F. Supp. 2d at 1,332-33.

In the AD investigation at issue, Commerce directed Hengli to report its FOPs on a CONNUM-specific basis. When Hengli first reported its FOP data in its questionnaire responses, it appeared that Hengli had done just that. Indeed, Hengli explicitly portrayed its FOP reporting as being CONNUM-specific on a kilograms-per-pack basis, representations that both the company and counsel certified as complete and accurate. Hengli DQR at D-4 & D-9, 4 & 5 P.R. 210; C.R. 115.

In a supplemental questionnaire, Commerce requested that Hengli revise its reported FOP usage rates to be on a kilograms-per-kilogram basis, rather than a kilograms-per-pack basis. *See Hengli SQ* at Question 12, P.R. 265; C.R. 143.

However, even after Hengli revised its reported FOP data, its reported FOPs continued to be based on a flawed, non-CONNUM specific allocation methodology, despite the fact that both Hengli and Hengli's counsel again certified to the accuracy and completeness of this submission. *See Hengli SQR* at 4 & 5, P.R. 265; C.R. 143. It was only at verification that Commerce observed that Hengli had the ability to report Ecosource's FOPs on a CONNUM-specific basis, but did not do so. *See Hengli SQR*, P.R. 265; C.R. 143; *Hengli Verification Report*, P.R. 335;

C.R. 313.  Hengli's inaccurately reported FOPs undermined Commerce's ability to calculate an accurate normal value, conduct accurate AD comparisons, or calculate an accurate AD margin. Accordingly, substantial evidence supports Commerce's determination that Hengli did not act to the best of its ability in providing accurate CONNUM-specific FOPs and that the application of total AFA was warranted.

### B. Hengli Did Not Act to the Best of Its Ability in Reporting its FOPs and Instead Reported Inaccurate Information that Warranted the Application of AFA

The record is clear that the FOPs submitted by Hengli for merchandise produced by Ecosource were not accurate and were not reported on a CONNUM-specific basis.  This is a significant issue, because Ecosource produced [   ] percent of the subject merchandise manufactured for Hengli.  *Hengli SQR* at Exhibit 5b, P.R. 278; C.R. 159.  Simply put, Hengli did not report its material usage rates on a CONNUM-specific basis, as directed by Commerce. Instead, for its paper/paperboard input, varnish, ink, flexo stabilizer, and all packing materials (such as packing cartons, packing film bags, and packing label paper), Hengli simply took the total amount of each input in kilograms and divided it by total output of all products in kilograms, including, for example, not only plates of all sizes, but also products not covered by the investigation.  *Hengli DQR* at D-13 to D-14, P.R. 210; C.R. 115.

In addition, Hengli used the same flawed methodology to report labor and electricity input consumption amounts, as well as byproducts (such as scrap paper and waste ink).  *Id.*  As one can plainly see from the updated FOP database submitted at verification, for merchandise produced by Ecosource, Hengli reported *the same* per kilogram usage rates for each input *for every single* CONNUM.  Hengli's Minor Corrections at Attachment 2, P.R. 331; C.R. 226.

Thus, to be clear, the reported FOP amounts were objectively and irrefutably *not* CONNUM-specific.[3]

Commerce observed the inherently flawed nature of Hengli's methodology at verification and explained clearly that it affected *all* CONNUMs produced by Ecosource:

> In Ecosource's methodology, the denominator is total production quantity (in kilogram) of subject and non-subject merchandise, and numerators are total consumption quantity (in kilogram) of each material. *See* VE-13.
>
> There are [        ] types of paper input by combination of width and basis weight, and each of them has a unique material code. The basis weights of them are [
>
>             ]. Each of the [        ] types of paper input is allocated to each of [        ] finished paper plates. As a result, paper inputs with basis weights of [
>
>
>             ] are allocated to paper plates with basis weight of [                    ]. Such allocation is inconsistent with the production process which is that a paper plate with basis weight of $270g/m^2$ is made only from paper input with basis weight of $270g/m^2$.
>
> The completeness test shows that all paper plates sold during the POI have two basis weights of $250g/m^2$ and $270g/m^2$. *See* VE-9. However, paper inputs with basis weights other than $250g/m^2$ and $270g/m^2$ are also included in the allocation. See VE-1 at Attachment 2.

*Hengli Verification Report* at 16.

Hengli commingled paper inputs of differing basis weights and used those to calculate FOP usage rates for CONNUMs that [

]. To illustrate, Ecosource produced CONNUMs with basis weight codes of either [

], but when reporting its FOPs, it reported consuming paperboard that did not correspond to

---

[3] Hengli has never disputed that its results are not CONNUM-specific. For example, in its rebuttal brief to Commerce, it argued that the methodology it applied was "non-distortive" because "products such as paper plates would consume *similar* quantities of inputs on a per-kg basis." Hengli Rebuttal at 33-34, P.R. 346; C.R. 318 (emphasis added). However, Commerce did not request that FOP consumption amounts be reported on a "similar to a CONNUM" basis, but requested that Hengli report its FOP consumption amounts on a CONNUM-specific basis.

those basis weights.  Thus, the FOP reporting did not reflect the actual production experience for CONNUMs with those basis weights.  For example, CONNUM [                    ] is the largest CONNUM by volume by pieces and reports a basis weight of [  ] which means that it is [                                        ]g/m$^2$, yet Hengli reported that it used paper input materials [                                              ], which have basis weights of [                    ] g/m$^2$, respectively, all which are in fact less than [        ] g/m$^2$ or larger than [        ] g/m$^2$, and thus could *not* have been used to produce this CONNUM.  *Hengli DQR* at Exhibit D-6, C.R. 115.

By combining inputs used to produce both subject and non-subject merchandise, and commingling paperboard of different basis weights in its FOP allocations, Hengli failed to abide by Commerce's requirement that Ecosource's consumption of inputs into the production of subject merchandise be reported on a CONNUM-by-CONNUM basis.  The very reason Commerce uses model-specific CONNUMs to calculate AD margins is to guarantee an "apples to apples" approach – to make certain that the correct models on the normal value side of the equation are compared to same or similar models on the U.S. price side of the equation. Commerce identified early in in the investigation that basis weight was the fourth most important feature in the hierarchy of comparison factors, and the second-most important physical feature (after paper thickness).  Product Characteristics Memorandum, P.R. 140.  Accordingly, it is unquestionably inaccurate to portray FOPs as CONNUM-specific when they are factually not model-specific and include amounts related to non-subject merchandise in both the numerator and denominator of the FOP calculations.

Commerce observed this problem in the IDM, stating that Hengli "provided the same paperboard input consumption rate for all CONNUMS which did not account for the fact that all

basis weights were not used for all products." IDM at 13. Furthermore, Commerce determined that by including paperboard inputs with different basis weights in its consumption calculations, Hengli's reported FOPs were not CONNUM-specific. *Id.* In addition, Commerce explained that at verification it discovered, based on Hengli's production process and records, that Hengli "was able to match the paperboard inputs with paper plates based on basis weight, but failed to do so." *Id.* at 12. Indeed, Hengli itself stated and certified that Ecosource tracked "the monthly consumption of inputs and outputs on a product-specific basis," and Commerce explained that it verified that Hengli had the ability to report a CONNUM-specific consumption rate, but it did not do so. *Id.* at 13 (citing to *Hengli DQR* at D-6, P.R. 210, C.R. 115).

In sum, Hengli was required to report its FOPs on a CONNUM-specific basis so that Commerce could, in turn, accurately compare Hengli's U.S. sales to normal values derived from those FOPs and surrogate values in its calculations. In failing to report its FOPs on a CONNUM-specific basis, despite having the ability to do so, Hengli therefore prevented Commerce from accurately calculating Hengli's AD margin.

Thus, because the reported FOPs for the paperboard inputs were not "reported in the manner requested and the company failed to notify Commerce that it used another reporting methodology in its initial questionnaire response," and Commerce verified that Hengli was able to match the paperboard inputs with paper plates on a CONNUM-specific basis and did not do so, Commerce correctly determined that Hengli "withheld information that was requested," pursuant to 19 U.S.C. § 1677e(a)(2)(A), "failed to timely report CONNUM-specific FOPs," pursuant to 19 U.S.C. § 1677e(a)(2)(B), and "significantly impeded" the investigation, pursuant to 19 U.S.C. § 1677e(a)(2)(C). IDM at 8.

In addition, Commerce determined that the application of AFA was warranted pursuant to 19 U.S.C. § 1677e(b) because Hengli did not act to the best of its ability in reporting the paperboard FOP inputs.  *Id.*[4]

As AFA, Commerce applied to Hengli the highest-calculated transaction-specific margin calculated for the other mandatory respondent, Jinhua.  IDM at 9.  Commerce had determined in the *Preliminary Determination* that such a rate "struck an appropriate balance between the goal of inducing future cooperation, and the rate not being punitive".  PDM at 18.  Further, the Federal Circuit has affirmed the use of another respondent's highest-calculated transaction specific margin as total AFA in the same proceeding as in accordance with law.  *See Nan Ya Plastics. Corp. v. United States*, 810 F.3d 1,333, 1,345 (Fed. Cir. 2016).

Commerce's determination that the application of AFA was warranted with respect to Hengli was clearly supported by substantial evidence on the record and otherwise in accordance with law, and should be affirmed by this Court.

### 1. Commerce did not approve of Hengli's averaging allocation methodology as applied to other FOPs

Hengli provides three primary arguments challenging Commerce's AFA determination.  First, it argues that because Commerce did not "take exception" to its use of the same allocation methodology for "varnish," "flexo stabilizer," or "ink," (*i.e.*, taking averages for the consumption of all models of a particular input, whether used in subject or non-subject merchandise and

---

[4] Commerce did not address the fact that the same flawed methodology used by Hengli to report its paperboard FOP, was also used to report all other FOPs (ink, flexo stabilizer, varnish, packing materials, electricity, and labor), as well as Hengli's byproducts (scrap paper and waste ink).  Commerce presumably focused on Hengli's flawed and inaccurate paperboard reporting because the effects of those incorrect FOP data on Hengli's overall AD calculations were significant enough, alone, to warrant the application of total AFA, given that paperboard inputs accounted for the overwhelming majority of Hengli's direct material FOPs.

reporting that average for all CONNUMs), then "there is absolutely no reason to treat" its approach to calculating the paperboard FOP "as an exception." Hengli Br. at 18. Hengli's argument presumes that Commerce found Hengli's commingling of consumption amounts for other inputs (varnish, flexo stabilizer or ink) used to produce both subject merchandise and non-subject merchandise to be acceptable. In fact, Commerce never agreed with Hengli's reported FOP allocation methodology for any of those inputs.

Instead, Commerce focused solely on the primary input for paper plates – paperboard. IDM at 10-14. Of the total direct materials, labor, and energy ("MLE") consumed to manufacture paper plates, Commerce's calculations show that paperboard inputs made up [    ] percent of the total cost to manufacture paper plates during the POI.[5] In contrast, varnish, ink, and flexo stabilizer, made up [   ] percent, [   ] percent, and [   ] percent, respectively, of Ecosource's total MLE costs.[6]

APPC raised concerns, both in its pre-preliminary comments, and then again in its administrative brief, about problems with respect to Hengli's reporting methodology for allocating paperboard FOPs, as well as concerns with respect to the same methodology being applied to other direct material inputs and scrap as well. Pet. Pre-Prelim at 4-6, P.R. 273; C.R. 150; Pet. Br. at 7-11, P.R. 340; C.R. 315. Furthermore, APPC pointed to additional problems with Ecosource's reported labor and energy FOPs, explaining that Ecosource "simply took the

---

[5] [    ] (total cost of paperboard consumed)/ [    ] (total MLE cost) = [    ] percent. Commerce Preliminary Analysis Memorandum for Hengli (Apr. 29, 2024), at Exhibit III, NME Margin Calculation Program, at 67 (observation 1, under WCPAPER_MAT_IN) and 69 (observation 1, under DIRECT_MATERIAL), P.R. 310; C.R. 183, C.R. 184.

[6] *Id. See also* Hengli *DQR* at Exhibit 1 (providing programming identifiers for each input), P.R. 210; C.R. 115.

total amount of labor or electricity consumed for all production and divided it by the total output of all products, both subject and non-subject."  Pet. Pre-Prelim at 6; Pet. Br. at 11.

In the *Final Determination*, Commerce found it necessary only to address the averaging of consumption amounts in the context of paperboard inputs in the IDM.  IDM at 10-14.

Rather than presume that Commerce tacitly accepted Hengli's flawed reporting methodology for all of these FOPs other than paperboard, it is far more logical to conclude that Commerce focused exclusively on Hengli's reported paperboard FOPs because paperboard accounted for [      ] percent of Ecosource's total materials, labor and energy, and because Commerce's verification of Ecosource focused on paperboard alone, finding that the company's FOP reporting was "inconsistent with the production process."  Hengli Verification Report at 16, P.R. 335; C.R. 213.

To the extent that Commerce found Hengli's reported FOP allocation methodology to be inaccurate for [      ] percent of Ecosource's direct material, labor and energy FOPs, and that the application of total AFA was warranted, there was no need for Commerce to conduct the the same analysis to Hengli's FOPs calculations for varnish, ink, flexo stabilizer, packaging, labor and electricity inputs, as well as byproducts such as scrap.  There is no merit to Hengli's claims that Commerce's silence concerning Hengli's other FOP allocations indicated acceptance by Commerce that Hengli's allocation methodology was in any way acceptable.

### 2. Commerce satisfied its obligations under 19 U.S.C. § 1677m(d) to provide notice to Hengli about deficiencies in its allocation method once Commerce determined deficiencies existed

Hengli next claims that Commerce "decided to play 'gotcha' by drumming up an excuse" to apply AFA to Hengli instead of abiding by the requirements of 19 U.S.C. § 1677m(d) to place a respondent on notice of the nature of a deficiency in its initial questionnaire response.  Hengli

Br. at 21-29.  However, as the CIT held in *Reiner*, Commerce is only obligated to inform a

respondent as to the nature of a deficiency once it has determined that a deficiency exists.

*Reiner*, 206 F. Supp. 2d 1,332.  Hengli portrays its initial questionnaire responses with respect to

its allocation methodology as transparent and obvious, and even claims that Commerce

"obfuscated" the record evidence.  Hengli Br. at 27.  However, if anything, it is Hengli who was

guilty of obfuscation of its allocation methodology in the investigation – obfuscation which

eventually led to the application of AFA by Commerce.

Simply put, Commerce's rejection of Hengli's data and resort to total AFA is a situation

of Hengli's own creation.  Hengli's initial questionnaire response appeared to comply with

Commerce's reporting requirements, but did not.  Hengli was directed to "{r}eport each raw

material used to produce a unit of the merchandise under consideration," and was always aware

of the comparison hierarchy Commerce placed on the record early in the investigation that

indicated that basis weight was the second-most important physical feature (after paper

thickness) for purposes of its AD comparisons.  *Hengli DQR* at D-11, P.R. 210; C.R. 115; *see

also* Product Characteristics Memorandum, Attachment at 2, P.R. 140.  When Hengli stated, in a

submission that both it and its counsel certified as accurate, that it "reported the FOPs on a

consistent basis, kilograms, for each and all material factors," and stated that it revised its FOP

CONNUMs "into the required format for the final submission," it was entirely reasonable for

Commerce to take the company's representations at face value, rather than somehow divining

that Hengli was reporting its FOPs using an allocation methodology that was illogical and in no

way CONNUM-specific.  *Hengli DQR* at D-12, D-15.

Furthermore, if one reviews Exhibit D-6 (Materials Allocation (Ecosource)) to Hengli's

questionnaire, it becomes even more obvious why in the beginning Commerce would have been

unaware of problems with Hengli's reported FOP allocation methodology. By using a "kilograms-per-pack" allocation methodology instead of a "kilograms-per-kilogram" allocation methodology, each and every CONNUM had a different reported FOP amount, exactly as one would expect if the reported consumption rate was truly CONNUM-specific. For example, in Exhibit D-6, CONNUMs [                                                        ] were reported to have consumption amounts of [                                        ]. *Hengli DQR*, Exhibit D-6 at 1, C.R. 102. However, after Commerce requested that Hengli revise its FOPs to report them on a kilograms-per-kilogram basis, Hengli reported the exact same consumption amounts of [                                        ] for each of those CONNUMs. *Hengli SQR,* Exhibit SQR-12.1 at 2, P.R. 278, C.R. 161. It is striking, in fact, that the charts in Exhibit SQR-12.1 show the exact same consumption amounts for each input for all CONNUMs, whether it be for varnish, ink, flexo stabilizer, electricity, packing cartons, packing film bags, packing label papers, labor and more. *See id*. Those charts provide the best and clearest demonstration that the allocation methodology used by Hengli to report FOPs was in no way CONNUM-specific.

Hengli's Section D questionnaire response was filed on June 18, 2024, and on July 23, 2024, Commerce issued a supplemental questionnaire which directed Hengli to "report all factor consumption usage rates on a per KG basis and revise the individual and combined FOP databases accordingly." *Hengli SQ* at Question 12, PR. 265; C.R. 143. At that point, Commerce clearly was aware that Hengli had not reported its FOP data on a kilograms-per-kilogram basis and that the reported FOPs required revision.

Accordingly, Commerce's supplemental questionnaire provided Hengli with an opportunity to remedy that perceived deficiency, in accordance with 19 U.S.C. § 1677m(d). Hengli requested an extension, which Commerce granted, and on August 9, 2024, Hengli filed its

supplemental response.  *Hengli SQR*, Exhibit SQR-12.1 at 2, P.R. 278, C.R. 161.  However, rather than take advantage of the opportunity and extra time it had been given by Commerce to fix its analysis, revise its allocation methodology, and submit its responses on a basis that was actually CONNUM-specific and did not include non-subject merchandise in its averaging calculations, Hengli merely supplied charts which applied the same input-averaging methodology used to report FOPs in the section D response, but expressed on a kilograms-per-kilogram basis rather than a kilograms-per-pack basis.  *Id.*[7]  As explained above, that supplemental questionnaire response underscored the inaccuracy of Hengli's allocation methodology – providing the same FOP consumption amount for all paperboard, as well as a uniform input number for the rest of the inputs, regardless of the CONNUM.  *Id.*

The issue was raised by APPC in its pre-prelim comments.  Petitioner Pre-Prelim Comments at 3-8.  Then, in its August 12, 2024, rebuttal comments, Hengli defended its averaging FOP methodology as "reasonable" because it claimed "paper plates would consume *similar* quantities of inputs on a per kg basis."  Hengli Pre-prelim Rebuttal at 2, P.R. 279 (emphasis added).  It never claimed that its allocation methodology resulted in CONNUM-specific FOP amounts in those comments, but defended its reported FOPs by stating that "paper

---

[7] In Hengli's section D questionnaire response, and then again in its supplemental questionnaire response, Hengli claimed to report Ecosource's FOPs on a CONNUM-specific basis, when in fact the input supplier's FOP amounts were never reported as such.  *Hengli DQR* at D-12 and Exhibit D-6, P.R. 20; C.R. 115; *Hengli SQR*, Exhibit SQR-12.1 at 2.  Had Hengli determined that it could not report the FOPs on a CONNUM-specific basis, it should have reached out to Commerce and worked with the agency to address its concerns.  *See* 19 U.S.C. §§ 1677m(c)(1) & (2) (allowing for parties to notify Commerce if they are unable to submit information in the requested form and manner, and work with the agency to find a workable alternative).  Instead, Hengli unilaterally decided to report the FOPs using a different methodology of its choosing, and now appeals the resulting application of AFA by Commerce to the Court once faced with the consequences of that decision.

plates" are "more or less the same except for size." *Id.* at 3.  Furthermore, it defended the

allocation methodology, claiming Ecosource did "not track production inputs by orders." *Id.*

Commerce was finally able to conduct a detailed examination of Ecosource's books and

records at onsite verification, where it observed that the methodology used by the company to

report its FOPs was inherently flawed.  As discussed above, Commerce determined at

verification that the paperboard FOPs reported by Hengli were "inconsistent with the production

process" of paper plates and that Ecosource in fact had the ability to report CONNUM-specific

FOPs. *Hengli Verification Report*, P.R. 331; C.R. 226 at 16.  Both of these points clearly

contradicted the assertions Hengli made in its pre-prelim rebuttal comments. *See* Hengli Pre-

Prelim Rebuttal Comments at 2-3, P.R. 279.

In response to Hengli's 19 U.S.C. § 1677m(d)-related claims in the investigation,

Commerce emphasized in the IDM that it explicitly asked "Fuzhou Hengli to revise its FOP

reporting to be on a per-kilogram basis" and "granted an extension in full," and that Hengli had

claimed it had "revised its reported material consumption to be a per-kilogram of *subject*

*merchandise* basis," which, as explained above, proved not to be the case.  IDM at 7 (emphasis

added).  Accordingly, Commerce determined that it had satisfied the requirements of the statute

because it provided Hengli with both an opportunity to fix its methodology, and an extension in

full, and Hengli elected not to avail itself of that opportunity.

Because Commerce made Hengli aware of certain deficiencies in its reported FOP

allocations and provided Hengli with an opportunity to remedy those deficiencies once

Commerce became aware of them, Commerce complied with the requirements of 19 U.S.C.

§ 1677m(d).  It was only later, at verification, that Commerce recognized the extent of Hengli's

inaccurate reporting and observed that Hengli had had the ability to report its FOPs in the correct

manner from the outset, despite its claims on the record that Ecosource's books and record did

not track the necessary information to allow for such reporting.

As the CIT held in *Reiner*, under 19 U.S.C. § 1677m(d), absent Commerce's knowledge

that a deficiency existed, no obligation to alert a respondent as to a deficiency existed in the first

place. *See Reiner*, 206 F. Supp. 2d at 1,333. In this case, Commerce was unaware of the full

extent of Hengli's FOP allocation deficiencies, and Ecosource's ability to correct for those

deficiencies, until verification.

Furthermore, it would have been unreasonable to expect that 19 U.S.C. § 1677m(d)

would have required Commerce, *post-verification*, to permit Hengli to revise its FOP allocation

methodology and fundamentally revise all its FOP data on the record. The purpose of

verification is to confirm, through a review of a company's books and records, that the

information that was reported to Commerce is accurate and correct, rather than an opportunity to

discover a company's systemic reporting deficiencies and allow them to fix them. *See Goodluck

India Ltd. v. United* States, 11 F. 4th 1,335, 1,343 (Fed. Cir. 2021) ("*Goodluck India*") (affirming

Commerce's application of AFA to a respondent that attempted to revise coding errors in its

earlier-reported data at verification that had resulted in "misreported CONNUMs for 682 sales in

Goodluck's home market database." In affirming Commerce's determination that the respondent

had not acted to the best of its ability in providing accurate data in the first instance, the Federal

Circuit emphasized that the proposed revisions at verification "were not minor" and "were a

systematic change to the entire reported database.").

As the Federal Circuit held in *Goodluck India*, "{v}erification represents a point of no

return." *Id.* at 1,343. This is because, as the CIT has explained, "Commerce cannot complete its

own work unless it is able at some point to freeze the record and make calculations and findings

based on that fixed and certain body of information." *Reiner*, 206 F. Supp. 2d at 1,334 (internal quotation marks and citations omitted). Accordingly, on that basis both the Federal Circuit and the CIT have recognized that Commerce is under no obligation, statutory or otherwise, to permit respondents to correct significant reporting methodology deficiencies during or following verification. This is particularly true when Commerce doesn't become fully aware of the extent of a respondent's reporting deficiencies until verification, as was the situation in this case with respect to Hengli.

In truth, it was Hengli who had an obligation to create an accurate record and provide Commerce with the requested CONNUM-specific FOPs, and it did not do so. It is well-established that a respondent in an AD proceeding "bears the burden of preparing and providing Commerce with an accurate submission within the prescribed statutory deadlines." In this case Hengli did not do so, and therefore the application of AFA was warranted. *RHP Bearings v. United States*, 875 F. Supp. 854, 857 (Ct. Int'l Trade 1995). *See also NSK Ltd. v. United States*, 825 F. Supp. 315, 318 (Ct. Int'l Trade 1993) ("Commerce is not required to correct a respondent's errors when a respondent reported erroneous data but failed to timely correct it.").

### 3. Hengli's FOP reporting was not accurate

In addition, Hengli argues that even though none of its reported FOPs were CONNUM-specific, or even specific solely to the production of subject merchandise, the FOP amounts were still "accurate." Hengli Br. at 18-20. It argues that there is "no meaningful difference if the particular paperboard input used is lighter or heavier." *Id*. at 18. In support of this allegation, Hengli cites to Attachment I of its rebuttal brief on the record. *Id*. at 19-20. Based on that information, Hengli claims that it re-calculated the FOPs to be CONNUM-specific, or as it states, "using the methodology that Commerce asserts was necessary," and it alleges that the

ultimate difference was "0.063 percent" between the CONNUM-specific methodology and the

methodology Hengli applied, with "Hengli's methodology resulting in very slightly higher

quantities, which is against its interest." *Id.* at 20.  It argues that it is "nonsensical to conclude

that a difference of six hundredths of one percent is evidence" that Hengli's methodology was

"inaccurate." *Id.*

There is no merit to this claim.  Hengli claimed in its rebuttal brief that it

"demonstrate{d} at Attachment I using evidence on the record that its methodology is accurate

and not distortive," and that for "the purposes of demonstrating that the current allocation

method completely reflects accurate consumption" it conducted certain comparisons "at

Attachment I."  Hengli Rebuttal at 9, 34-36, P.R. 346; C.R. 318.  However, Hengli's rebuttal

brief did not contain an "Attachment I."  Because it was a rebuttal brief, and therefore the last

document filed by Hengli on the record before Commerce issued its *Final Determination*, APPC

had no opportunity to challenge Hengli's unsupported calculations on this point.  IDM at 14.

Hengli now cites to and relies on "Attachment I" as part of its argument, but again, no such

document exists on the record of the investigation.  Hengli Br. at 19-20.  Accordingly, the Court

should dismiss this argument as unsupported by any record evidence.

Furthermore, even accepting, *arguendo*, that Hengli's recalculation of its paperboard

FOP results in the percentage difference it claims, that alleged difference in no way undermines

the merits of Commerce's AFA determination.  In its description of the non-existent Attachment

I to its rebuttal brief, Hengli claimed that the attachment consisted of worksheets found in

"Exhibit D-6 Materials Allocation," as updated by verification exhibit "VE-1 Attachment 2."

Hengli Rebuttal at 35, P.R. 346; C.R. 318.  Assuming that information derived from those

worksheets does support Hengli's alleged calculations, the result of those calculations still shows

34

that the "FOP data" reported by Hengli in its questionnaire responses were, as Commerce stated

in the IDM, "not as accurate as" Hengli could have provided had it reported its FOPs on a

CONNUM-specific basis.  IDM at 14.

Furthermore, underlying Hengli's calculation of the hypothetical difference between the

CONNUM-specific methodology required by Commerce and the methodology it used instead to

allocate consumption amounts for paperboard inputs is a flawed presumption that had Commerce

not rejected the paperboard input amounts and applied total AFA to Hengli, Commerce would

have just accepted all of the other FOP amounts on the record which were not reported on a

CONNUM-specific basis in calculating an AD margin for Hengli.  As noted above, such a

presumption is illogical – the flaws in Hengli's reported FOP data went further than just its

reported paperboard consumption amounts.  Had Commerce not applied total AFA in the *Final*

*Determination*, and instead had demanded that Hengli "fix" all of its paperboard FOPs, the only

logical presumption would be that Commerce would have also ordered Hengli to fix *all* of its

reported FOPs that were calculated using an inaccurate and unreasonable averaging methodology

that included inputs used to produce both subject and non-subject merchandise.  Despite Hengli's

claims to the contrary, it is unlikely that such a major overhaul of Hengli's FOP amounts would

have merely yielded Hengli's alleged calculated "0.063 percent" difference.  Hengli claims that

believing such an alleged small difference in margins would be "inaccurate" is "nonsensical,"

but in fact what is nonsensical is believing that if Commerce had ordered Hengli to fix its

allocation methodology for paperboard FOPs, it would have otherwise ignored that the same fix

was also necessary for the rest of Ecosource's reported FOP amounts.  Hengli Br. at 20.

Finally, Hengli dismisses Commerce's consideration of basis weight as an important

CONNUM characteristic, but Hengli's claims on this point in no way undermine the

reasonableness of Commerce's AFA determination. In challenging Commerce's criticism of its FOP allocation methodology, Hengli claims that "there is no meaningful difference" in FOP amounts "if the particular paperboard input used is lighter or heavier" and that paperboards "with different basis weights" have no meaningful difference in values. Hengli Br. at 18 and 19. Hengli claims that its "reporting methodology is therefore accurate and Commerce's distinction between the two reporting methods is a false one." Hengli Br. at 19. Hengli's arguments are misleading, as elaborated upon below.

In conjunction with input from interested parties, at the beginning of the investigation, Commerce identified 17 product characteristics ranked in order of importance, with "basis weight" listed as the fourth factor in the hierarchy. Product Characteristics Memo, at 1-2, P.R. 140. Basis weight is the measurement of the density of the paper/paperboard input of which the paper plate is made. *Id.* at 2.

Commerce issues its hierarchy of product characteristics early in a proceeding so that the criteria can be applied equally to all respondents and so its analysis can consider the arguments about the criteria "on their own merits, rather than as a result of their impact on any particular respondent's margin calculation." *Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy; 2019-2020*, 87 Fed. Reg. 71 (Dept. of Commerce Jan 3, 2022) (fin. admin. rev. results), and accompanying Issues and Decision Memo at 28 n.23. Accordingly, for all three LTFV investigations of paper plates (*i.e.*, China, Vietnam, and Thailand), Commerce applied these criteria equally to all examined respondents. Product Characteristics Memo at 1.

If Hengli had concerns with the criteria set forth in the matching hierarchy, including Commerce's consideration of basis weight in developing CONNUM-specific FOPs, Hengli should have raised those concerns early in the investigation during the agency process of

determining its product characteristics hierarchy, or even later in responding to Commerce's questionnaires. However, Hengli did not raise concerns with the matching hierarchy or its data reporting at any point.

Instead, Hengli elected, unilaterally and without notice to Commerce, to apply an FOP allocation methodology that commingled paperboard of all basis weights and applied that methodology in an overly general manner to the production of both subject and non-subject merchandise. Hengli thus reported FOPs to Commerce that were not CONNUM-specific despite being given two opportunities (the initial and supplemental questionnaires) to do so.

In any case, Hengli did not act to the best of its ability in reporting its consumption of all of its FOPs, including paperboard, varnish, ink, packing cartons, packing film bags, packing label paper, electricity, labor, and scrap, and Commerce correctly and reasonably determined that the use of facts available with an adverse inference was warranted. APPC respectfully submits that this Court should affirm Commerce's application of total AFA to Hengli as supported by substantial evidence and otherwise in accordance with law.

## II. COMMERCE'S DETERMINATION TO NOT ADDRESS HENGLI'S SURROGATE VALUE ARGUMENTS WAS IN ACCORDANCE WITH LAW AND THIS COURT SHOULD DISMISS THOSE ARGUMENTS AS NOT RIPE FOR JUDICIAL REVIEW

Hengli devotes numerous pages of its brief to the argument that this Court should: 1) analyze the record as to the difference between folding box board ("FBB") paperboard and kraft paper paperboard; 2) determine that Hengli's suppliers used FBB to produce subject merchandise; 3) reject the surrogate values Commerce selected for paperboard in its AD calculations for Jinhua and unexamined separate rate companies on the basis of the production experience of Hengli's suppliers; and 4) order Commerce to calculate a new margin for Hengli using a new surrogate value based on those suppliers' production experience. Hengli Br. at 29-

44.  However, Commerce determined in the IDM that Hengli's arguments regarding this issue were moot because it had applied total AFA to Hengli based on the company's failure to report FOPs on a CONNUM-specific basis.  IDM at 18.  Because of this, Commerce did not reach the surrogate value issue in the *Final Determination*.  Accordingly, this Court should dismiss this line of arguments "as unripe for adjudication."  *Aluminum Extrusions Fair Trade Committee v. United States*, 968 F.Supp.2d 1,244, 1,254 (Ct. Int'l Trade 2014) ("*Aluminum Extrusions*").

Commerce applied an AFA rate to Hengli based on Jinhua's highest calculated transaction-specific margin, not using the production experience of Hengli's suppliers of subject merchandise.  IDM at 9.  Similarly, in *Qingdao Sea-Line International Trade Co. v. United States*, 503 F. Supp. 3d 1,355, 1,365 (Ct. Int'l Trade 2021) ("*Qingdao*"), the plaintiff challenged both Commerce's application of total AFA and its selection of surrogate country.  The CIT affirmed Commerce's application of AFA and therefore determined to "not address Sea-Line's challenge to Commerce selection of a surrogate country because Commerce relied on total AFA and not surrogate information to calculate Sea-Line's dumping margin."  *Id.*  The Court explained that it reached this decision on the basis of the ripeness doctrine.  *Id.* at n.4.  As the Court explained in *Aluminum Extrusions*, the "ripeness prerequisite springs from the Constitution's requirement that the judiciary address only an actual case or controversy and avoid extending its role to advisory or hypothetical judgments."  *Aluminum Extrusions*, 968 F. Supp. 2d at 1,254 (citing *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003)).

In *Qingdao*, the Court explained that "in order to confer jurisdiction, a plaintiff must show 'that it has suffered a concrete and particularized injury that is either actual or imminent,'" that "the injury is fairly traceable to the defendant," and "that a favorable decision will likely

redress that injury.'" *Qingdao*, 503 F. Supp. 3d at 1,365, n.4 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) and citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). A "claim is not ripe if it is based on 'contingent future events that many not occur as anticipated, or indeed may not occur at all.'" *Aluminum Extrusions*, 968 F. Supp. 2d at 1,254 (citing *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

In this case, any challenge to the surrogate value selected by Commerce is not ripe for adjudication by this Court because Commerce applied total AFA to Hengli and lawfully did not address its arguments on this matter. The production experience of Hengli's suppliers is of no importance in selecting surrogate values used in calculating AD margins for other respondents. In other words, if the Court affirms Commerce's AFA determination in this litigation, then a holding by the Court on this issue would be, at best, an "advisory or hypothetical judgment" with no impact on Hengli's AD margin.

Indeed, the use of a different surrogate value would only become "ripe" if the Court struck down Commerce's AFA determination, parties had the opportunity to argue the issue on remand, Commerce addressed the arguments in the first instance on remand, and Hengli disagreed with the surrogate value used by Commerce on remand. However, because these are all hypothetical possibilities "based on contingent future events" that "may not occur," this Court should dismiss this line of argument as unripe for adjudication.

### III. COMMERCE'S DETERMINATION, AS AFA, THAT CRITICAL CIRCUMSTANCES EXISTED FOR HENGLI IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW

With respect to Commerce's finding of critical circumstances in the *Final Determination*, 19 U.S.C. § 1673d(a)(3) states that Commerce shall contain a finding of whether "the person by whom, or for whose account, the merchandise was imported knew or should have known that the

exporter was selling the subject merchandise at less than fair value and that there was likely to be material injury by such sales, and (B) there have been massive imports of the subject merchandise over a relatively short period, resulting in a critical circumstances determination."

Furthermore, 19 C.F.R. § 351.206(h)(2) provides that a "relatively short period" is "normally" "the period beginning on the date the proceeding begins (*i.e.*, the date the petition is filed) and ending at least three months later" and states that for imports to be "massive," they "must increase by at least 15 percent." IDM at 3. As Commerce explained in the PDM, "Commerce normally considers margins of 25 percent or more for EP sales and 15 percent or more for constructed export price sales sufficient to impute importer knowledge of sales at LTFV." PDM at 29. Furthermore, if the International Trade Commission ("ITC") "finds a reasonable indication of material injury (rather than the threat of injury) to the relevant U.S. industry, Commerce will normally determine that a reasonable basis exists to impute to importers sufficient knowledge to find injury by such imports." *Id.* at 30.

Based on the AFA rate of 515.40 percent applied by Commerce in the *Final Determination* to Hengli, plus the ITC's preliminary finding that there was a "reasonable indication" of material injury to the paper plate domestic industry due to Chinese sales of paper plates for LTFV to the United States, Commerce determined that such information was sufficient to impute knowledge that Hengli's importers "knew or should have known" that Hengli was selling subject merchandise at LTFV and "that there was likely to be material injury by reason of sales of paper plates." IDM at 4-5. Furthermore, pursuant to 19 U.S.C. §§ 1677e(a) & (b), Commerce determined as AFA that Hengli "dumped 'massive imports' over a 'relatively short period'" of time. *Id.* Thus, Commerce determined in the *Final Determination* that critical circumstances existed for Hengli. *Id.*

Hengli argues that because Commerce should not have applied AFA in the first place based on its reported FOPs, the Court should hold that Commerce's critical circumstances determination was also unlawful.  Hengli Br. at 45-47.  Specifically, Hengli claims that because "its margin does not exceed the 25 percent threshold," this Court should order Commerce to "reverse its finding that critical circumstances exist" for Hengli.  *Id.*

As explained above, Commerce correctly determined that Hengli withheld information specifically requested by the agency, failed to provide that information in the form and manner requested, and significantly impeded the information in not providing CONNUM-specific FOPS, pursuant to 19 U.S.C. §§ 1677e(a)(2)(A),(B), and (C).  Furthermore, Commerce's decision that Hengli did not act to the best of its ability in providing that information to Commerce, and that the application of an adverse inference was warranted, pursuant to 19 U.S.C. § 1677e(b), was also in accordance with the information on the record and the statute.  Accordingly, there is no merit to Hengli's argument, and this Court should affirm Commerce's critical circumstances determination as supported by substantial evidence on the record and otherwise in accordance with law.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that this Court deny Hengli's motion for judgment on the agency record and sustain Commerce's *Final Determination* as supported by substantial evidence and otherwise in accordance with law.

PUBLIC VERSION

Respectfully submitted,

Date:  September 30, 2025

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to the American Paper Plate Coalition*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 12,440 words and therefore complies with word count limitation in the Standard Chambers Procedures.

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to the American Paper Plate Coalition*