A-570-164
Remand
Slip Op. 26-59
**Public Document**
E&C/OVII: LW

***Fuzhou Hengli Paper Co., Ltd. v. United States*,**
**Court No. 25-00064, Slip Op. 26-59 (CIT 2026)**
**Certain Paper Plates from the People's Republic of China**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (CIT) in *Fuzhou Hengli Paper Co., Ltd. v. United States*, Slip Op. 26-59, Ct. No. 25-64 (CIT June 11, 2026) (*Remand Order*). These final results of redetermination arose from the *Final Determination* and *Order* in the antidumping duty investigation of certain paper plates (paper plates) from the People's Republic of China (China).[1] The CIT remanded for Commerce to reconsider its application of total adverse facts available (AFA) to Fuzhou Hengli Paper Co., Ltd. (Fuzhou Hengli) on the basis of Fuzhou Hengli's failure to report control number (CONNUM)-specific factors of production (FOP). More specifically, the CIT concluded that Commerce failed to notify Fuzhou Hengli of its deficient response as required by section 782(d) of the Tariff Act of 1930, as amended (the Act), and directed Commerce to provide Fuzhou Hengli with the notice of deficiency and allow it to cure the deficiency, therein.[2] On remand,

---

[1] *See Certain Paper Plates from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 FR 8271 (January 28, 2025) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 FR 13139 (March 20, 2025) (*Order*).
[2] *See Remand Order* at 26-27 ("On remand, Commerce must provide Fuzhou with sufficient notice of the deficiencies in the factors of production reporting and must provide Fuzhou with the opportunity to cure the deficiencies.").

under respectful protest,[3] Commerce issued an "Opportunity to Cure Deficiencies" to explicitly notify Fuzhou Hengli of the deficiency and allow for an opportunity to cure the deficient response.[4] On July 15, 2026, Fuzhou Hengli reported CONNUM-specific FOPs in its response.[5] Because there is no longer a gap in the record, Commerce finds no reason to resort to AFA; on remand, the agency has relied on Fuzhou Hengli's CONNUM-specific FOP reporting to calculate an estimated weighted-average dumping margin of 91.83 percent.[6] In doing so, Commerce simple-averaged the average unit values (AUV) from the Harmonized System (HS) subheadings 4810.32 and 4810.92 to value paperboard.[7] Furthermore, Commerce finds that critical circumstances exist.[8]

## II. BACKGROUND

In the underlying proceeding, Fuzhou Hengli initially reported FOPs on a per-pack basis in its initial questionnaire response but submitted surrogate values (SV) on a per-kilogram (KG) basis.[9] As a result, Commerce issued its July 26, 2024, supplemental questionnaire[10] requesting Fuzhou Hengli modify its FOP reporting to be on a per-KG basis. Fuzhou Hengli responded to the supplemental questionnaire on August 9, 2024.[11]

---

[3] *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (*Viraj*).
[4] *See* Memorandum, "Opportunity to Cure Deficiencies," dated July 2, 2026 (Opportunity to Cure Deficiencies).
[5] *See* Fuzhou Hengli's Letter, "Fuzhou Hengli's Response to Opportunity to Cure Deficiencies," dated July 15, 2026.
[6] *See* Memorandum, "Margin Calculation for Fuzhou Hengli Paper Co., Ltd," dated August 3, 2026 (Remand Analysis Memorandum).
[7] *Id.*
[8] *See* Memorandum, "Critical Circumstances Analysis for Draft Remand," dated August 3, 2026 (Critical Circumstances Memorandum); *see also Certain Paper Plates from the People's Republic of China, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 FR 13139 (March 20, 2025) (in which the ITC also found that critical circumstances exist).
[9] *See* Fuzhou's Letter, "Fuzhou Hengli's Section C and D Initial Questionnaire Responses," dated June 18, 2024 (DQR); *see also* Fuzhou's Letters, "Fuzhou Hengli's Surrogate Value Comments," dated June 28, 2024, and "Fuzhou Hengli's Final Surrogate Value Submission," dated June 23, 2024 (submitted on July 23, 2024).
[10] *See* Commerce's Letter, "Supplemental Questionnaire for Fuzhou Hengli Paper Co., Ltd.," dated July 26, 2024, at question 12 and 13.
[11] *See* Fuzhou Hengli's Letter, "Fuzhou Hengli's Supplemental Questionnaire Response," dated August 9, 2024 (Supplemental Questionnaire Response).

In its supplemental response, Fuzhou Hengli revised the material allocation from per-pack (Exhibit D-6) to per-KG (Exhibit SQR-12) and updated its FOP databases (henglifop02, henglifop02_ecosource, henglifop02_hongtai).[12] In the *Preliminary Determination*, Commerce relied upon Fuzhou Hengli's FOP reporting in making its dumping margin calculation.[13]

At verification, Commerce discovered that Fuzhou Hengli's FOP reporting was inaccurate when it learned that every different paperboard input has a different basis weight.[14] Therefore, Fuzhou Hengli's FOP reporting in response to the Supplemental Questionnaire, which showed that all finished paper plates shared the same combination of basis weights despite being made from paperboard inputs of different dimensions, was not CONNUM-specific and failed to account for the different basis weights of different paperboard inputs. Exhibit SQR-12 showed that the "CONNUM FOP reported" worksheet assigned the same consumption rate of paperboard inputs to all paper plates with different surface areas and basis weights. Likewise, the "FOB Materials Allocation" worksheet reflected that each paper plate consumed about twenty paperboard inputs of varying sizes and weights, which remained commingled rather than CONNUM-specific.

Consequently, for purposes of the *Final Determination*, Commerce found that Fuzhou Hengli failed to report CONNUM-specific FOPs as Commerce requested, and that application of AFA was warranted pursuant sections 776(a)(2)(A), (B), and (C), and 776(b) of the Act. As a result of applying AFA to Fuzhou Hengli's FOP reporting, Commerce considered that Fuzhou

[12] *Id.* at Exhibit SQR-12 (per-KG) which is revised Exhibit D-6 (per-pack), henglifop02, henglifop02_ecosource, and henglifop02_hongtai.

[13] *See Certain Paper Plates from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 89 FR 72367 (September 5, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[14] *See* Memorandum, "Verification of the Questionnaire Responses of Hengli Paper Co., Ltd. (Hengli) and its producer Guangdong Ecosource Environmental Technology Co., Ltd. (Ecosource)," dated December 17, 2024, (Verification Report) at 16.

Hengli's arguments on SVs were moot and determined that critical circumstances existed.[15] Fuzhou Hengli challenged the final determination before the CIT as not supported by substantial evidence nor in accordance with law.

In the *Remand Order*, the CIT held that Commerce's application of total AFA was not supported by substantial evidence and was not in accordance with law. Specifically, the CIT stated that "on remand, Commerce must provide Fuzhou with sufficient notice of the deficiencies in the factors of production reporting and must provide Fuzhou with the opportunity to cure the deficiencies."[16] Furthermore, the CIT stated that it may revisit the issues of SVs and critical circumstances after remand as appropriate.[17]

On remand, under respectful protest,[18] Commerce notified Fuzhou Hengli of the deficiency — "that the factors of production reporting was not truly CONNUM-specific because it did not account for the different materials of different basis weights."[19] In this notification, the "Opportunity to Cure Deficiencies," Commerce stated that it reviewed the record of the underlying proceeding and determined that it was unnecessary to reopen the administrative record because it contained sufficient verified information that Fuzhou Hengli could use to cure its deficient response.[20] Thus, the Opportunity to Cure Deficiencies informed Fuzhou Hengli of its deficient FOP reporting, and requested that Fuzhou Hengli rely on existing factual information on the record to cure its deficient response.[21] In response to the Opportunity to Cure

---

[15] *See Final Determination* IDM at 18.
[16] *See Remand Order* at 27, and 22-23 ("Commerce did not explicitly notify Fuzhou of the deficiency—that the factors of production reporting were not truly CONNUM-specific because it did not account for the different materials of different basis weights.").
[17] *See Remand Order* at 27.
[18] *See Viraj*, 343 F.3d at 1376.
[19] *See* Opportunity to Cure Deficiencies.
[20] *Id*., (citing Supplemental Questionnaire Response, and Exhibit SQR-12).
[21] *See* Opportunity to Cure Deficiencies.

Deficiencies, Fuzhou Hengli submitted a revised material allocations in Exhibit DQR-12.1 and revised FOP database which contains CONNUM-specific FOPs.[22]

On August 3, 2026, Commerce issued its Draft Results of Redetermination, and invited interested parties to comment.[23] Because there was no longer a gap in the record, Commerce found no reason to resort to AFA; instead, the agency relied on Fuzhou Hengli's CONNUM-specific FOP reporting to calculate an estimated weighted-average dumping margin of 91.83 percent.[24] In doing so, Commerce simple-averaged the AUVs from HS subheadings 4810.32 and 4810.92 to value paperboard.[25] Furthermore, Commerce found that critical circumstances continued to exist.[26]

On August 11, 2026, Fuzhou Hengli and the American Paper Plate Coalition each filed comments on the Draft Results of Redetermination.[27]

## III. ANALYSIS

### A. CONNUM-specific FOPs

Commerce provided the following instructions in the Opportunity to Cure Deficiencies:

1. Revise the material allocation in Exhibit SQR-12 to reflect that each paper plate is produced from a single type of paper input with a uniform basis weight (un-commingled). For example, revise "FOB Materials Allocation" worksheet to reflect a paper plate with basis weight of 270g/m$^2$ should consume only paper input with basis weight of 270g/m$^2$.
2. Demonstrate that total production quantity and total material consumption quantity remain unchanged. Commerce verified those quantities in November 2024.[28]

---

[22] *See* Fuzhou Hengli's Letter, "Fuzhou Hengli's Response to Opportunity to Cure Deficiencies," dated July 15, 2026, at Exhibit DQR-13.
[23] *See* Draft Results of Redetermination Pursuant to Court Remand, *Fuzhou Hengli Paper Co., Ltd. v. United States*, Court No. 25-00064, Slip Op. 26-59 (CIT June 11, 2026), dated August 3, 2026 (Draft Results of Redetermination); *see also* Remand Analysis Memorandum; and Critical Circumstances Memorandum.
[24] *See* Remand Analysis Memorandum.
[25] *Id.*
[26] *See* Critical Circumstances Memorandum.
[27] *See* Fuzhou Hengli's Letter, "Comments on Draft Redetermination," dated August 11, 2026 (Fuzhou Hengli Comments); *see also* AAPC's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand in *Fuzhou Hengli Paper Co., Ltd. v. United States*, Court No. 25-0064, Slip Op. 26-59 (CIT June 11, 2026)," dated August 11, 2026 (American Paper Plate Coalition Comments).
[28] *See* Verification Report.

3. Update all three FOP databases to reflect CONNUM-specific material allocations, using the latest verification-stage FOP databases that incorporate the accepted minor corrections (*i.e.*, hgnlifop03, henglifop03_ecosource).

In Fuzhou Hengli's response to the Opportunity to Cure Deficiencies, it reported CONNUM-specific FOPs and demonstrated that total production quantity and total material consumption quantity remained unchanged. Because there is no longer a gap in the record, Commerce finds no reason to resort to AFA; on remand, Commerce has relied on Fuzhou Hengli's CONNUM-specific FOP reporting to calculate its estimated weighted-average dumping margin. Consequently, Commerce also revisited its determinations regarding SVs and critical circumstances, as explained below.

B. Surrogate Value for Paperboard Input

By way of background, the SV in this case must not only account for the content of the input, but also the weight of that input.[29] Because HS 4810.92 covers only the content of input ("multi-ply" paperboard), and HS 4810.32 covers only the weight of the input, Commerce averaged the unit value of these HS import values for purposes of its *Final Determination*. Fuzhou Hengli argued extensively in the underlying investigation that the HS subheading 4810.32 does not cover the chemical fiber content of its paperboard input. Fuzhou Hengli, however, did not address the need for a surrogate value to account for the basis weight of the paperboard input.[30] Given Commerce found that the use of AFA was warranted for Fuzhou Hengli because of its failure to accurately report its CONNUM-specific paperboard inputs, the agency did not consider these arguments.[31] On remand, Commerce has addressed this issue.

[29] *See Final Determination* IDM at Comment 2.
[30] *See* Fuzhou Hengli Pre-Prelim Comments at 2-9; and Fuzhou Hengli's Letter, "Fuzhou Hengli's Rebuttal Brief," dated January 8, 2025.
[31] *See Final Determination* IDM at Comment 2.

Evidence on the record of this remand proceeding shows that it is appropriate to average the unit values of the HS 4810.32 and 4810.92 import values in determining the appropriate surrogate value for Fuzhou Hengli's paperboard inputs, as Commerce did for the other mandatory respondent, Jinhua, in the *Final Determination*. Specifically, the material allocation in Exhibit DQR-12 demonstrates that all of Fuzhou Hengli's paperboard inputs weighed more than 150g/$m^2$, so HS subheading 4810.32 is more specific to the basis weight of paperboard inputs used by Fuzhou Hengli, despite the differences in fiber content.[32] HS 4810.92 is multi-ply paperboard used by Fuzhou Hengli and does not have the Kraft, bleached, and 95 percent wood fiber content requirements, but is less specific than HS 4810.32 because it includes all weights of paperboard inputs. Therefore, simple averaging the AUVs of both HS codes captures an accurate fiber content and an accurate basis weight for the inputs.

First, Commerce notes that basis weight is a critical component in the manufacture and sale of paper plates as supported by the fact that basis weight is the fourth of the thirteen CONNUM characteristics, superseded in the hierarchy of product characteristics only by paper package count and plate dimensions (plate surface area and nominal caliper (thickness)).[33] Therefore, of the various descriptors for the paper plates subject to this investigation, basis weight is on the top third of the considerations for describing the paper plates costs and sales to the United States.[34] Further, HS subheading 4810.92 represents a product that weighs more than 150 g/$m^2$, which is a critical consideration in this investigation because the majority of Fuzhou Hengli's paperboard input is greater than 150g/$m^2$. Finally, calculating an AUV to value paperboard input using either HS 4810.92 or just HS 4810.32 will not adequately capture all aspects of the paperboard input. Specifically, it is necessary to take paper basis weight into

[32] *See* Fuzhou Hengli's Letter, "Fuzhou Hengli's Response to Opportunity to Cure Deficiencies," dated July 15, 2026, at Exhibit DQR-12.
[33] *See* Memorandum, "Product Characteristics," dated April 23, 2024.
[34] *Id*.

consideration in the valuation of paperboard inputs. Thus, while HS subheading 4810.32 also specifies another physical characteristic that is inconsistent with paperboard input, *i.e.*, "more than 95% by weight of the total fiber content consists of wood fibers obtained by a chemical process," it captures the critical characteristic of basis weight not covered by HS 4810.92. Commerce is applying a simple average and not a weighted average of the two AUVs to avoid an imbalanced result in line with *PET Film from China*.[35] Therefore, for the above reasons and based on the record evidence, Commerce simple averaged the AUVs from HS subheadings 4810.32 and 4810.92 to use as the SV.

C. Critical Circumstances Analysis

In Commerce's *Final Determination*, pursuant to section 773(e), 776(a), and 776(b) of the Act, Commerce made an adverse inference that Fuzhou Hengli dumped "massive imports" over a relatively short period," and thus, that critical circumstances existed for Fuzhou Hengli.[36] Although on remand there is no basis to rely on AFA, Commerce continues to find that critical circumstances exist for Fuzhou Hengli, as discussed below.

Commerce's normal practice in determining whether critical circumstances exist pursuant to the statutory criteria under section 733(e) of the Act has been to examine evidence available to Commerce, such as: (1) the evidence presented in the petitioner's critical circumstances allegation; (2) import statistics released by the U.S. International Trade Commission (ITC); and (3) shipment information submitted to Commerce by the respondent selected for individual

[35] *See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of the First Antidumping Duty Administrative Review*, 76 FR 9753 (February 22, 2011) (*PET Film from China*), and accompanying IDM at Issue 3.

[36] *See Final Determination* IDM at 4-5.

examination.[37] Commerce considered each of the statutory criteria for finding critical circumstances below.

*1. History of Dumping and Material Injury*

To determine whether there is a history of dumping pursuant to section 733(e)(1)(A)(i) of the Act, Commerce generally considers current or previous antidumping duty orders on subject merchandise from the country in question in the United States and current antidumping duty orders imposed by other countries with regard to imports of the same merchandise.[38] There have been no previous orders on paper plates from China in the United States. Therefore, Commerce finds no history of injurious dumping of the subject merchandise pursuant to section 733(e)(1)(A)(i) of the Act.

*2. Knowledge of Sales Below Fair Value and Material Injury*

In determining whether an importer knew or should have known that the exporter was selling subject merchandise at less than fair value and that there was likely to be material injury by reason of such sales, Commerce must rely on the facts before it at the time the determination is made. Commerce generally bases its decision with respect to knowledge on the margins calculated in the preliminary determination and the ITC's preliminary injury determination.[39]

---

[37] *See, e.g.*, *Certain Carbon and Alloy Steel Wire Rod from the Russian Federation and the United Arab Emirates: Affirmative Preliminary Determinations of Sales at Less Than Fair Value, and Affirmative Preliminary Determination of Critical Circumstances for Imports of Certain Carbon and Alloy Steel Wire Rod from the Russian Federation,* 82 FR 42794 (September 12, 2017), and accompanying PDM at 11, unchanged in *Certain Carbon and Alloy Steel Wire Rod from Belarus, the Russian Federation, and the United Arab Emirates: Affirmative Final Determinations of Sales at Less Than Fair Value, and Partial Affirmative Finding of Critical Circumstances,* 82 FR 56214 (November 28, 2017).

[38] *See, e.g.*, *Certain Oil Country Tubular Goods from the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination*, 74 FR 59117, 59120 (November 17, 2009), unchanged in *Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010).

[39] *See, e.g.*, *Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 28808 (May 11, 2022), and accompanying PDM at 15, unchanged in *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 FR 59041 (September 29, 2022).

Commerce normally considers margins of 25 percent or more for export price sales and 15 percent or more for constructed export price sales sufficient to impute importer knowledge of sales at less than fair value.[40] Here, Fuzhou Hengli's U.S. sales are export price sales; its margin of 91.83 percent exceeds the threshold of 25 percent and, thus, is sufficient to impute knowledge of sales below fair value. On that basis, Commerce finds that importers knew or should have known that Fuzhou Hengli was selling the subject merchandise at less than fair value.

To determine whether importers knew or should have known that there was likely to be material injury caused by reason of such imports pursuant to section 733(e)(1)(A)(ii) of the Act, Commerce normally will look to the preliminary injury determination of the ITC.[41] If the ITC finds a reasonable indication of material injury (rather than the threat of injury) to the relevant U.S industry, Commerce will normally determine that a reasonable basis exists to impute to importers sufficient knowledge of injury by such imports. In its injury investigation of paper plates from China, the ITC found that there is a "reasonable indication" of material injury to the domestic industry because of the imported subject merchandise.[42] Therefore, the *ITC Preliminary Determination* is sufficient to impute knowledge of the likelihood of material injury to importers. Thus, Commerce determines that importers knew, or should have known, that there

---

[40] *See, e.g.*, *Carbon and Alloy Steel Wire Rod from Germany, Mexico, Moldova, Trinidad and Tobago, and Ukraine: Preliminary Determination of Critical Circumstances*, 67 FR 6224, 6225 (February 11, 2002), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value: Carbon and Certain Alloy Steel Wire Rod from Moldova*, 67 FR 55790 (August 30, 2002); and *Affirmative Preliminary Determination of Critical Circumstances: Magnesium Metal from the People's Republic of China*, 69 FR 59187 (October 4, 2004), unchanged in *Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances: Magnesium Metal from the People's Republic of China,* 70 FR 9037 (February 24, 2005).

[41] *See, e.g.*, *Certain Potassium Phosphate Salts from the People's Republic of China: Preliminary Affirmative Determination of Critical Circumstances in the Antidumping Duty Investigation*, 75 FR 24572, 24573 (May 5, 2010), unchanged in *Certain Potassium Phosphate Salts from the People's Republic of China: Final Determination of Critical Circumstances in the Antidumping Duty Investigation*, 75 FR 30377 (June 1, 2010).

[42] *See Preliminary Determination* PDM at 2 ("On March 15, 2024, the {ITC} preliminarily determined that there is a reasonable indication that an industry in the United States has been materially injured by reason of imports of paper plates from China…" (citing *Paper Plates from China, Thailand, and Vietnam; Determinations*, 89 FR 18970 (March 15, 2024) (*ITC Preliminary Determination*)).

was likely to be material injury caused by reason of such imports, pursuant to section 733(e)(1)(A)(ii) of the Act.

*3. Massive Imports*

In determining whether imports of the subject merchandise were "massive" over a relatively short period, pursuant to section 733(e)(1)(B) of the Act and 19 CFR 351.206(h), Commerce normally compares the import volumes of the subject merchandise for at least three months immediately preceding the filing of the petition (*i.e.*, the base period) to a comparable period of at least three months following the filing of the petition (*i.e.*, the comparison period). Imports will normally be considered massive when the imports during the comparison period have increased by 15 percent or more compared to imports during the base period.

Commerce requested Fuzhou Hengli to report monthly shipment data from July 2023 through September 2024 (the preliminary determination's publication month-end) by no later than 15 calendar days after the last day of the given reporting month (*e.g.*, August 15 is the deadline for July 2024 data, *etc*.).[43] Fuzhou Hengli filed July 2024 shipments data after the deadline, to which Commerce rejected and removed it from the record.[44] For July 2024, Commerce used the highest one among seven shipments submitted.[45] For the final determination, based on the available Global Trade Atlas data, the base period is July 2023 through January 2024, and comparison period is February 2024 through August 2024. Fuzhou Hengli's imports increased by more than 15 percent during the comparison period.[46] Therefore, Commerce determines that the imports were massive.

In summary, Commerce finds that Fuzhou Hengli met the statutory criteria for knowledge of sales below fair value and material injury, and massive imports.

---

[43] *See* Commerce's Letter, "Request for Monthly Quantity and Value Shipment Data," dated June 14, 2024.
[44] *See* Memorandum, "Reject and Remove Document from Case Record," dated August 29, 2024.
[45] *See* Critical Circumstances Memorandum.
[46] *Id*.

D. Explanation of Protest

On remand, Commerce has complied with the CIT's *Remand Order* to provide Fuzhou the opportunity to cure its deficiencies in its FOP reporting. However, it is appropriate to explain why Commerce is doing so under respectful protest. As an initial matter, Commerce does not dispute its obligation to inform parties and provide an opportunity to remedy or explain deficiencies, under section 782(d) of the Act. However, Commerce cannot plausibly inform parties of deficiencies or provide the requisite opportunity to remedy or explain if Commerce is not aware of such deficiency and had no reason to know such reporting was deficient. In this instance, Commerce could not have determined that Fuzhou Hengli's reporting failed to comply with the agency's request, informed the respondent of the deficiency, and provided the respondent with an opportunity to remedy or explain the deficiency. Specifically, Fuzhou Hengli's misreporting was not apparent until Commerce officials conducted verification and *discovered* the reporting failures.

Respondents bear the burden of preparing and providing Commerce with an accurate submission by the prescribed deadline,[47] and verification is not a time for additional fact gathering; rather, verification is "intended to test the accuracy of data already submitted."[48] Indeed, Commerce is prohibited from considering untimely new factual information.[49] Consequently, for Commerce to accept untimely corrective information for failures discovered at verification undermines the law and incentivizes respondents to withhold or selectively respond to Commerce's requests for information. Furthermore, if Commerce were to adopt such a practice, this would allow new factual information to be submitted up until and

[47] *See Alloy Piping Products, Inc. v. U.S.*, 201 F.Supp.2d 1267, 1284 (CIT 2002), *aff'd* 334 F.3d 1283 (Fed. Cir. 2003).
[48] *See Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F.Supp.2d 1294, 1304 (CIT 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005).
[49] *See* 19 CFR 351.301(c)(1); 19 CFR 351.302(d); 19 CFR 351.104(a)(2).

through verification, which would conflict with Commerce's ability to set and enforce its own deadlines.[50] In doing so, Commerce would then be required to allow parties to comment on any new factual information as required under 19 CFR 351.301. Commerce then would be forced to either extend or conduct a second verification or possibly rely on unverified information. The Act requires Commerce to allow parties to comment on record information, prohibits Commerce from relying on unverified information, and nothing in the Act contemplates mandating that Commerce conducts repeated international trips to verify new information submitted at previous verification trips. Doing so would be unadministrable and impractical. Nevertheless, under respectful protest, Commerce accepted Fuzhou Hengli's revised material allocations and databases consistent with the CIT's *Remand Order*.

## IV. INTERESTED PARTY COMMENTS

*Fuzhou Hengli's Comments*:

The following is a verbatim summary of argument submitted by Fuzhou Hengli. For further details, *see* Fuzhou Hengli Comments at 2.

> Fuzhou Hengli agrees that Commerce complied with the Court's order insofar as it issued a supplemental questionnaire allowing Fuzhou Hengli to cure the alleged deficiency, and used the information to calculate a margin. Further, Fuzhou Hengli has found no errors in the margin calculation itself.
>
> It is unclear why Commerce also took this opportunity to repeat its erroneous arguments regarding its illegal use of a surrogate value for a material that was not used by Fuzhou Hengli. That issue was not yet addressed by the Court and not remanded to Commerce at this point in time. In any event, Fuzhou Hengli has addressed this issue extensively in its briefs in this litigation, including each of the arguments repeated by Commerce in the redetermination, and incorporates those briefs by reference. For the record, Fuzhou Hengli asserts that the use of a material not specific to the input in question, as done by Commerce, was illegal in the investigation, and continues to be illegal in this Redetermination.

---

[50] *See ArcelorMittal USA LLC v. United States*, 399 F.Supp.3d 1271, 1279 (CIT 2019) ("Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits").

> It is also unclear why Commerce has addressed the issue of critical circumstances at this time. That issue is clearly not ready to be addressed until after the surrogate value issue is settled. Fuzhou Hengli will address both of these issues fully with the Court at the proper time.

*American Paper Plate Coalition's Comments*

The following is a verbatim summary of argument submitted by American Paper Plate Coalition. For further details, *see* American Paper Plate Coalition Comments at 2-4.

> Commerce's {Draft Results of Redetermination is} fully consistent with the Court's holding in {the *Remand Order*}. The Court ordered Commerce to provide {Fuzhou Hengli} an opportunity on remand to cure its paperboard input CONNUM-reporting deficiencies, pursuant to section 782(d) of {the Act}, and it did so.
>
> Furthermore, Commerce correctly applied a simple average of the {AUVs} of {HS} 4810.32 and 4810.92 to determine the surrogate value for the paperboard input used to make paper plates, because {HS} 4810.32 represents a product that has a basis weight of more than 150g/m2, which reflects the basis weight of the paperboard used in the paper plates sold by {Fuzhou Hengli} during the {period of investigation}, but not the type of paper, folding boxboard (FBB), used in producing the plates sold by {Fuzhou Hengli} during that period, and {HS} 4810.92, which covers the type of paper, used by {Fuzhou Hengli} in producing its plates, but without any limitation on basis weight – meaning that it includes paperboard that literally could not be used to produce subject paper plates. Commerce's determination of a surrogate value for paperboard inputs was reasonable, consistent with the Court's order to revisit that issue on remand, and supported by the substantial evidence on the record.
>
> In addition, Commerce's determination that critical circumstances exist for {Fuzhou Hengli}, in accordance with section 733(e) of the Act, is lawful and supported by substantial evidence on the record, as the statutory criteria for knowledge of sales below fair value, material injury and massive imports by {Fuzhou Hengli} were met.
>
> Finally, Commerce correctly indicated that it intends to file its remand under protest. The Court mistakenly believed that Commerce had definitive knowledge of the extent of {Fuzhou Hengli's} misreported FOPs when it issued Hengli a supplemental questionnaire, in part based on an unfortunate legal and factual argument made by the Government in its brief to the Court.
>
> However, as Commerce points out in the {Draft Results of Redetermination}, Commerce did not discover the extent of {Fuzhou Hengli's} misreporting until verification. Accordingly, Commerce was under no obligation to provide {Fuzhou Hengli} with an opportunity to remedy its misreported FOPs under section 782(d) of the Act because, unlike {Fuzhou Hengli}, Commerce was unaware of the extent of those deficiencies until it was too late to remedy that deficiency at verification. Thus, the { American Paper Plate Coalition} supports Commerce filing the remand

redetermination under protest, as the Court's holding was based on an erroneous understanding of the facts on the administrative record.

**Commerce's Position:**

The American Paper Plate Coalition does not object to Commerce's Draft Results of Redetermination. Fuzhou Hengli, although content with the results, disapproves of the agency revisiting its underlying decisions on SVs and critical circumstances. Fuzhou Hengli's argument is not only premised on the improper view that the *Remand Order* restricts the agency, but also misconstrues the scope of the CIT's instructions. Indeed, contrary to Fuzhou Hengli's claim, Commerce's SV and critical circumstances decisions were previously predicated on the agency's application of AFA. And as the CIT explained, the Court "may revisit {these} issue{s} after remand as appropriate"[51] It follows, then, that, that these issues cannot be divorced from one another. For example, because Commerce is no longer applying AFA, the agency must address the requisite surrogate value determination in order to calculate a dumping margin that is not based on AFA. Furthermore, the Court did not preclude the agency from revisiting these issues on remand. This is consistent with the principle that Courts "generally disfavor limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue."[52] Fuzhou Hengli's constrained interpretation is also inconsistent with Commerce's statutory obligation to undertake a fully balanced examination that produces accurate results.[53] Consequently, Commerce's decision to address SV selection and critical circumstances on remand was consistent with the parameters established in the *Remand Order.*

As the CIT observed, in the *Final Determination*, as a result of its total AFA determination, Commerce did not make an SV determination for Fuzhou Hengli's paperboard

[51] *See Remand Order* at 27.
[52] *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012).
[53] *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038–39 (Fed. Cir. 2003) ("By sharply limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results.").

input, and found that critical circumstances existed for Fuzhou Hengli.[54] Without making an SV determination, Fuzhou Hengli's submitted corrected FOPs alone cannot be used to calculate normal value for determining the antidumping duty margin under section 773(c)(1)(B) of the Act. For that reason, Commerce was required to use SVs to calculate a rate once, pursuant to the *Remand Order*, it decided to no longer rely on AFA. Indeed, Commerce's analysis of SVs was a necessary consideration to effectuate the *Remand Order*.

Additionally, section 703(e) of the Act requires Commerce to promptly make a critical circumstances determination based on the information available at the time. As the CIT observed, in the *Final Determination*, Commerce used AFA to find that critical circumstances existed.[55] Once Fuzhou Hengli submitted its revised FOP database pursuant to the "Opportunity to Cure Deficiencies," there was different information available on the record for Commerce to use in its critical circumstances analysis.[56] As a result, it was necessary for Commerce to perform a renewed critical circumstances analysis to reflect the information available to it for purposes of its Draft Results of Redetermination pursuant to section 703(e) of the Act.

For the foregoing reasons, Commerce's decision to revisit its SV and critical circumstances determinations on remand was consistent with the parameters established by the *Remand Order.*

## V. FINAL RESULTS OF REDETERMINATION

There is no change from the Draft Results of Redetermination for these final results of redetermination. Consistent with the *Remand Order*, and under respectful protest,[57] Commerce continues to find no basis to rely on AFA; on remand, Commerce has relied on Fuzhou Hengli's CONNUM-specific FOP reporting to calculate an estimated weighted-average dumping margin

[54] *See Final Determination* IDM at 4 and 18; *see also Remand Order* at 27.
[55] *See Final Determination* IDM at 2-5; *see also Remand Order* at 27.
[56] *See* Draft Results of Redetermination at 8-12; *see also* Critical Circumstances Memorandum.
[57] *See Viraj*, 343 F.3d at 1376.

of 91.83 percent.[58] In doing so, Commerce simple averaged the AUVs from the HS subheadings 4810.32 and 4810.92 to value paperboard.[59] Furthermore, Commerce continues to find that critical circumstances exist.[60]

Because the weighted-average dumping margin for Fuzhou Hengli is different from that in the *Final Determination*, Commerce intends to issue a *Timken* notice[61] with the amended final determination should the CIT sustain these final results of redetermination.

8/28/2026

X

Signed by: CHRISTOPHER ABBOTT