**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| **FUZHOU HENGLI PAPER CO., LTD.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**AMERICAN PAPER PLATE COALITION,**<br><br>**Defendant-Intervenor.** | Court No. 25-00064 |

# DEFENDANT-INTERVENOR'S COMMENTS IN SUPPORT OF FINAL REMAND RESULTS

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Date: October 9, 2026

*Counsel to Defendant-Intervenor*
*American Paper Plate Coalition*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. COMMERCE PROVIDED HENGLI THE OPPORTUNITY TO CORRECT ITS FOP REPORTING DEFICIENCIES AND CALCULATED HENGLI'S AD MARGIN USING THOSE CORRECTED CONNUMS CONSISENT WITH THE COURT'S ORDER ..... 5

IV. COMMERCE'S SURROGATE VALUE AND CRITICAL CIRCUMSTANCES DETERMINATIONS ARE SUPPORTED BY SUBSTANIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW ..... 5

A. Commerce Correctly Determined The Paperboard Surrogate Value Using A Simple Average Of The AUVs Of HTS Subheadings 4810.32 And 4810.92 ..... 8

B. Commerce Correctly Determined That Critical Circumstances Existed For Hengli ..... 12

V. CONCLUSION ..... 14

## TABLE OF AUTHORITIES

### CASES

*Changzhou Trina Solar Energy v. United States*,
975 F.3d 1,318 (Fed. Cir. 2020) .......... 11

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
701 F.3d 1,367 (Fed. Cir. 2012) .......... 6

*Nation Ford Chem. Co. v. United States*,
166 F. 3d 1,373 (Fed. Cir. 1999) .......... 11

*Reiner Brach GmbH & Co.KG v. United States*,
206 F. Supp. 2d at 1,323 (Ct. Int'l Trade 2002), appeal dismissed sub nom., 49 F. App'x 296 (Fed. Cir. 2002) .......... 4

*Risen Energy Co., Ltd. v. United States*,
122 F. 4th 1,348 (Fed. Cir. 2024) .......... 11

*Stupp Corp. v. United States*,
Consol. Ct. No. 15-00334, slip op. 26-113 (Ct. Int'l Trade Sept. 15, 2026) .......... 6, 7

### STATUTES

19 U.S.C. § 1673b(e) .......... 3, 5

19 U.S.C. § 1673b(e)(1) .......... 5

19 U.S.C. § 1673d(a)(3) .......... 12

19 U.S.C. § 1673d(a)(3)(A)(i) .......... 12

19 U.S.C. § 1673d(a)(3)(A)(ii) .......... 12

19 U.S.C. § 1673d(a)(3)(B) .......... 13

19 U.S.C. § 1677(18)(A) .......... 2

19 U.S.C. § 1677a(c) .......... 2

19 U.S.C. §§ 1677a(c)(1) – (4) .......... 2

19 U.S.C. §§ 1677e(a) & (b) .......... 2, 3

19 U.S.C. § 1677m(d) .......... 3, 4

## REGULATIONS

19 C.F.R. § 351.206 .......... 3

19 C.F.R. § 351.206(h) .......... 13

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Certain Paper Plates from the People's Republic of China*, 90 Fed. Reg. 8,271 (Jan. 28, 2025) *(fin. determ.)*, and accompanying Issues and Decision Memorandum .......... 1, 2, 3, 6

*Paper Plates from China, Thailand, and Vietnam; Determinations, Investigation Nos. 701-TA-704-705 and 731-TA-1664-1666 (Preliminary)*, 89 Fed. Reg. 18,970 (Int'l Trade Comm. Mar. 15, 2024) .......... 13

## I. INTRODUCTION

On behalf of Defendant-Intervenor, the American Paper Plate Coalition ("APPC"), we respectfully submit comments in support of the *Remand Results* filed with the U.S. Court of International Trade ("CIT") in this litigation on August 28, 2026. *Final Results of Redetermination Pursuant to Court Remand, Certain Paper Plates from the People's Republic of China, Court No. 25-00064* (Ct. Int'l Trade 2026) (Aug. 28, 2026) (CM/ECF Doc. No. 71) ("*Remand Results*"), REM P.R. 1.[1] These comments are filed in accordance with the court's Amended Scheduling Order, issued on August 4, 2026 (CM/ECF Doc. No. 69).

The *Remand Results* were issued by the United States Department of Commerce ("Commerce") in accordance with the court's June 11, 2026, order, remanding the case to the agency. *Fuzhou Hengli Paper Co., Ltd. v. United States*, Slip Op. 26-59, Ct. No. 25-00064 (Ct. Int'l Trade June 11, 2026) (CM/ECF 67) ("*Remand Order*"). The litigation pertains to a challenge by Plaintiff Fuzhou Hengli Paper Co., Ltd. ("Hengli") to Commerce's final affirmative determination in the less than fair value investigation of certain paper plates from China. *Certain Paper Plates from the People's Republic of China*, 90 Fed. Reg. 8,271 (Jan. 28, 2025) *(fin. determ.)* ("*Final Determination*"), P.R. 360, and accompanying Issues and Decision Memorandum ("*IDM*"), P.R. 354.

The *Remand Results* fully comply with the Court's *Remand Order.* Accordingly, the Court should affirm the *Remand Results* in full.

---

[1] Public documents in the investigation administrative record are designated as "P.R." and confidential documents are designated as "C.R." Documents in the remand redetermination administrative record are designated as "REM P.R." and "REM C.R."

## II. BACKGROUND

China is a non-market economy country pursuant to 19 U.S.C. § 1677(18)(A), *i.e.*, a country with an economy that does "not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." Thus, in accordance with 19 U.S.C. § 1677a(c), Commerce does not use prices of sales of paper plates in China to establish normal value ("NV") (the price in the home market that is compared to U.S. prices), and instead calculates a proxy NV for the antidumping ("AD") calculation using the factors of production ("FOPs") reported by the examined respondents, which are then valued using surrogate values ("SVs") obtained from a comparable market economy country. 19 U.S.C. §§ 1677a(c)(1) – (4).

In the *Final Determination*, Commerce applied facts available with an inference adverse to the respondent's interests ("AFA"), pursuant to 19 U.S.C. §§ 1677e(a) & (b), in determining Hengli's AD margin because of Hengli's failure to report control number ("CONNUM")[2]-specific FOPs. *IDM* at 10-14, P.R. 354.

Because Commerce rejected Hengli's data and applied a rate based entirely on AFA, Commerce did not value any of Hengli's inputs, including paperboard,[3] on an individual basis. Commerce did, however, decide how to value paperboard when calculating the AD margin for another respondent in the investigation. Commerce addressed the arguments raised by APPC, Hengli, and the other respondent on that issue in its *IDM*. *Id.* at 15-20. Commerce concluded

---

[2] A control number or "CONNUM" is a multi-digit number whose digits represent, from first to last, the most important physical characteristics of the subject merchandise. In a general sense, it is akin to a Stock Keeping Unit or SKU. CONNUMs form the heart of the antidumping calculations, because they determine which U.S. sales and NVs are compared to one another to calculate the dumping margin.

[3] Paperboard is the most significant input used to produce paper plates.

that the most appropriate SV to use in calculating an AD margin for the other respondent was a simple average of average unit values ("AUVs") derived from Harmonized Tariff Schedule ("HTS") subheadings 4810.32 and 4810.92. *Id.* at 20.

Finally, as part of its AFA determination Commerce determined that critical circumstances existed for Hengli, pursuant to 19 U.S.C. §§1677e(a) & (b), 19 U.S.C. § 1673b(e), and 19 C.F.R. § 351.206, concluding that Hengli imported massive amounts of paper plates after the Petition was filed in an attempt to beat the preliminary imposition of duties. *Id.* at 2-5.

Hengli appealed each of these determinations. In its *Remand Order,* the court held that Commerce was aware that Hengli's FOP responses were deficient when it issued a supplemental questionnaire on July 23, 2024, but did not "distinctly inform" Hengli of that deficiency in accordance with the requirements of 19 U.S.C. § 1677m(d). *Remand Order*, slip op. at 25-26. The Court reached this decision, in part, by relying on certain statements made in the Defendant's Brief. *Id.* at 25 nn. 3-4 (citing pages 13 & 21 of the Defendant's Response to Plaintiff's Rule 56.2 Motion For Judgment Upon the Agency Record (Sept. 30, 2025) (CM/ECF Doc No. 44), in which the Defendant argued that the supplemental questionnaire at issue met the notice requirements of 19 U.S.C. § 1677m(d)). Accordingly, the court ordered Commerce to provide Hengli "with sufficient notice of the deficiencies in the factors of production reporting" and an "opportunity to cure the deficiencies." *Id.* at 27. With respect to the paperboard SV and critical circumstances determinations, the Court held that it might "revisit" those issues after remand "as appropriate." *Id.*

On July 2, 2026, Commerce issued a memorandum allowing Hengli to cure its FOP reporting deficiencies. On July 15, 2026, Hengli submitted a response with new CONNUM-specific FOP data, which Commerce accepted and used as the basis for new AD margin

calculations in both its draft and final *Remand Results*. *Remand Results* at 2-5, REM P.R. 1. Commerce accepted and used Hengli's revised data, however, under respectful protest, explaining that throughout most of the investigation it was unaware that Hengli's reported FOPs did not comply with its instructions to report FOPs on a CONNUM-specific basis, and only understood the extent of the deficiencies in Hengli's FOP reporting after conducting verification. *Id.* at 12.[4]

Because Commerce received Hengli's revised FOP data and used them to calculate an AD margin, Commerce appropriately revisited both the SV and critical circumstances determinations. Commerce explained that because basis weight is a critical component in the manufacture and sale of paper plates, and because "all of Fuzhou Hengli's paperboard inputs weighed more than 150g/m$^2$," HTS subheading 4810.32 was "more specific to the basis weight paperboard inputs used by Fuzhou Hengli," while HTS subheading 4810.92 better reflected the type of paperboard used by Hengli to make the subject merchandise. *Remand Results* at 7-8.

Accordingly, Commerce concluded, as it had in the *Final Determination*, that a simple average of the AUVs from both HS subheadings 4810.32 and 4810.92 was appropriate to use as the SV for Hengli's paperboard input. *Id.* at 8.

---

[4] The APPC agrees with Commerce's description of the agency's knowledge and the record information. *See* Letter from The Bristol Group to Sec'y of Commerce, *Paper Plates from the People's Republic of China: Comments on Draft Results of Redetermination Pursuant to Court Remand* (Aug. 11, 202) at 12-17, REM P.R. 2. As the CIT has held, under 19 U.S.C. § 1677m(d), absent Commerce's knowledge that a deficiency existed, Commerce cannot be expected to alert a respondent as to a deficiency that it does not know exists in the first place, as the record establishes was the case below. *See Reiner Brach GmbH & Co.KG v. United States*, 206 F. Supp. 2d at 1,323, 1,333 (Ct. Int'l Trade 2002), appeal dismissed sub nom., 49 F. App'x 296 (Fed. Cir. 2002). In this case, notwithstanding the litigation position initially taken by the government counsel, Commerce was not fully aware of the extent of Hengli's FOP reporting deficiencies, and producer Ecosource's ability to correct those deficiencies, until verification.

Finally, with respect to Commerce's critical circumstances analysis and determination, Commerce reviewed each of the statutory criteria found in 19 U.S.C. § 1673b(e)(1). On the basis of those criteria, Commerce concluded that Hengli "met the statutory criteria for knowledge of sales below fair value and material injury" as well as "massive imports." *Id.* at 11. Commerce therefore determined that critical circumstances existed for Hengli. *Id.* at 8.

On September 25, 2026, Hengli filed its opposition comments in this litigation. Plaintiff's Comments in Opposition to Remand Results (Sept. 25, 2026) (CM/ECF Doc. No. 73) ("*Hengli's Comments*").

## III. COMMERCE PROVIDED HENGLI THE OPPORTUNITY TO CORRECT ITS FOP REPORTING DEFICIENCIES AND CALCULATED HENGLI'S AD MARGIN USING THOSE CORRECTED CONNUMS CONSISENT WITH THE COURT'S ORDER

In accordance with the Court's *Remand Order*, Commerce provided Hengli an opportunity to correct and report its deliberately inaccurate allocations of paperboard inputs on a CONNUM-specific basis, and then used those revised data to calculate an AD margin for Hengli. *Remand Results* at 5, REM P.R. 1. Hengli agrees. *Hengli's Comments* at 2. Accordingly, Commerce has issued a redetermination on this issue consistent with the court's *Remand Order*.

## IV. COMMERCE'S SURROGATE VALUE AND CRITICAL CIRCUMSTANCES DETERMINATIONS ARE SUPPORTED BY SUBSTANIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

In addition to calculating its AD margin using Hengli's revised data, on remand Commerce correctly revisited the SV for paperboard in order to calculate a new AD margin for Hengli. In the *Final Determination*, Hengli's AD margin was 515.40 percent. *Final Determination*, 90 Fed Reg. at 8272, P.R. 360. In the *Remand Results*, after accepting Hengli's new data and revisiting the other issues in this litigation, Commerce calculated an AD margin of 91.83 percent for Hengli. *Remand Results* at 2, REM P.R. 1.

In addition, Commerce also correctly conducted a critical circumstances analysis for Hengli using the shipment data Hengli had reported in the underlying investigation in conjunction with the new AD margin. *Id.* at 8-11. Commerce revisited both additional issues before the court, issued draft remand results to the parties for comment, received comments from the APPC and Hengli, and responded to those comments in its final remand redetermination.

Hengli argues that Commerce's analysis of critical circumstances "is clearly not ready to be addressed until after the surrogate value issue is settled and Fuzhou Hengli's margin is recalculated, as the dumping margin is an integral element in the critical circumstances analysis." *Hengli's Comments* at 4. There is no merit to that argument, however, because Commerce's *Remand Results* are an agency determination, subject to appeal, and therefore Commerce was obligated to issue a *complete* remand redetermination that revised Hengli's AD margin calculations.

It is well-established that on remand federal agencies "possess broad authority to reconsider the record before them and formulate an appropriate approach consistent with the power given to them by Congress." *Stupp Corp. v. United States*, Consol. Ct. No. 15-00334, slip op. 26-113 (Ct. Int'l Trade Sept. 15, 2026) ("*Stupp*") at 13 (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 201 (1947) ("After the remand was made, therefore, the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress")). Indeed, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has held that it generally disfavors "limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue." *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1,367, 1,374-75 (Fed. Cir. 2012) (citing *Am. Silicon Techs. v. United States*, 334 F.3d 1,033, 1,038-39 (Fed. Cir. 2003) ("By sharply limiting Commerce's

inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results")). Thus, an agency is generally permitted on remand to offer "a fuller explanation of the agency's reasoning at the time of the agency's action" or deal with the contested problem anew. *Stupp*, slip op., at 13 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*. 591 U.S. 1, 20-21 (2020)).

Under Hengli's argument, Commerce was required to accept the revised FOP data, but then would be required to continue to rely on its prior determination for the other two issues in dispute – even though, for example, its critical circumstances determination in the *Final Determination* was based on the same application of AFA to Hengli struck down by the court in this case. *See IDM* at 2-5 ("However, as Commerce is applying total AFA to Fuzhou Hengli for this final determination as discussed below at Section VI and Comment 1, we are finding that critical circumstances exist for Fuzhou Hengli."), P.R. 354.

Under Hengli's interpretation of Commerce's remand obligations, Commerce could make no further modification to its AD margin calculation unless the court later ordered an additional remand redetermination. That understanding of Commerce's obligations is particularly illogical in this case, because as Commerce explained, once "Hengli submitted its revised FOP database pursuant to the 'Opportunity to Cure Deficiencies,' there was different information available on the record for Commerce to use in its critical circumstances analysis." *Remand Results* at 16. In other words, Hengli's argument is that Commerce cannot make any additional changes to its determinations on remand, even though Commerce was affirmatively aware that its earlier critical circumstances analysis required reanalysis and revision. It is a nonsensical claim.

Furthermore, no statute, regulation or rule of this court requires that the court or Commerce take such additional steps before the agency can revisit the outstanding issues in the

litigation on remand. Under Hengli's interpretation of Commerce's obligations, in every appeal with multiple issues Commerce would be required to issue two or more remand redeterminations, even when issues are intrinsically related, such as they are here. Such a requirement would waste the time of both the court and the other parties to the litigation, and potentially and unnecessarily drag litigation on for years. Notably, Hengli cites to no legal authority for such an unreasonable claim. *See Hengli's Comments* at 3-4.

Accordingly, Commerce properly and lawfully addressed both the SV and critical circumstances issues in detail in the *Remand Results*.

### A. Commerce Correctly Determined The Paperboard Surrogate Value Using A Simple Average Of The AUVs of HTS Subheadings 4810.32 And 4810.92

Commerce's SV determination is supported by substantial evidence on the record and otherwise in accordance with law. Early in the investigation, Commerce requested comments from interested parties on the physical characteristics of paper plates that should be used to define individual types of paper plate products in Commerce's AD margin calculations, and then placed a product characteristics hierarchy on the record after considering those submissions. Memorandum from Bryan Hansen, Senior International Trade Analyst, AD/CVD Operations, Office I, to the File, *AD Investigation of Certain Paper Plates from China, Thailand, and the Socialist Republic of Vietnam: Product Characteristics Memorandum* (Apr. 23, 2024), Attachment at 2 ("*Product Characteristics Memorandum*"), P.R. 140. This exercise was necessary to create unique CONNUMs for each discrete product type, which are then used in Commerce's AD margin calculations.

In the *Product Characteristics Memorandum*, Commerce identified 17 product characteristics, ranking them by their order of importance. The first six product characteristics identified in the *Product Characteristics Memorandum* were: 1) the number of paper plates in

each wrapped package; 2) the surface area of the paper plates; 3) the thickness of the paperboard used to produce the plate (*i.e.*, the caliper); 4) the "basis weight," expressed in grams per square meter, of the paperboard from which the paper plate is made; 5) the type of paper fiber used to produce the plate; and 6) the type of paper used to produce the plate. *Id.*, Attachment, at 1-3.

"Basis weight" was described as the measurement of the "density" of the "paper/paperboard input of which the paper plate is made." *Id.* at 2. The basis weight of paper is commonly described in terms of the number of grams a square meter of the paper weighs, i.e., the "GSM" or $G/m^2$. The heavier the paper, the greater the basis weight. Paper plates require paperboard of sufficient rigidity, and hence basis weight, to be fit for purpose and not collapse when used.

The reason Commerce determined that the thickness and basis weight of the paperboard used to produce paper plates were considered the most important physical characteristics is no secret. Regardless of whatever *type* of paperboard subject merchandise is produced from, if it does not have a sufficiently heavy *basis weight*, it will not be sufficiently sturdy and rigid for its intended purposes, holding and conveying food items.

As Commerce explained in the *Remand Results*, "basis weight is a critical component in the manufacture and sale of paper plates as supported by the fact that" Commerce ranked basis weight fourth out of 13 product characteristics that comprise CONNUMs "in the investigation, superseded in the hierarchy of product characteristics only by paper package count and plate dimensions (plate surface area) and nominal caliper (thickness)." *Remand Results* at 7, REM P.R. 1.

In determining an appropriate SV for paperboard inputs used in Hengli's paper plates, there were two potential Turkish HTS subheadings on the record. The HTS subheading

advocated by Hengli, HTS 4810.92, covers Folding Box Board ("FBB") – a type of paperboard Hengli used. The problem, however, is that HTS 4810.92 "does not specify basis weight or chemical fiber content" of the paper. *Id.* at 6.

The other HTS subheading on the record, HTS 4810.32, covers paperboard with a basis weight of more than 150 g/m$^2$, precisely the range of weights needed to produce functional paper plates. Commerce observed on remand that "the majority of Fuzhou Hengli's paperboard input is greater than 150 g/m$^2$." *Id.* at 7. The concern about that HTS subheading, as Hengli argued in the underlying investigation, was that it does not cover the *type* of paperboard that was used in the plates Hengli exported during the POI.

Nonetheless, if given the choice between the two HTS subheadings to select an SV, consistent with Commerce's product characteristics hierarchy, Commerce could have reasonably used an AUV based solely on HTS 4810.32 because under Commerce's product characteristics hierarchy, the basis weight of a paper plate is more important than the type of paper used to make the paper plate.

Because HTS subheading 4810.92 provides no basis weight identifiers, it covers all paper imported under that HTS subheading, including paper that weighs more than 150 g/m$^2$ and paper that weighs less than 150 g/m$^2$. For purposes of surrogate valuation, that could lead to significantly distorted results. Imports of paper under that HTS subheading could be heavy and rigid, but could also be lightweight and weak, and completely unsuitable for the use as paper plates that convey food items. In other words, many products imported under the HTS 4810.92 subheading would never be used in the manufacture of paper plates, and there would be a significant risk of significant undervaluation if Commerce used only that HTS subheading to value paperboard inputs.

Accordingly, Commerce reasonably determined on remand that it was important to take *both* basis weight and paper type characteristics into consideration in selecting an SV for Hengli's paperboard inputs, and applied a simple average of the AUVs for both HTS subheadings as the SV for paperboard inputs. *Id*. at 8.

The Tariff Act "accords Commerce wide discretion in the valuation of factors of production" ("FOP") because it "does not define what constitutes the 'best available information.'" *Nation Ford Chem. Co. v. United States*, 166 F. 3d 1,373, 1,377 (Fed. Cir. 1999); *Risen Energy Co., Ltd. v. United States*, 122 F. 4th 1,348, 1,353 (Fed. Cir. 2024) ("*Risen*") (citing *Changzhou Trina Solar Energy v. United States*, 975 F.3d 1,318, 1,321 (Fed. Cir. 2020) ("*Changzhou Trina*")).

Furthermore, the Federal Circuit has recognized that "Commerce 'generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Changzhou Trina*, 975 F.3d at 1,331 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1,378, 1,386 (Fed. Cir. 2014)).

In this case, the SV used by Commerce met all of these criteria – the values were publicly available, product-specific, reflected a broad market average, and were contemporaneous with the POI. In addition, they "corresponded to the particular input" at issue; the paperboard type and basis weights used by Hengli to produce paper plates. *Risen*, 122 F. 4th at 1,354.

Accordingly, Commerce's determination to use a simple average of the AUVs for HTS subheadings 4810.92 and 4810.32 in the *Remand Results* was clearly within its lawful discretion, reasonable, and supported by substantial evidence on the record. This court should therefore

afford Commerce the appropriate amount of discretion, and affirm its selection on remand of an SV for Hengli's paperboard input.

**B. Commerce Correctly Determined That Critical Circumstances Existed For Hengli**

Furthermore, on remand Commerce properly determined that critical circumstances existed with respect to paper plate shipments from Hengli, pursuant to section 19 U.S.C. § 1673d(a)(3). *Remand Results* at 8-11, REM P.R. 1. Commerce examined the following: (1) the evidence presented in the petitioner's critical circumstances allegation; (2) import statistics released by the U.S. International Trade Commission (ITC); and (3) shipment information submitted to Commerce by the respondent selected for individual examination. *Id.* at 8-9.

Regarding the history of dumping and material injury, Commerce considered current or previous AD orders on subject merchandise from the country in question in the United States and current AD orders imposed by other countries with regard to imports of the same merchandise. Commerce acknowledged that, as this was an investigation involving a new product, there were no previous orders on paper plates from China in the United States. Therefore, Commerce found no history of injurious dumping of the subject merchandise pursuant to 19 U.S.C. § 1673d(a)(3)(A)(i). *Id.* at 9.

Commerce then considered the respondent's knowledge of sales below fair value and material injury, in accordance with 19 U.S.C. § 1673d(a)(3)(A)(ii). *Id*. With respect to this criterion, Commerce typically considers margins of 25 percent or more for export price sales and 15 percent or more for constructed export price sales sufficient to impute importer knowledge of sales below fair value. Hengli's U.S. sales were all export price sales, and Commerce properly found that its margin of 91.83 percent easily exceeded the threshold of 25 percent and, thus, was more than adequate to impute knowledge of sales below fair value. *Id.*

With respect to its material injury analysis, Commerce normally looks to the injury determination made by the U.S. International Trade Commission ("ITC"). On March 11, 2024, the ITC preliminarily found that there was a "reasonable indication" of material injury to the domestic industry because of the imported subject merchandise. *Paper Plates from China, Thailand, and Vietnam; Determinations, Investigation Nos. 701-TA-704-705 and 731-TA-1664-1666 (Preliminary)*, 89 Fed. Reg. 18,970, 18,970-971 (Int'l Trade Comm. Mar. 15, 2024). Commerce concluded that the ITC's preliminary "reasonable indication" of injury determination was sufficient to impute knowledge of the likelihood of material injury to importers for purposes of its critical circumstances analysis. *Remand Results* at 10-11. That conclusion was reasonable and consistent with Commerce's practice.

Finally, with respect to whether the volume of imports was massive, pursuant to section 19 U.S.C. § 1673d(a)(3)(B) and 19 C.F.R. § 351.206(h), on remand Commerce compared the import volumes of the subject merchandise between the base period and the comparison period, and evaluated whether the imports during the comparison period increased by 15 percent or more compared the base period. *Id.* at 11-12.

During the investigation, Commerce had instructed Hengli to report monthly shipment data from July 2023 through September 2024 (the preliminary determination's publication month-end) by no later than fifteen calendar days after the last day of the given reporting month. However, Hengli filed its July 2024 shipments data after the deadline, and Commerce properly rejected and removed it from the record. *Remand Results* at 11 (chronicling Commerce's request, Hengli's late submission, and Commerce's rejection of that late submission).

Given Hengli's failure to file the July 2024 month of shipment data by the deadline, on remand Commerce appropriately used data from the month with the highest shipment volume

from among the seven months of shipment data Hengli had timely submitted, for that month. *Remand Results* at 11, n. 45. *See also* Memorandum from Lingjun Wang, International Compliance Analyst, AD/CVD Operations, Office VII, To File, *Critical Circumstances Analysis for Draft Remand* (Aug. 3, 2026), REM P.R. 4; REM C.R. 2. Based on the available data from the Global Trade Atlas, on remand Commerce used a base period of July 2023 through January 2024, and a comparison period of February 2024 through August 2024. *Remand Results* at 11, P.R. 1.

With this framework, Commerce correctly determined that Hengli's imports increased by more than 15 percent during the comparison period and were thus massive. *Id.*

In sum, Commerce's critical circumstances analysis was in full compliance with the statute, regulation, and its practice, and supported by the substantial evidence on the record. Accordingly, the court should affirm Commerce's determination in the *Remand Results* that critical circumstances existed for Hengli during the period of investigation.

## V. CONCLUSION

Commerce's *Remand Results* comply fully with the Court's *Remand Order*. Accordingly, the Court should affirm the *Remand Results* as supported by substantial evidence and otherwise in accordance with law.

* * *

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**

*Counsel to the American Paper Plate Coalition*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Comments of Defendant-Intervenors American Paper Plate Coalition in Support of Final Remand Results, as computed by The Bristol Group PLLC's word processing system, is 4,144 words, below the 10,000-word limit pursuant to Standard Chambers Procedures 2(B)(1)(b).

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

*Counsel to Defendant-Intervenor American Paper Plate Coalition*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of October, 2026, I electronically filed a copy of the forgoing using the CM/ECF system, which sent a notification of such filing to counsel of record for all parties.

*/s/ Adam H. Gordon*
Adam H. Gordon